**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| COVENANT MEDICAL CENTER | ) | |
| 3615 19th Street | ) | |
| Lubbock, TX 79410 | ) | |
| | ) | Case No. _____ |
| *Plaintiff*, | ) | |
| | ) | |
| *v.* | ) | |
| | ) | |
| ROBERT F. KENNEDY, JR, in his official | ) | |
| capacity as Secretary of Health and Human | ) | |
| Services, | ) | |
| 200 Independence Avenue SW | ) | |
| Washington, DC 20201, | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

**COMPLAINT**

## I.    INTRODUCTION

In June 2024, a group of hospitals in the Northern District of Texas, including Plaintiff Covenant Medical Center, challenged a new Medicare reimbursement rule (the "Exclusion Rule") promulgated by the Secretary of Health and Human Services.  That rule sought to deny reimbursement for a large swath of patients served by hospitals that disproportionately care for low-income patients. In August 2024, Judge Pittman held that rule unlawful in a decision that he deemed "simple on the merits."  *See* Case No. 4:24-cv-000432-P, ECF Nos. 33–35. The Fifth Circuit reversed solely on jurisdictional grounds, without addressing the merits of the hospitals' challenge or otherwise opining on the lawfulness of the Secretary's rule.  *Baylor All Saints Med. Ctr. v. Kennedy*, 161 F.4th 298 (5th Cir. 2025).  Having now fully satisfied those jurisdictional prerequisites, as expressly recognized by the government in administrative proceedings below, Plaintiff Covenant Medical Center brings this lawsuit challenging the same rule on the same grounds previously found meritorious by this Court.

Covenant Medical Center ("Covenant") is a hospital located in the State of Texas that participates in the federal Medicare program.  Covenant challenges the final decision of the Secretary of the United States Department of Health and Human Services ("the Secretary") to deny a significant portion of its Medicare disproportionate share hospital ("DSH") payments.  DSH payments are a statutorily required supplemental payment to Medicare hospitals that help offset the cost of providing care to large numbers of low-income Medicare and Medicaid-eligible individuals.  The Secretary's Exclusion Rule, effective October 1, 2023, permanently reduces Covenant's Medicare DSH payments beginning with the hospital's cost reporting period ending June 30, 2024.  The Exclusion Rule inflicts two distinct adverse impacts on Covenant and other DSH hospitals in Texas.  First, it reduces Covenant's DSH payments by excluding from the DSH calculation individuals who are not traditionally eligible for Medicaid, but whom the Secretary

deemed to be Medicaid-eligible when he approved a Texas Medicaid waiver program that helped pay for their inpatient care. Second, it denies hospitals access to discounts under the federal 340B drug discount program, which Congress adopted to assist safety-net hospitals in combatting the high cost of drugs. *See* 42 U.S.C. § 256b(a)(4)(L). The Secretary's regulation unfairly targets Covenant and other DSH hospitals in states, like Texas, that have elected to provide Medicaid-like benefits to uninsured individuals through uncompensated care pools rather than expand traditional Medicaid benefits to those patients.

The Secretary's new regulation is in direct conflict with the Medicare statute, which requires him to credit such individuals in Covenant's Medicare DSH payments. *See* 42 U.S.C. § 1395ww(d)(5)(F). Indeed, the United States Court of Appeals for the Fifth Circuit has already held that the Medicare statute requires the Secretary to include for purposes of Medicare DSH payments those individuals the Secretary deemed to be Medicaid-eligible by virtue of approving a Medicaid state waiver that renders them eligible to receive medical assistance funded in part by federal Medicaid dollars. *Forrest Gen. Hosp. v. Azar*, 926 F.3d 221, 228–29 (5th Cir. 2019); *see also Bethesda Health, Inc. v. Azar*, 389 F. Supp. 3d 32, 47 (D.D.C. 2019) (favorably citing the Fifth Circuit's interpretation of the statute in *Forrest General*), *aff'd*, 980 F.3d 121 (D.C. Cir. 2020). Indeed, Judge Pittman, in analyzing the same exact merits issue presented by this case, concluded that the Fifth Circuit's "spotted dog" decision "directly controls the Court's inquiry— and clarifies that the Exclusion Rule contradicts the statute's plain text." *See* Case No. 4:24-cv-000432-P, ECF Nos. 33 at 10. As Judge Pittman recognized, the Exclusion Rule is clearly unlawful.

The Secretary's actions will cause Covenant immediate and irreparable harm. The Secretary's DSH payment cuts have significantly reduced Covenant's Medicare reimbursement

for its cost reporting period ending June 30, 2024, and will continue to do so in the future, forcing Covenant to limit services and immediately undertake other cost-cutting measures in the short term. The Exclusion Rule has also prevented Covenant from enrolling in the 340B Program, depriving Covenant of the opportunity to receive critical discounts for outpatient drugs. For these reasons, Covenant seeks entry of an order from this Court: (1) vacating the Secretary's Exclusion Rule because it is contrary to law and arbitrary and capricious; and (2) enjoining the Secretary from further implementing the Exclusion Rule.

## II.    PARTIES

1.     Plaintiff is Covenant Medical Center, a non-profit 355-bed hospital and Level II trauma center that serves the community of Lubbock, Texas and its surrounding areas. Covenant participates in the Medicare Program under Medicare provider number 45-0040. The Secretary has classified Covenant as a Rural Referral Center. Because it serves a high percentage of low-income beneficiaries, Covenant receives an additional payment from Medicare known as a disproportionate share adjustment.

2.     The Defendant, Robert F. Kennedy, Jr., is the Secretary of HHS, which administers the Medicare and Medicaid programs established under titles XVIII and XIX of the Social Security Act. Defendant Kennedy is sued in his official capacity only. The Centers for Medicare & Medicaid Services ("CMS") is the federal agency to which the Secretary has delegated administrative authority over the Medicare and Medicaid programs. References to the Secretary herein are meant to refer to him, his subordinate agencies and officials, and to his official predecessors or successors as the context requires.

### III.    JURISDICTION AND VENUE

3.    Covenant's Medicare reimbursement claims at issue in this case arise under the Medicare statute, title XVIII of the Social Security Act, 42 U.S.C § 1395 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*

4.    Jurisdiction is proper under 42 U.S.C. § 1395oo(f)(1).

5.    Venue is proper in the Northern District of Texas under 42 U.S.C. § 1395oo(f)(1) because the Northern District of Texas is "the judicial district in which the provider is located." Covenant's principal place of business is Lubbock, Texas.  Venue is also proper in this judicial district under 28 U.S.C. § 1391.

### IV.    BACKGROUND

#### A.    The Medicare DSH adjustment

6.    The Medicare program, established as title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, is a federal entitlement program that provides healthcare insurance to the nation's aged and disabled.  Medicare Part A entitles beneficiaries to payment for inpatient hospital services and other institutional health care services such as skilled nursing facility services and home health care services.  Medicare Part B entitles beneficiaries to payment for physician and other medical services such as clinical diagnostic laboratory testing and other diagnostic services.

7.    Prior to 1983, the Medicare program reimbursed hospitals for the actual costs they incurred when providing inpatient care to Medicare beneficiaries.  Congress determined, however, that reimbursing hospitals on a cost basis did not properly incentivize hospitals to lower costs and seek efficiencies in providing care.  Since 1983, hospitals have instead been reimbursed for the inpatient services they provide Medicare beneficiaries pursuant to an inpatient prospective payment system ("IPPS").

8.      Established under subsection 1886(d) of the Social Security Act, the IPPS reimburses hospitals a fixed payment amount for each hospital patient upon their discharge. The unit of fixed payment is referred to as a diagnostic related-group ("DRG"). The Medicare program recognizes hundreds of DRGs, each of which corresponds to a group of related diagnoses with a separate payment rate. 42 U.S.C. § 1395ww(d). For example, patients with pneumonia diagnoses are grouped to a single DRG that has a standardized payment rate. Patients who are admitted for a hip replacement are grouped to a different DRG with a different payment rate.

9.      The Secretary determines the final payment rate for each DRG in advance of each fiscal year by applying a formula set forth in the Medicare statute that ties the rate for each DRG to the relative number of resources needed to treat the diagnoses grouped to that DRG. *Id*. Hospitals are then reimbursed the applicable fixed DRG payment amount for each Medicare inpatient they treat in the forthcoming fiscal year regardless of the patient's length of stay. By setting prospectively determined, fixed rates for hospital care, Congress intended to incentivize hospitals to seek efficiencies and lower the cost of care. In order to do so, hospitals project the total amount of Medicare reimbursement they will receive each year, relying upon the Secretary's prospectively determined rates, and they budget accordingly.

10.     In 1986, Congress amended title XVIII of the Social Security Act to require the Secretary to supplement the DRG rates for hospitals that serve "a significantly disproportionate number of low-income patients ...." 42 U.S.C. § 1395ww(d)(5)(F)(i)(I). Congress mandated these supplemental payments so that the Medicare program would pay its share of the increased costs that comes with treating low-income patients. A hospital is determined to be eligible for "disproportionate share" payments based on the calculation of a "disproportionate share" or

"DSH" percentage which serves as a proxy for the number of low-income patients a hospital serves. 42 U.S.C. §§ 1395ww(d)(5)(F)(v) and (vi).

11.     Each hospital's DSH percentage must be calculated pursuant to a precise formula set forth in the Medicare statute that accounts for the demographics of the hospital's inpatient population. The formula is based upon two fractions—or ratios—which are then added together to determine the hospital's DSH percentage. The DRG payment rates announced at the beginning of each fiscal year are increased by each hospital's DSH percentage to determine the final payment rate the hospital will receive for each discharge in that fiscal year. For example, if the unadjusted payment rate for a DRG is $5,000 and a hospital has a DSH percentage of 20 percent, the hospital will receive a payment rate of $6,000 for that DRG ([$5,000 x .20 = $1,000] + $5,000 = $6,000).

12.     The first fraction of the DSH percentage, commonly known as the "SSI fraction," determines the ratio of the number of hospital days attributable to individuals who are entitled to both Medicare Part A and Supplemental Security Income ("SSI") benefits (the numerator) to the number of hospital days applicable to individuals who are entitled to benefits under Medicare Part A (the denominator).

13.     The second fraction, commonly known as the "Medicaid" fraction, determines the ratio of the number of patient days attributable to Medicaid-eligible individuals (the numerator) to the number of inpatient days attributable to all hospital inpatients (the denominator). The statutory formula for the Medicaid fraction is set forth in the following language:

> (II) The fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consists of patients who (for such days) *were eligible for medical assistance under a State plan approved under subchapter XIX*, but who were not entitled to benefits under part A of this subchapter, and the denominator of which is the total number of the hospital's patient days for such period.

42 U.S.C. § 1395ww(d)(5)(F)(vi) (emphasis added).  The phrase "eligible for medical assistance under a State plan approved under subchapter XIX" essentially means a patient who is eligible for Medicaid.

14.     Covenant in this case challenges a regulation adopted by the Secretary that excludes from the numerator of the Medicaid fraction a large number of patients that the Secretary, consistent with the statutory framework, has previously deemed to be Medicaid-eligible.

**B.      Section 1115 Medicaid Waivers**

15.     The Medicaid program, established as part of title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, is a federal entitlement program that provides "medical assistance" to certain categories of low-income individuals.  The federal Medicaid program is operated as a joint federal-state partnership under which Congress has appropriated funds for the Secretary to match a participating State's expenditures for "medical assistance."  42 U.S.C. § 1396a *et seq.*

16.     In order to receive federal matching funds, states participating in the federal Medicaid program must receive the Secretary's approval of a state plan which must include certain statutorily-defined categories of individuals—commonly referred to as "Medicaid eligibility" categories.  These categories include low-income aged, blind, disabled and pregnant individuals. 42 U.S.C. § 1396d(a).  A state plan must also provide these Medicaid-eligible individuals with "medical assistance," which is defined as "payment" for certain specified categories of health care services, including inpatient hospital services and physician services.  *Id.*

17.     Pursuant to section 1115 of the Social Security Act, the Secretary may waive compliance with the statutory eligibility and medical assistance requirements in order to carry out "experimental, pilot, or demonstration" projects that promote the objectives of the Medicaid program.  42 U.S.C. § 1315(a).  The objectives of the Medicaid program are to provide healthcare

services to low-income individuals to improve their health outcomes. To achieve these objectives, the Secretary may, for example, waive certain eligibility requirements and authorize states to expand the group of Medicaid-eligible individuals to whom they provide "medical assistance" beyond the mandatory Medicaid-eligible categories identified in the statute. The individuals who receive this benefit are often referred to as "expansion," "demonstration" or "waiver" populations, and typically they are also low-income.

18.    By operation of 42 U.S.C. § 1315(a), when the Secretary approves a section 1115 waiver that confers benefits upon waiver populations, he also has elected to regard the costs of such projects as "medical assistance" expenditures under the Medicaid statute even though the "costs of such project … would not otherwise be included as expenditures under" the Medicaid program and, therefore, not eligible for Medicaid matching funds. *Id.*

19.    Subject to the Secretary's approval, section 1115 allows states to experiment with different mechanisms for providing "medical assistance" to demonstration populations. States can, for example, expand the categories of individuals who may enroll in the State's Medicaid health plans. But some States chose not to do so, and the Secretary has approved section 1115 waivers in those States under which demonstration populations receive medical assistance in other forms. Since 2005, for example, the Secretary has approved section 1115 waivers in several states, including Texas, pursuant to which the state Medicaid programs provide medical assistance in the form of direct payments to hospitals to cover the cost of inpatient care for uninsured individuals and those who receive charity care. These payments are made from uncompensated care ("UCC") pools authorized by the Secretary and recognized by him as providing the benefit of "medical assistance" to the uninsured and charity care populations. In order to approve these UCC pools, the Secretary must assure himself that they further the objectives of the Medicaid program.

20.    The Secretary has approved the Texas Healthcare Transformation and Quality Improvement Program pursuant to section 1115(a)(2) of the Social Security Act, which provides medical assistance benefits through a UCC pool in the manner described in the preceding paragraph.  Pursuant to the Healthcare Transformation and Quality Improvement Program, the Texas Medicaid program makes payments to hospitals from a UCC pool of dollars (matched by the Secretary) which, under the terms of the demonstration waiver, is intended to cover the cost of care provided to uninsured patients who receive some or all of their inpatient hospital services free of charge under the hospital's charity care policy.  Exhibit 1 (Texas Healthcare Transformation and Quality Improvement Program) at 52–55.

### C.    The Deficit Reduction Act of 2005

21.    Although the federal government has consistently matched the Medicaid expenditures incurred by States to provide medical assistance to section 1115 waiver populations, the Secretary years ago refused to count such individuals as "Medicaid-eligible" when calculating a hospital's Medicare DSH percentage.  According to the Secretary, the inpatient days for such individuals could not be counted in the numerator of the Medicaid fraction because they were not "eligible for medical assistance *under a State plan approved under subchapter XIX*."  42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (emphasis added).  The Secretary claimed that he was prohibited by statute from including waiver populations in the numerator of the Medicaid fraction because they were only made eligible for medical assistance pursuant to a waiver he approved under Title XI, not a State plan.

22.    In 2000, however, the Secretary reversed his interpretation of the Medicare DSH statute and adopted a regulation to include the inpatient days of Medicaid waiver populations in the numerator of the Medicaid fraction.  Pursuant to that regulation, individuals are also considered

"eligible for Medicaid … if the patient is eligible for inpatient hospital services under an approved State Medicaid plan *or under a waiver authorized under section 1115(a)(2)* of the [Social Security] Act." 42 C.F.R. § 412.106(b)(4)(i)–(ii) (2022) (emphasis added).

23.    However, the Secretary refused to apply his new interpretation to Medicare DSH payments before 2000.  Numerous hospitals challenged the Secretary's refusal.  Several courts ruled in their favor, holding that the Secretary could not rationally explain his position that the statutory language setting forth the Medicaid fraction formula precluded him from treating section 1115 waiver populations as "eligible … under a State plan" prior to 2000 but somehow this same language granted him the discretion to deem them to be "Medicaid-eligible" after 2000.  *Portland Adventist Med. Ctr. v. Thompson*, 399 F.3d 1091, 1093 (9th Cir. 2005); *see also Cookeville Reg'l Med. Ctr. v. Leavitt*, 531 F.3d 844, 845 (D.C. Cir. 2008) ("Despite not meeting the requirements of [Title] XIX, the costs of providing care under a demonstration project are treated as federally reimbursable expenditures made under [Title XIX] 'to the extent and for the period prescribed by the Secretary.'" (quoting 42 U.S.C. § 1315(a)(2)(A))).

24.    In the Deficit Reduction Act ("DRA") of 2005, Pub. L. No. 109-171, 120 Stat. 4, Congress amended the Medicare DSH statute and gave the Secretary explicit commands as to how to treat Medicaid waiver populations when calculating Medicare DSH payments.  Congress added statutory language that required the Secretary to treat section 1115 waiver populations as "Medicaid-eligible" once he exercised his discretionary authority to approve a section 1115 waiver.  The DRA of 2005 added the following language to the Medicaid fraction formula:

> In determining under subclause (II) the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under title XIX, the Secretary may, to the extent and for the period the Secretary determines appropriate, *include patient days of patients not so eligible but who are regarded as such because they receive benefits under a demonstration project approved under title XI.*

Pub. L. No. 109-171, § 5002, 120 Stat. at 31 (emphasis added).

25.     The DRA of 2005 makes clear that section 1115 waiver populations are not "eligible for medical assistance under a State plan." But it also makes clear that, if the Secretary exercises his authority under section 1115 and approves a waiver that extends "benefits" to such individuals, he has "regarded them" as "eligible under a State Plan," and he must include their patient days in the numerator of the Medicaid fraction. *Forrest Gen.*, 926 F.3d at 228–29; *Bethesda Health*, 389 F. Supp. 3d at 47. In this manner, the DRA gave the Secretary prospective discretion to include or exclude section 1115 waiver populations. *See Cookeville Reg'l Med. Ctr.*, 531 F.3d at 848 ("No one contests that § 5002(a) of the Act gives the Secretary discretion (*at least prospectively*) to exclude the expansion waiver population.") (emphasis added).

26.     Despite this explicit statutory command, the Secretary did not include *all* waiver population patient days in the Medicaid fraction numerator after 2005. For example, in 2005 the Secretary approved a section 1115 waiver for the State of Mississippi which, in relevant part, created a UCC pool to pay for the costs of inpatient hospital care provided to uninsured individuals who were displaced by Hurricane Katrina. In 2006, the Secretary approved a state Medicaid waiver for the State of Florida, which expanded medical assistance benefits to uninsured individuals. These benefits took the form of payments made to Florida hospitals from a Low Income Pool ("LIP") that was created by the State (and approved by the Secretary) to cover the cost of inpatient hospital services to uninsured individuals who received services at those hospitals. Even though the Secretary prospectively "regarded" these uninsured individuals as "eligible" for Medicaid when he approved the waiver and extended them benefits by means of UCC payments to cover their inpatient care, the Secretary retroactively refused to allow Mississippi and Florida hospitals to count their inpatient hospital days in the numerator of the Medicaid fraction for purposes of calculating their Medicare DSH payments.

27.    Again, hospitals challenged the Secretary's decision to reduce their Medicare DSH payments, this time by excluding patient days attributable to individuals who receive benefits through section 1115 UCC pool payments.  And again, multiple courts held that the Secretary's policy violated the plain language of the Medicare statute, specifically Congress's mandate in the DRA of 2005 that the Secretary must include patient days of individuals who are not eligible under a State plan, but whom he "regards as such" by approving benefits under a section 1115 waiver. For example, the Fifth Circuit set aside the Secretary's decision to exclude patient days attributable to patients for whom hospitals received UCC pool payments.  *See Forrest Gen.*, 926 F.3d at 228 ("[I]f the Secretary approves a demonstration project, then we regard patient days involving patients who 'receive benefits under a demonstration project' as if they were patient days attributable to Medicaid-eligible patients (which means those days also go into the numerator).").  The D.C. Circuit reached a similar decision regarding the Secretary's decision to exclude patient days attributable to Florida LIP payments.  *Bethesda Health*, 980 F.3d at 122.

28.    After the D.C. Circuit's decision in *Bethesda Health*, the Secretary acquiesced to these judicial decisions on a national basis—that is, until the promulgation of the Exclusion Rule. Prior to the Rule, in States where the Secretary approved a section 1115 Medicaid waiver that created UCC pools to pay for the cost of inpatient care provided to uninsured and charity care patients—including the State of Texas—the Secretary made Medicare DSH payments to hospitals that included the patient days attributable to uninsured and charity patients in the numerator of their Medicaid fractions.  Pursuant to this nationwide policy, Covenant received Medicare DSH payments that included such patient days for Medicare DSH payments for periods predating the effective date of the Exclusion Rule.

29.     The federal 340B drug discount program permits certain covered entities to purchase outpatient drugs at discounted prices, significantly reducing the costs of pharmaceuticals and enabling these hospitals to expand care to uninsured individuals.  Medicare DSH hospitals with a DSH percentage greater than 11.75 qualify as 340B covered entities and are entitled to discounted drugs.  42 U.S.C. § 256b(a)(4)(L).  A Medicare rural referral center or a sole community hospital with a DSH percentage equal to or greater than 8 also qualifies as a 340B covered entity that is generally entitled to discounted drugs.  42 U.S.C. § 256b(a)(4)(O).  However, unlike covered entities that qualify for the 340B program as DSH hospitals, rural referral centers and sole community hospitals are not entitled to discounts on "orphan drugs"—*i.e.*, drugs designated by the Secretary under 21 U.S.C. § 360bb for a rare disease or condition. 42 U.S.C. § 256b(e).  Many hospitals in Texas and other states that provide Medicaid benefits through Section 1115 uncompensated care pools are able to maintain qualifying DSH percentages because they can include the patient days of uninsured and charity patients in the numerator of the Medicaid fraction.

### D.    The Exclusion Rule

30.     In August 2023, the Secretary adopted the Exclusion Rule, a new regulation— effective October 1, 2023 and beyond—that expressly excludes from the Medicaid numerator patients who have received inpatient hospital benefits through section 1115 UCC pool payments approved by the Secretary.  The Exclusion Rule, promulgated at 42 C.F.R. § 412.106(b)(4)(iii), is in direct conflict with the law of the Fifth Circuit.  Even though the language of the DRA of 2005 amendment is clear that the Secretary must count *all* individuals who receive benefits through an approved section 1115 waiver, the Secretary's rule is premised on the misguided belief that he has unfettered discretion to include certain waiver populations and exclude others.  The Fifth Circuit

has already rejected this interpretation as contrary to the plain language of the Medicare statute. *Forrest Gen.*, 926 F.3d at 228–29.

31.    The Secretary is well aware that his new rule conflicts with the Medicare statute. He first proposed a similar regulation in 2021, to be effective in FY 2022, but he did not finalize the rule due to opposition from hospital providers in Texas and other affected states.  And again in 2022, he proposed a slightly modified version of the 2021 proposal to be effective for FY 2023. But again, the Secretary did not finalize the proposal in response to opposition from hospital providers.  The Secretary eventually adopted the current version of his new DSH regulation even though hospital providers continued to explain in comments that several courts—including the Fifth Circuit—had previously rejected the Secretary's interpretation of the Medicare DSH statute upon which he was relying to promulgate the new rule.

32.    Commenters on the Exclusion Rule also emphasized providers' reliance interests and the inherent unfairness of the Secretary's decision, for purposes of the DSH percentage calculation, to take back and nullify his previous (and still effective) approval of those UCC pools. *See* 88 Fed. Reg. at 59,016; *Forrest Gen.*, 926 F.3d at 233 ("Once the Secretary authorizes a demonstration project, no take-backs.").  The Secretary dismissed those concerns in finalizing the Exclusion Rule.

33.    The regulation targets individuals who receive medical assistance in the form of payments from UCC funding pools with the following language:

> Patients whose health care costs, including inpatient hospital services costs, for a given day are claimed for payment by a provider from an uncompensated, undercompensated, or other type of funding pool authorized under section 1115(a) of the Act to fund providers' uncompensated care costs are not regarded as eligible for Medicaid for purposes of paragraph (b)(4)(ii) of this section on that day and the days of such patients may not be included in this second computation.

42 C.F.R. § 412.106(b)(4)(iii); 88 Fed. Reg. 58,640, 59,332 (Aug. 28, 2023).

34.     With new clause (b)(4)(iii), the Secretary has declared, contrary to law, that he chooses not to "regard[]" individuals who receive inpatient benefits by means of a section 1115 UCC pool as "eligible for Medicaid."

35.     Federal courts have already found the Secretary's prior attempts to limit the inclusion of section 1115 UCC days in the Medicaid fraction as a violation of the Medicare statute, and (b)(4)(iii) is no exception.  The Secretary relied upon the same interpretation of the DRA of 2005 in defense of his position in *Forrest General*.  In plain and direct language, the Fifth Circuit held that this theory was foreclosed by the language of the Medicare statute:

> Put bluntly: Certain days just go into the Medicaid fraction's numerator. Which days? Days that a hospital treated Medicaid-eligible patients or — if the Secretary approves a demonstration project — patients regarded as Medicaid eligible because of a demonstration project. This is binary: Patient days are either in or out. If patients underlying a given day were Medicaid-eligible or "receive[d] benefits under a demonstration project," then that day goes into the numerator.

*Forrest Gen.*, 926 F.3d at 228–29; *see also Bethesda Health*, 389 F. Supp. 3d at 47 (favorably citing *Forrest General*).

36.     The Exclusion Rule runs directly counter to Congress's stated reason for mandating that the Secretary provide supplemental Medicare DSH payments.  The 1986 amendments to the Medicare statute reflect Congress's recognition that "[h]ospitals that serve a disproportionate share of low-income patients have higher [M]edicare costs per case[,]" H.R. Rep. No. 99-241, pt. 1, at 16 (1985), and that those higher costs would not otherwise be compensated by the IPPS DRG rate formula.  Yet the Secretary now contravenes the Medicare statute by denying Covenant all Medicare DSH reimbursement attributable to claiming large numbers of low-income individuals as "Medicaid eligible."  What is more, the Secretary adopted the Exclusion Rule even though he has already been instructed by courts (several times) that the Medicare statute does not afford him the discretion to exclude certain patients once he has conferred a benefit upon them by approving

a section 1115 waiver. *See Forrest Gen.*, 926 F.3d at 233 ("Once the Secretary authorizes a demonstration project, no take-backs.").

37.     When reminded of the Fifth Circuit's holding during notice and comment rulemaking, the Secretary brushed aside that statutory holding and stated that he "do[es] not believe anything in the courts' decisions … limits the Secretary's authority to amend his own regulations." 88 Fed. Reg. at 59,020.

### E.     Cost Reports and Appeals

38.     Most claims "arising under" the Medicare statute are channeled through a system of administrative review prior to judicial review. *See Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 8–9 (2000) (emphasis omitted) (quoting 42 U.S.C. § 405(h)). Judicial review of such a claim is typically available after a "final decision" by the Secretary, *id.* § 405(g), which entails two elements: a jurisdictional presentment requirement and a waivable requirement that the plaintiff exhaust administrative remedies. *See Mathews v. Eldridge*, 424 U.S. 319, 328 (1976).

39.     As described below, the Medicare statute further specifies how a hospital can assert a challenge involving DSH payments in order to satisfy the jurisdictional prerequisite to judicial review. The Secretary contracts with Medicare Administrative Contractors ("MACs") to administer payment to hospitals participating in the Medicare program. Hospitals receive interim payments from MACs throughout the year, subject to subsequent adjustment for overpayment or underpayment. Adjustments are determined based on annual cost reports submitted by hospitals. 42 C.F.R. § 413.20. The cost report contains the calculation of the Medicare DSH payment owed to the hospital for the reporting period, which is calculated based in part on the Medicaid days reported by the hospital.

40.     The Secretary requires MACs to audit hospital cost reports to determine each hospital's Medicare reimbursement for the reporting period, including, if applicable, the amount

of DSH reimbursement owed. The MAC will issue a final determination known as a notice of program reimbursement ("NPR"), which itemizes adjustments and states the amount of the approved reimbursement, including the final amount of DSH payment. *Id*. § 405.1803.

41.     If a hospital is dissatisfied with the MAC's final determination as reflected in the NPR, it may file an appeal with the Provider Reimbursement Review Board ("Board") within 180 days after receiving the NPR. 42 U.S.C. § 1395oo(a)(1)(A)(i); 42 C.F.R. § 405.1835(a). That is one pathway for how a hospital may bring a claim challenging DSH payments before the Board.

42.     Alternatively, a hospital can bring an appeal with the Board if it does not receive an NPR from the MAC within 12 months of submitting its cost report. 42 U.S.C. § 1395oo(a)(1)(B) & (C); 42 C.F.R. § 405.1835(c). The appeal must be filed within 180 days following the anniversary of the submission of the cost report.

43.     Any appeal filed with the Board must meet the statutory amount in controversy requirement, which is $10,000 for appeals filed by individual hospitals.

44.     A hospital that has filed an appeal with the Board can request Expedited Judicial Review ("EJR") in cases where the Board has jurisdiction under the statute to hear a hospital's appeal but lacks the authority to grant the hospital the relief requested. Specifically, the Board is bound to follow all statutes, regulations, and agency policies. 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1842. When a hospital provider seeks to have one of those provisions set aside as unlawful, the Board instead must grant EJR of the appeal so that the provider may immediately elevate its challenge to federal district court. 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1842.

### F.    Prior Litigation

45.     In the *Baylor All Saints* case, fourteen Texas hospitals, including Plaintiff here, challenged the Exclusion Rule, alleging that it would result in Medicare DSH losses exceeding $10 million each year in addition to jeopardizing the hospitals' ability to save millions of additional

dollars on drug purchases through the 340B program.  *See* Case No. 4:24-cv-000432-P, ECF No. 6 at 26–27, ECF No. 8-1 at 2–7.

46.    Prior to filing suit in the Fort Worth Division, the plaintiffs had filed an appeal request with the PRRB.  *Id.*, ECF No. 1-2 at 2–3.  The PRRB decided that it lacked jurisdiction because the *Baylor All Saints* plaintiffs had not filed cost reports or otherwise satisfied the requirements for Board review under the Medicare statute.  *Id.* at 3, 21.  The PRRB also relatedly concluded that the Exclusion Rule was not a "final determination" directly appealable to the Board under 42 U.S.C. § 1395oo(a)(1)(A)(i) or (ii).  *Id.*  In other words, the PRRB deemed the hospitals' challenge to the Exclusion Rule premature and therefore not within the Board's jurisdiction.

47.    Before Judge Pittman, the *Baylor All Saints* plaintiffs requested an order finding that their PRRB appeals were jurisdictionally proper and also vacating the Exclusion Rule as contrary to the Medicare statute.  *Id.*, ECF No. 1 at 25–29.

48.    The plaintiffs moved for a stay of the effective date of the Exclusion Rule under 5 U.S.C. § 705, or, as an alternative, a preliminary injunction against implementation of the Rule.  *Id.*, ECF No. 7.  The plaintiffs explained that in the absence of such relief, they faced a substantial threat of irreparable harm in the form of unrecoverable economic losses if they were wrongfully deemed ineligible for the 340B program.  *Id.*, ECF No. 8 at 27–28.

49.    The district court determined that there were no factual disputes to be resolved and gave notice of its intent to convert the motion into a motion for summary judgment and proceed to a resolution on the merits.  *Id.*, ECF No. 11.  The plaintiffs consented to the court's plan and argued that vacatur of the regulation would be the most appropriate remedy.  *Id.*, ECF No. 12.  The Secretary objected to the court's plan.  *Id.*, ECF No. 13.

50.     The court advanced to the merits of the case and granted judgment in plaintiffs' favor.  *Id*., ECF No. 33.  First, the court agreed with plaintiffs that the PRRB violated procedural requirements in its dismissal decision.  *Id*. at 8–9.  Second, the court held that the PRRB's jurisdictional decision was erroneous; the hospitals did not need to submit cost reports prior to challenging the Exclusion Rule because the Exclusion Rule itself was a final determination of the Secretary as to the DSH adjustment, which is an amount of payment under subsection (d) of 42 U.S.C. § 1395ww.  *Id*. at 9 (citing 42 U.S.C. § 1395oo(a)(1)(A)(ii)).  Third, the court concluded that there was no reason to remand the claims to the PRRB, which lacked the authority to decide the validity of the regulation, because "sending the Hospitals back to PRRB would be lengthy, costly, and futile."  *Id*. at 10.  Fourth, the district court held that the Fifth Circuit's decision in *Forrest General* "directly controls the [c]ourt's inquiry—and clarifies that the Exclusion Rule contradicts the [Medicare] statute's plain text."  *Id*.  In other words, the Court held that the Exclusion Rule was "unlawful."  *Id.* at 12. As a result, the district court vacated the Exclusion Rule, consistent with "the Fifth Circuit's 'ordinary practice [of] vacat[ing] unlawful agency action.'"  *Id*. at 15–16 (quoting *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022)).

51.     From the time that the hospitals filed their amended complaint to when Judge Pittman's Opinion & Order issued, 59 days passed.

52.     On appeal, the Fifth Circuit reversed.  Rejecting the argument that the Exclusion Rule itself was a final determination supporting jurisdiction, the Fifth Circuit held that the plaintiffs had filed their challenge before the Board prematurely.  "[T]he presentment requirement cannot be fulfilled before a hospital submits its cost report to a Medicare Administrative Contractor," the court explained, and "[b]ecause the hospitals failed to present a claim to the agency, the district

court had no jurisdiction to hear the case." *Baylor All Saints*, 161 F.4th at 303–04. The court recognized that the hospitals "may suffer irreparable delay-related costs," but held that "such costs are not sufficient to exempt them from the channeling requirement." *Id*. at 305.

53.     With Board jurisdiction pursuant to 42 U.S.C. § 1395oo(a) now clearly and indisputably satisfied, as described below, Covenant is before this Court again asking it to reach the same merits decision and order the same relief of vacatur as it previously did in *Baylor All Saints*.

## V.    PROCEDURAL HISTORY

54.     On November 27, 2024, Covenant filed—and the Medicare contractor received—Covenant's annual cost report for the reporting period spanning July 1, 2023, through June 30, 2024.

55.     In preparing the DSH calculation for that cost report, Covenant complied with the Secretary's regulation at section 412.106(b)(4)(iii) by excluding from the numerator of the Medicaid fraction patient days of patients who, on or after October 1, 2023, received inpatient hospital benefits from the UCC Pool under the Texas Section 1115 Waiver.

56.     On December 12, 2025, Covenant filed an appeal with the Board contending that its DSH payment for the reporting period ending June 30, 2024, is understated due to the unlawful requirements of the Exclusion Rule and section 412.106(b)(4)(iii). The Board had jurisdiction over this appeal because more than a year had passed since Covenant filed its cost report for that period, the MAC had not yet issued an NPR, the appeal was filed within 180 days of the anniversary of the filing of the cost report, and the amount in controversy exceeded $10,000. *See* 42 U.S.C. § 1395oo(a)(1).

57.     On December 19, 2025, Covenant submitted a request for the Board to grant expedited judicial review of its appeal. By letter dated January 13, 2026, the Board granted

Covenant's request for expedited judicial review, finding that it had jurisdiction over Covenant's appeal but lacked authority to grant the requested relief. Exhibit 2 (PRRB's EJR Determination) at 11 ("[T]he Board finds that the question of the validity of the § 1115 Waiver Days issue, as set forth in the August 28, 2023 Federal Register, properly falls within the provisions of 42 U.S.C. § 1395oo(f)(1) and hereby grants the Provider's request for EJR for the issue and the subject year."). In other words, unlike in *Baylor All Saints*, the PRRB expressly recognized that it had jurisdiction over Covenant's appeal and, in turn, granted the request for judicial review.

58.     Covenant has timely initiated this action pursuant to § 1395oo(f)(1).

## VI.    CAUSES OF ACTION

### COUNT ONE
### (Secretary's Final DSH Regulation)
(Violation of the Medicare Statute)

59.     Covenant realleges and reincorporates by reference each of the preceding paragraphs as if set forth fully herein.

60.     The Secretary's Exclusion Rule is in direct violation of the Medicare statute at 42 U.S.C. § 1395ww(d)(5)(F)(vi) (hanging paragraph) as amended by Congress in the DRA of 2005.

61.     The Medicare statute is clear. Once the Secretary regards patients as eligible by providing coverage for their inpatient care through an approved section 1115 waiver, the Secretary must include all such patient days in the numerator of the Medicaid fraction. *Forrest Gen.*, 926 F.3d at 228. The Secretary's new regulation defies this command. It unlawfully carves out a sub-population of patients who receive inpatient benefits through an approved section 1115 waiver.

62.     The consequences of this payment determination are not hypothetical. They are known and serious. For Covenant, the projected loss of Medicare DSH money is over $2 million per year. Beyond the unlawful loss of additional Medicare DSH reimbursement, the new regulation poses irreparable harm by preventing Covenant from being able to save millions of

dollars on the costs of expensive outpatient drugs through participation in the federal 340B Drug Pricing Program. The Health Resources & Services Administration, which administers the 340B Drug Pricing Program, relies upon the DSH percentage set forth in a provider's filed cost report to determine whether the provider qualifies for 340B discounts. By excluding days attributable to patients who receive benefits through UCC pool payments, the Secretary's regulation will require Covenant to file a cost report with a lower DSH percentage than the law allows. That will prevent Covenant from qualifying as a covered entity under the 340B program, depriving Covenant of the opportunity to access valuable 340B discounts, which Covenant would otherwise seek and be entitled to obtain. Covenant will not be able to recover those lost savings retroactively.

63.    In attempting to justify the new regulation at 42 C.F.R. § 412.106(b)(4)(iii), the Secretary simply flouts prior contrary and binding interpretations of the very statute he believes gives him the discretion to exclude certain categories of section 1115 beneficiaries from calculations of the Medicaid fraction. The Secretary tries to pretend that the courts did not in fact interpret the statute in this way—and that his regulatory authority is therefore unconstrained—but just the opposite is true.

### COUNT TWO
**(Secretary's Final DSH Regulation)**
(Violation of the Administrative Procedure Act—Arbitrary and Capricious)

64.    Covenant realleges and reincorporates by reference each of the preceding paragraphs as if set forth fully herein.

65.    Under 5 U.S.C. § 706(2)(A), "[t]he reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be [] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

66.    Agency action is considered arbitrary and capricious if, as relevant here, the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its

decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also* Sw. *Elec. Power Co. v. EPA,* 920 F.3d 999, 1013–14 (5th Cir. 2019) (similar).

67.     The Exclusion Rule is arbitrary and capricious in several respects, including its discriminatory treatment of UCC pools.  According to the Secretary, patients who receive inpatient benefits through an approved section 1115 UCC pool receive only a "limited benefit," which is unlike a more robust "health insurance" plan.  88 Fed. Reg. at 59,016.  Even if, contrary to fact, the Secretary is correct, Congress did not authorize him to take this factor into consideration when making Medicare DSH payments.  *See, e.g.*, *Bethesda Health*, 389 F. Supp. 3d at 46–47 (noting that "[t]he statutory text does not require uninsured and underinsured patients to enroll in a health insurance plan" to be counted and that "[t]he government's proposed interpretation would informally add new and limiting phrases to a statute that is already clear when unadorned."); *Forrest Gen.*, 926 F.2d at 229 (noting that the ordinary meaning of "benefit" refers broadly to an "advantage or privilege something gives; the helpful or useful effect something has.").

68.     The Exclusion Rule is also arbitrary and capricious because it fails to adequately account for the purpose of the DSH adjustment.  As the Secretary acknowledged, Congress implemented the DSH adjustment "to recognize the higher costs to hospitals of treating low-income individuals covered under Medicaid."  88 Fed. Reg. at 59,013.  UCC pools promote the objectives of Medicaid (as the Secretary found when he approved the pools) because they "help hospitals that treat the uninsured and underinsured stay financially viable so they can treat Medicaid patients."  *Id.* at 59,015.  The Secretary does not assert that the higher costs of treating low-income individuals who benefit from UCC pools are any different from the higher costs of

treating low-income individuals who benefit from section 1115 demonstrations in other ways. Thus, he has not justified his regulation in light of the undisputed statutory purpose.

69.    The regulation is also arbitrary and capricious because the Secretary did not adequately explain why he exercised his purported discretion to exclude inpatient days attributable to section 1115 UCC pools that he already approved, especially in light of the reliance concerns raised by this retroactive take-back.

70.    For these reasons, the Secretary's new DSH regulation is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

## VII.    RELIEF REQUESTED

71.    Plaintiff requests that this Court enter an Order:

(a) Invalidating and vacating the Secretary's new regulation at 42 C.F.R. § 412.106(b)(4)(iii);

(b) Enjoining the Secretary from applying his new regulation at 42 C.F.R. § 412.106(b)(4)(iii).

(c) Requiring the Defendant to pay legal fees and cost of suit incurred by Plaintiff; and

(d) Providing such other relief as the Court may consider appropriate.

Date:  January 21, 2026          Respectfully submitted,

*/s/ Bobby Hill*
Robert M. Hill
Texas Bar No. 24125624
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, Texas 75201
Tel: 214-764-4414
Fax: 214-764-4601
rhill@kslaw.com

*/s/ Mark D. Polston*
Mark D. Polston (*pro hac vice application forthcoming*)
Christopher P. Kenny (*pro hac vice application forthcoming*)
Nikesh Jindal (*pro hac vice application forthcoming*)
Alek Pivec (*pro hac vice application forthcoming*)
Ahsin Azim (*pro hac vice application forthcoming*)
Alexander Kazam (*pro hac vice application forthcoming*)
KING & SPALDING LLP
1700 Pennsylvania Avenue NW, Suite 900
Washington, D.C. 20006
(202) 737-0500 (phone)
(202) 626-3737 (fax)
MPolston@kslaw.com
CKenny@kslaw.com
NJindal@kslaw.com
APivec@kslaw.com
AAzim@kslaw.com
AKazam@kslaw.com

*Attorneys for Plaintiff*