IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| COVENANT MEDICAL CENTER, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| ROBERT F. KENNEDY, JR, in his official | § | Civil Action No. 4:26-cv-00077-P |
| capacity as Secretary of Health and Human | § | |
| Services, | § | |
| | § | |
| *Defendant*. | § | |
| | § | |
| | § | |
| | § | |
| | § | |

## PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

I.  INTRODUCTION ..................................................................................................1

II.  BACKGROUND ..................................................................................................4

    A.  Statutory and Regulatory Background................................................... 4

        1.  Medicare Reimbursements and Providers' Rights..................................... 4

        2.  The DSH Adjustment................................................................. 4

        3.  The Cost Report Appeals Process.............................................. 6

        4.  Medicaid Demonstration Projects and the Texas Demonstration............... 7

        5.  Previous DSH Regulations and the Deficit Reduction Act of 2005 ........... 9

        6.  Courts Apply the DRA and Congress Acquiesces................................... 11

        7.  The Exclusion Rule................................................................ 12

        8.  The 340B Drug Pricing Program ............................................... 13

    B.  Prior Litigation........................................................................ 14
    C.  Factual and Procedural Background ...................................... 16

III.  LEGAL STANDARDS ........................................................................17

    A.  Administrative Procedure Act............................................... 17
    B.  Summary Judgment ............................................................... 18

IV.  ARGUMENT.................................................................................18

    A.  The Exclusion Rule Is Contrary to Law. ............................... 19
    B.  The Exclusion Rule Is Arbitrary and Capricious..................... 23
    C.  Vacatur is the Appropriate Remedy...................................... 27

V.  CONCLUSION.............................................................................28

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ams. for Beneficiary Choice v. United States Dep't of Health & Human Services*,
  795 F. Supp. 3d 895 (N.D. Tex. 2025) ....................................................................27

*Baylor All Saints Med. Ctr. v. Kennedy*,
  161 F.4th 298 (5th Cir. 2025) .................................................................... *passim*

*Becerra v. Empire Health Found. ex rel. Valley Hosp. Med. Ctr.*,
  597 U.S. 424 (2022).................................................................................4, 5, 6

*Bethesda Health, Inc. v. Azar*,
  389 F. Supp. 3d 32 (D.D.C. 2019).....................................................................23, 24

*Bethesda Health, Inc. v. Azar*,
  980 F.3d 121 (D.C. Cir. 2020).......................................................................8, 11, 13

*Cabell Huntington Hosp., Inc. v. Shalala*,
  101 F.3d 984 (4th Cir. 1996) .............................................................................5

*Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*,
  98 F.4th 220 (5th Cir. 2024).............................................................................28

*In re Clarke*,
  94 F.4th 502 (5th Cir. 2024) .............................................................................28

*Cookeville Reg'l Med. Ctr. v. Leavitt*,
  Civ. A. No. 04-1053, 2006 WL 2787831 (D.D.C. Sept. 26, 2006) .......................................10

*Cookeville Reg'l Med. Ctr. v. Thompson*,
  Civ. A. No. 04-1053, 2005 WL 3276219 (D.D.C. Oct. 28, 2005) .....................................9, 10

*DHS v. Regents of Univ. of Cal.*,
  591 U.S. 1 (2020).......................................................................................27

*Elec. Power Co. v. EPA*,
  920 F.3d 999 (5th Cir. 2019) ...........................................................................18

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009).....................................................................................27

*Forrest Gen. Hosp. v. Azar*,
  926 F.3d 221 (5th Cir. 2019) .................................................................... *passim*

*Legacy Emanuel Hosp. & Health Ctr. v. Shalala*,
  97 F.3d 1261 (9th Cir. 1996) ..................................................................................................5

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ..........................................................................................................18, 24

*Outsourcing Facilities Ass'n v. United States Food & Drug Admin.*,
  No. 4:25-CV-0174-P, 2025 WL 1697270 (N.D. Tex. June 13, 2025) ...................................18

*R.J. Reynolds Vapor Co. v. Food & Drug Admin.*,
  65 F.4th 182 (5th Cir. 2023) ..................................................................................................27

*Rest. L. Ctr. v. United States Dep't of Lab.*,
  120 F.4th 163 (5th Cir. 2024) ................................................................................................18

*Wash. Hosp. Ctr. v. Bowen*,
  795 F.2d 139 (D.C. Cir. 1986) ..................................................................................................4

**Statutes**

5 U.S.C. § 705 .............................................................................................................................15

5 U.S.C. § 706 .........................................................................................................................17, 27

42 U.S.C. § 256b .........................................................................................................................13

42 U.S.C. § 1315(a) .....................................................................................................................7, 8

42 U.S.C. § 1395oo(a)(1) .................................................................................................6, 14, 15, 17

42 U.S.C. § 1395oo(f)(1) .............................................................................................................7, 17

42 U.S.C. § 1395ww(d) ...................................................................................................................4

42 U.S.C. § 1395ww(d)(3) ..............................................................................................................4

42 U.S.C. § 1395ww(d)(5)(F) ............................................................................................... *passim*

42 U.S.C. § 1396a *et seq.* ..............................................................................................................7

42 U.S.C. § 1396d(a) ..................................................................................................................7, 24

Deficit Reduction Act of 2005 ..............................................................................................3, 9, 10, 11

Pub. L. No. 98-21, § 601 *et seq.*, 97 Stat. 65, 149 (1983) ..............................................................4

Pub. L. No. 109-171, § 5002, 120 Stat. 4, 31 (2006) ....................................................................10

Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1818 (2022) ..........................................12

One Big Beautiful Bill Act, Pub. L. No. 119-21, 139 Stat. 72 (2025)..........................................12

Social Security Act title XIX, 42 U.S.C. § 1396 *et seq.* .........................................................7, 9

**Regulations**

42 C.F.R. § 405.1835(c)...............................................................................................................6

42 C.F.R. § 405.1842....................................................................................................................7

42 C.F.R. § 412.8(b)(2)................................................................................................................4

42 C.F.R. § 412.106(b)(4)(iii).....................................................................................................12

42 C.F.R. §§ 413.20, 413.24(f)....................................................................................................6

65 Fed. Reg. at 3,136–37.............................................................................................................9

65 Fed. Reg. 3,136, 3,138 (Jan. 20, 2000) .................................................................................9

65 Fed. Reg. 3,139 ....................................................................................................................10

65 Fed. Reg. 47,054, 47,087 (Aug. 1, 2000)..............................................................................9

65 Fed. Reg. 47,087 ....................................................................................................................9

88 Fed. Reg. 58,640, 59,332 (Aug. 28, 2023)...........................................................................12

88 Fed. Reg. 59,013 ...................................................................................................................25

88 Fed. Reg. 59,015 ...................................................................................................................27

88 Fed. Reg. 59,016 ..............................................................................................13, 23, 24, 26

88 Fed. Reg. 59,017 ..............................................................................................................24, 25

88 Fed. Reg. 59,022 ...................................................................................................................25

88 Fed. Reg. 59,025 ...................................................................................................................26

**Other Authorities**

CMS Approval Letter ...................................................................................................................9

HRSA, *340B Drug Pricing Program Frequently Asked Questions* (June 22, 2020) ...................14

## I.    INTRODUCTION

Plaintiff Covenant Medical Center returns to this Court to renew its challenge to an August 2023 Medicare reimbursement rule (the "Exclusion Rule") promulgated by the Secretary of Health and Human Services.  The Exclusion Rule seeks to deny reimbursement for a large swath of patients served by hospitals that disproportionately care for low-income patients.  This Court has already found that rule unlawful in a decision this Court described as "simple on the merits." *See* Case No. 4:24-cv-000432-P, ECF Nos. 33–35 ("Opinion & Order"). The Fifth Circuit reversed this Court's decision solely on jurisdictional grounds, without addressing the merits of the decision or otherwise opining on the lawfulness of the Secretary's rule.  *Baylor All Saints Med. Ctr. v. Kennedy*, 161 F.4th 298 (5th Cir. 2025).  Having now fully satisfied those jurisdictional prerequisites, as expressly recognized by the government in administrative proceedings below, Covenant brings this lawsuit challenging the same rule on the same grounds previously found meritorious by this Court.

As the Court will recall, the State of Texas, like several other states, has chosen not to expand enrollment in the federal Medicaid program pursuant to the Affordable Care Act.  Instead, practicing the "experimentation and innovation in policymaking" that is "one of the hallmarks of our federal system," these states have "opt[ed] to chart their own path."  Opinion & Order 4 & n.4. Specifically, Texas has elected to provide medical assistance to low-income patients through direct payments to hospitals that cover the cost of inpatient care.  The Secretary long ago approved that alternative to conventional Medicaid expansion, enabling Texas and similarly situated states to receive federal matching dollars for their approved "demonstration projects."  Under the statute governing "disproportionate share hospital" ("DSH") adjustments to Medicare reimbursements, Texas hospitals that serve a disproportionate number of low-income patients are entitled to an additional Medicare payment that takes into account inpatient days attributable to Medicaid

1

patients, including those who benefit from and are deemed Medicaid eligible through demonstration projects like the one maintained by Texas. Through the Exclusion Rule, however, the Secretary claims that he can simply refuse to count the days of patients who benefit from approved demonstration projects like Texas's. *See* ECF No. 24-1 at 393 ("Therefore, hospitals in the following six States can no longer report days of patients for which they receive payments from uncompensated/undercompensated care pools authorized by the States' section 1115 demonstration as Medicaid days in the DPP Medicaid fraction numerator: Florida, Kansas, Massachusetts, New Mexico, Tennessee, and Texas.").

In June 2024, a group of hospitals, including Covenant, challenged before this Court the Secretary's latest of many attempts to rewrite the DSH statute through regulation—this time in the form of the Exclusion Rule. After converting plaintiffs' motion for preliminary relief into a motion for summary judgment, the Court held the Exclusion Rule to be clearly unlawful under a straightforward application of binding Fifth Circuit precedent, citing "a recent 'spotted dog' decision by the Fifth Circuit [that] directly controls the Court's inquiry." Opinion & Order at 10 (citing *Forrest Gen. Hosp. v. Azar*, 926 F.3d 221, 228–29 (5th Cir. 2019)). Given that "the Fifth Circuit's 'ordinary practice is to vacate unlawful agency action,'" the Court vacated the Exclusion Rule. *Id.* at 15 (quoting *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859-60 (5th Cir. 2022)).

On appeal, the Fifth Circuit recognized that the hospitals "may suffer irreparable delay-related costs," but held that "such costs are not sufficient to exempt them from" certain procedural steps requisite under Medicare for the Court to have jurisdiction. *Baylor All Saints*, 161 F.4th at 305. Finding that the plaintiff hospitals in *Baylor All Saints* had failed to satisfy those procedural requirements, the Fifth Circuit reversed for lack of subject matter jurisdiction, without addressing

2

the merits of the hospitals' challenge to the Exclusion Rule.  Having now satisfied those procedural requirements, as expressly recognized by the government in administrative proceedings below, Covenant is again before this Court seeking relief from the plainly unlawful Exclusion Rule.  *See* ECF No. 1 ("Compl.") ¶¶ 54–58; *infra* § II.C.

The Exclusion Rule remains contrary to law and is arbitrary and capricious.  *First*, the rule is contrary to law because it flouts Congress's efforts through the Deficit Reduction Act of 2005 (the "DRA") to write into law coverage for patients like those served by Covenant.  In construing the pertinent DRA provisions, the Fifth Circuit in *Forrest General* noted that once the Secretary approves a demonstration project that extends inpatient benefits to individuals, he has regarded them as Medicaid eligible and therefore must include their hospital days for DSH purposes.  As this Court has explained, "[p]romulgating a new rule does not change the statutory text or the Fifth Circuit's interpretation," and "what the Fifth Circuit has already addressed this Court need not entertain further." Opinion & Order 11.  *Second*, the rule is arbitrary and capricious, lacking any reasoned basis because, *inter alia*, the relevant statute does not permit the Secretary to favor certain types of medical assistance over others, as he attempts to do through the rule.

As a result of the unlawful Exclusion Rule, Covenant and other Texas hospitals that disproportionately serve low-income patients stand to lose millions of dollars in critical Medicare funding every year.  By artificially suppressing Covenant's DSH percentage, which is used as a benchmark for determining eligibility to participate in the federal 340B Drug Pricing Program, the Exclusion Rule also threatens to prevent Covenant from qualifying for 340B discounts, which would save Covenant millions of dollars on the costs of expensive outpatient drugs.  That loss of savings cannot be recovered retroactively.

For these reasons, the Court should grant summary judgment and once again vacate the Exclusion Rule.

## II.     BACKGROUND

### A.     Statutory and Regulatory Background

#### 1.     Medicare Reimbursements and Providers' Rights

In its early years, Medicare reimbursed hospitals for the "reasonable cost" of inpatient services provided to Medicare beneficiaries. *See Wash. Hosp. Ctr. v. Bowen*, 795 F.2d 139, 141 (D.C. Cir. 1986). Under that *retrospective* system, each provider submitted at the end of its reporting year a "cost report" to its fiscal intermediary. *Id.*

In 1983, Congress transformed that system by establishing the inpatient *prospective* payment system (the "IPPS"). *Id.* at 141–42. Congress implemented the IPPS to promote efficiency by giving providers advance notice of payment for future services, enabling providers to forecast their Medicare reimbursements and budget accordingly. *Id.* at 142; *see Becerra v. Empire Health Found. ex rel. Valley Hosp. Med. Ctr.*, 597 U.S. 424, 429 (2022); Pub. L. No. 98-21, § 601 *et seq.*, 97 Stat. 65, 149 (1983). Under the IPPS, the base rates Medicare pays hospitals are predetermined. The unit of payment, a diagnostic related group ("DRG"), corresponds to related diagnoses with a set payment rate. *See* 42 U.S.C. § 1395ww(d). In advance of each fiscal year, the Secretary applies a statutory formula to determine the final payment rate for each DRG. *Id*. § 1395ww(d)(3). These rates are finalized 60 days in advance of the fiscal year in which they will apply. 42 C.F.R. § 412.8(b)(2).

#### 2.     The DSH Adjustment

In addition to predetermined base payment rates for each DRG, the IPPS provides for hospital-specific adjustments to those rates. The formulae to calculate those adjustments are set forth in subsection (d) of § 1395ww.

4

The adjustment at issue here is the DSH adjustment, which enhances Medicare rates for hospitals that serve an unusually high proportion of low-income patients. *Empire Health*, 597 U.S. at 429. Congress recognized that even for the same medical conditions—corresponding to the same DRGs—a low-income patient is often more expensive to treat than a high-income patient. *Id.* The DSH adjustment compensates hospitals for that disparity to enable them to continue serving low-income patients. *Id.*

Congress authorized the DSH adjustment at the same time that it created the IPPS. *See Cabell Huntington Hosp., Inc. v. Shalala*, 101 F.3d 984, 985–86 (4th Cir. 1996). After the Secretary resisted—first declining to exercise his discretion to create a DSH adjustment, and then failing to act even after Congress made the adjustment mandatory—Congress in 1986 stepped in to create the criteria for the adjustment. *Id.* at 986.

A hospital's eligibility for the adjustment is based on its DSH percentage, a calculation of the hospital's share of low-income patients. 42 U.S.C. § 1395ww(d)(5)(F)(v). Each hospital's unique DSH percentage is calculated pursuant to a statutory formula, using Medicaid and Supplemental Security Income ("SSI") status as a proxy for low income. *Id.* § 1395ww(d)(5)(F)(vi); *see Forrest Gen.*, 926 F.3d at 223. Each hospital with a sufficiently high DSH percentage receives a hospital-specific percentage increase to the DRG rates paid for each inpatient discharge. 42 U.S.C. § 1395ww(d)(5)(F).

A hospital's DSH percentage is the sum of two fractions, based on the demographics of its inpatient population: the "Medicare fraction" and the "Medicaid fraction." The "Medicare fraction" represents the proportion of Medicare patients who are low-income (based on SSI entitlement). *See Legacy Emanuel Hosp. & Health Ctr. v. Shalala*, 97 F.3d 1261, 1265–66 (9th Cir. 1996). This case concerns the numerator of the "Medicaid fraction." At a high level, "the

Medicaid fraction is a measure of a hospital's non-senior (except for disabled) low-income population." *Empire Health*, 597 U.S. at 430. Specifically, it is the ratio of inpatient days attributable to Medicaid-eligible individuals (the numerator) to inpatient days attributable to all inpatients (the denominator):

> [T]he fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under subchapter XIX, but who were not entitled to benefits under part A of this subchapter, and the denominator of which is the total number of the hospital's patient days for such period.

42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).

### 3.    The Cost Report Appeals Process

Hospitals are required to submit annual cost reports to claim reimbursement from the Medicare program. 42 C.F.R. §§ 413.20, 413.24(f). The Secretary contracts with intermediaries, also known as Medicare Administrative Contractors ("MACs"), to administer payment to hospitals participating in the Medicare program. The MACs audit the cost report to determine the amount owed to the provider, including amounts owed under IPPS and DSH. *Id.* at § 405.1803. Upon conclusion of the audit, the MAC issues a final determination known as a notice of program reimbursement ("NPR"), which itemizes adjustments and states the amount of the approved program reimbursement. *Id.*

If a provider is dissatisfied with the MAC's final determination, it may file an appeal with the Provider Reimbursement Review Board ("PRRB," or "Board"). 42 U.S.C. § 1395oo(a)(1)(A). Alternatively, a hospital can bring an appeal with the Board if it does not receive an NPR from the MAC within 12 months of submitting its cost report. 42 U.S.C. § 1395oo(a)(1)(B) & (C); 42 C.F.R. § 405.1835(c). That appeal must be filed within 180 days following the anniversary of the cost report submission. If the PRRB has jurisdiction to hear an appeal but lacks authority to decide

6

the legal question at issue, a hospital may request expedited judicial review ("EJR") to proceed directly to federal court. 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1842.  A provider may obtain judicial review of any final decision of the PRRB, including the granting of EJR, by commencing a civil action within 60 days of the hospital's receipt of that decision.  42 U.S.C. § 1395oo(f)(1).

### 4.    Medicaid Demonstration Projects and the Texas Demonstration

The Medicaid program, established as part of title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, is a federal entitlement program that provides "medical assistance" to certain categories of low-income individuals.  The federal Medicaid program is operated as a joint federal-state partnership under which Congress has appropriated funds for the Secretary to match a participating State's expenditures for "medical assistance."  42 U.S.C. § 1396a *et seq.*

In order to receive federal matching funds, states participating in the federal Medicaid program must receive the Secretary's approval of a state plan which must include certain statutorily-defined categories of individuals—commonly referred to as "Medicaid eligibility" categories.  These categories include low-income aged, blind, disabled and pregnant individuals. 42 U.S.C. § 1396d(a).  A state plan must also provide these Medicaid-eligible individuals with "medical assistance," which is defined as "payment" for certain specified categories of health care services, including inpatient hospital services and physician services.  *Id.*

As part of that federal-state partnership, the Medicaid statute allows states to experiment with different mechanisms for providing medical assistance, subject to the Secretary's approval. *Id.* § 1315(a).  If a State wishes to expand services or enlarge the group of individuals to whom it provides medical assistance beyond enumerated, mandatory Medicaid-eligible categories, the Secretary may waive certain eligibility requirements if he determines that the waiver for such a "demonstration project" "is likely to assist in promoting the objectives" of Medicaid.  *See Forrest*

7

*Gen.*, 926 F.3d at 224; 42 U.S.C. § 1315(a).  The Secretary's terms and conditions are set forth in a "section 1115 waiver."

When the Secretary approves a program that confers benefits in the form of medical assistance upon an expanded population not otherwise eligible for Medicaid—a "demonstration population"—he regards the State's expenditures to provide those benefits as "expenditures under the State plan," which are therefore matchable by federal funds.  42 U.S.C. §§ 1315(a)(2)(A) ("[C]osts of such project which would not otherwise be included as expenditures … shall, to the extent and for the period prescribed by the Secretary, be regarded as expenditures under the State plan."); 1396b(a)(1) (directing payment of federal matching funds).

In *NFIB v. Sebelius*, the Supreme Court held unconstitutional the Affordable Care Act's Medicaid expansion provisions insofar as they attempted to coerce states to expand Medicaid coverage.  *See* 567 U.S. 519, 581–85 (2012) (plurality op.), 689 (Scalia, J., dissenting) ("Seven Members of the Court agree that the Medicaid Expansion … is unconstitutional.").  Like many other states, Texas has exercised its right not to expand Medicaid enrollment.  *See* Opinion & Order at 4.  Instead, it has elected to provide medical assistance to low-income individuals through direct payments to hospitals to cover the cost of those individuals' inpatient care.  The Secretary approved the Texas Healthcare Transformation and Quality Improvement Program (the "Texas Demonstration") as a demonstration project after determining the program was "likely to assist in promoting the objectives" of Medicaid.  *See* ECF No. 1-1 at 3, 133; 42 U.S.C. § 1315(a).  Under the Texas Demonstration, the state's Medicaid program makes payments to hospitals from a pool of funds called an "Uncompensated Care" ("UCC") pool.  ECF No. 1-1 at 6, 45–47.  In January 2021—well after *Forrest General* and *Bethesda Health, Inc. v. Azar*, 980 F.3d 121 (D.C. Cir. 2020) made clear that UCC-eligible patients must be included in the Medicaid fraction—the

Secretary approved a ten-year extension of the Texas Demonstration. *See* CMS Approval Letter at 1-10, https://tinyurl.com/2t48yhza.  Prior to the issuance of the Exclusion Rule, the Secretary allowed Texas hospitals to count the inpatient days of UCC-eligible patients for DSH purposes, as consistent with the plain terms of the DRA.

###### 5.    Previous DSH Regulations and the Deficit Reduction Act of 2005

Over the last three decades, the Secretary has put forward shifting interpretations of the statutory provisions that relate to calculating the numerator of the Medicaid fraction.  For many years, the Secretary interpreted the reference to "a State plan approved under subchapter XIX" to *prohibit* counting as "eligible for medical assistance" patients made eligible for medical assistance under a demonstration project.  *See* 65 Fed. Reg. 3,136, 3,138 (Jan. 20, 2000) ("[O]ur policy was that [section 1115 days] were not allowable"); 65 Fed. Reg. 47,054, 47,087 (Aug. 1, 2000) ("[W]e initially determined that States under a Medicaid expansion waiver *could not* include those expansion waiver days as part of the Medicare DSH adjustment calculation …." (emphasis added)).  The Secretary's view was that demonstration-project patients were not "eligible" under a "State plan" under title XIX because their eligibility for medical assistance stemmed instead from the section 1115 waiver.  *See Cookeville Reg'l Med. Ctr. v. Thompson*, Civ. A. No. 04-1053, 2005 WL 3276219, at *6 (D.D.C. Oct. 28, 2005).

Then, in 2000, the agency reversed its interpretation and "revised" its policy "to allow hospitals to include the patient days of all populations eligible for Title XIX matching payments in a State's section 1115 waiver."  65 Fed. Reg. at 3,136–37.  As the Secretary explained in the 2000 policy reversal, because "section 1115 waiver days are utilized by patients whose care is considered to be an approved expenditure under Title XIX," "these days are considered to be Title XIX days by Medicaid standards."  65 Fed. Reg. at 47,087.  But the Secretary refused to apply that

new interpretation to pre-2000 DSH payments.  *See* 65 Fed. Reg. at 3,139 (making the new policy effective "with discharges occurring on or after January 20, 2000").

Providers successfully challenged that pre-2000 carveout, arguing that patients who benefited from demonstration projects during that time period must likewise be considered "eligible for medical assistance under a State plan approved under [Medicaid]."  42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).  The Ninth Circuit, followed by the District Court for the District of Columbia, held that *all* demonstration-project patients were within that category.  *See Portland Adventist*, 399 F.3d at 1095–99; *Cookeville*, 2005 WL 3276219, at *8.[1]  These courts squarely rejected the Secretary's tortured theory that the statute somehow excluded patients before 2000 even as the exact same statutory text included patients after that date.

Following the Secretary's flip-flopping statutory interpretations and those judicial decisions, in the DRA, Congress amended the provisions regarding the DSH percentage formula to provide "clarification."  *See* Pub. L. No. 109-171, § 5002, 120 Stat. 4, 31 (2006).  It added the following paragraph after the provisions that set out the Medicaid fraction:

> In determining under subclause (II) the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under title XIX, the Secretary may, to the extent and for the period the Secretary determines appropriate, include patient days of patients not so eligible but who are regarded as such because they receive benefits under a demonstration project approved under title XI.

*Id.* § 5002(a) (codified at 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (hanging paragraph).  In clarifying that the Secretary's pre-2000 interpretation of the statute was incorrect, the language established a clear policy going forward: section 1115 patients' days were to be counted in the Medicaid fraction

---

[1] The district court later altered its decision after Congress amended the DSH provisions. *See Cookeville Reg'l Med. Ctr. v. Leavitt*, Civ. A. No. 04-1053, 2006 WL 2787831 (D.D.C. Sept. 26, 2006), *aff'd*, 531 F.3d 844 (D.C. Cir. 2008).

10

if patients receive benefits under a demonstration project and were thus "regarded" as Medicaid eligible.

### 6.    Courts Apply the DRA and Congress Acquiesces

In 2019, the Fifth Circuit, applying the statutory text of the DRA, held that the Secretary's attempt to prevent Mississippi hospitals from including in their Medicaid fractions hospital days attributable to patients eligible to benefit from a UCC pool "flouted the law's plain language." *Forrest Gen.*, 926 F.3d at 222.  The UCC pool at issue in *Forrest General* reimbursed providers for the uncompensated costs of providing inpatient hospital services to individuals who were not otherwise eligible for Medicaid.  The Court explained that "the governing statutory text is clear": patients who are "capable of receiving a demonstration project's helpful or useful effects by reason of a demonstration project's authority" must be counted in the Medicaid fraction.  *Id.* at 228, 229. That included patients eligible to have inpatient care paid for through the UCC pool.  *Id.* at 225, 234.  The Court later denied the Secretary's petition for rehearing *en banc*.  *See Forrest Gen.*, No. 18-60227 (5th Cir. Sept. 10, 2019), ECF 90-2.  The D.C. Circuit reached a similar decision regarding the Secretary's decision to exclude patient days attributable to Florida Low Income Pool payments.  *Bethesda Health, Inc. v. Azar*, 980 F.3d 121 (D.C. Cir. 2020).

After *Forrest General* and *Bethesda Health*, the Secretary initially yielded to the courts' holdings by making retroactive DSH payments to account for inpatient days of demonstration-project patients eligible to benefit from UCC pools.  *See* CMS, Transmittal R11912OTN, Change Request 12669 (Mar. 16, 2023) (issuing guidance for retroactive payments).  Moreover, as noted above, the Secretary allowed hospitals under the Texas Demonstration (and other similar demonstration programs) to count the inpatient days of UCC-eligible patients for DSH purposes. That framework has been left intact by Congress.  Amid much legislating on the Medicare and Medicaid programs in the intervening years, the operative provisions of the DRA governing the

11

calculation of the Medicaid fraction remain unchanged—even after their meaning was made clear and underscored by the Fifth Circuit and the D.C. Circuit. *See* Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1818 (2022); One Big Beautiful Bill Act, Pub. L. No. 119-21, 139 Stat. 72 (2025).

### 7.    The Exclusion Rule

In August 2023, over the objections of many commenters, the Secretary adopted the Exclusion Rule. That new regulation expressly excludes from the Medicaid fraction numerator patients who benefited from an uncompensated care pool as part of a demonstration project, beginning with discharges on October 1, 2023. The regulation states:

> Patients whose health care costs, including inpatient hospital services costs, for a given day are claimed for payment by a provider from an uncompensated, undercompensated, or other type of funding pool authorized under section 1115(a) of the Act to fund providers' uncompensated care costs are not regarded as eligible for Medicaid for purposes of [42 C.F.R. § 412.106(b)(4)(ii)] on that day and the days of such patients may not be included in [the Medicaid fraction].

88 Fed. Reg. 58,640, 59,332 (Aug. 28, 2023), promulgated at 42 C.F.R. § 412.106(b)(4)(iii); ECF No. 24-1 at 321.

The Secretary first proposed a similar regulation in 2021, to be effective in FY 2022, but he did not finalize the rule due to opposition from hospital providers in Texas and other affected states. *Id.* at 4–5 ("Commenters generally disagreed with the proposal … [CMS] stated that after further consideration of the issue  it had determined not to move forward with the proposal"). And again in 2022, he proposed a slightly modified version of the 2021 proposal to be effective for FY 2023. *Id.* at 5. But again, the Secretary did not finalize the proposal in response to opposition from hospital providers. *Id.* ("We indicated that due to the number and nature of the comments that we received, and after further consideration of the issue, we had determined not to move forward with the FY 2023 proposal."). The Secretary eventually adopted the current version of

12

his new DSH regulation even though hospital providers continued to explain in comments that several courts—including the Fifth Circuit—had previously rejected the Secretary's interpretation of the Medicare DSH statute upon which he was relying to promulgate the new rule. *Id.* at 7 ("In addition, many of these commenters also argued that two Federal appeals courts have held that the statute requires all patients who are 'capable of receiving a demonstration project's helpful or useful effect by reason of a demonstration project's authority' be counted in the Medicare DSH DPP Medicaid numerator, citing *Forrest General Hospital v. Azar*, 926 F.3d 221 (5th Cir. 2019), and *Bethesda Health, Inc. v. Azar*, 980 F.3d 121 (D.C. Cir. 2020).").

Commenters to the Exclusion Rule also emphasized providers' reliance interests and the inherent unfairness of the Secretary's decision, for purposes of the DSH percentage calculation, to take back and nullify his previous (and still effective) approval of those UCC pools. *See* 88 Fed. Reg. at 59,016; *Forrest Gen.*, 926 F.3d at 233 ("Once the Secretary authorizes a demonstration project, no take-backs."). The Secretary dismissed those concerns in finalizing the Exclusion Rule.

### 8. The 340B Drug Pricing Program

A hospital's DSH percentage affects more than only the hospital's Medicare reimbursements. That percentage is also a key metric for determining a hospital's eligibility for the federal 340B Drug Pricing Program. Congress created the 340B program, a component of the Public Health Service Act administered by the Health Resources & Services Administration ("HRSA"), to give covered entities such as hospitals access to discounts on purchases of outpatient drugs. *See* 42 U.S.C. § 256b. Participants are entitled to discounts off commercial rates charged by private drug manufacturers for drugs provided to hospital outpatients, whether or not those outpatients are covered by Medicare.

Congress decided that hospitals that serve a disproportionate share of low-income patients should be entitled to those discounts. For a hospital to qualify for the 340B program based on the

13

proportion of low-income patients it serves, its DSH percentage must meet or exceed a certain threshold. *See id.* § 256b(a)(4)(L)(ii), (a)(4)(O). HRSA relies on the DSH percentage set forth in a provider's most recently filed cost report to determine whether the provider qualifies for 340B discounts. *Id.* § 256b(a)(4)(L). If a hospital that participates in the 340B program files a cost report with a percentage below the applicable threshold, then it is immediately disqualified from the 340B program and cannot receive discounts for outpatient drugs. *See* HRSA, *340B Drug Pricing Program Frequently Asked Questions* (June 22, 2020) ("340B FAQs"), https://tinyurl.com/yfv5k2e6; *see also* Compl. ¶ 29. Once a hospital is disqualified from the program for a given year, it can never recoup discounts for that year.

Pursuant to the Exclusion Rule, Covenant filed a cost report for its 2024 fiscal year with a lower DSH percentage than the statute allows. As a result, Covenant did not participate in the 340B program in the following year and was therefore deprived of the opportunity to access valuable 340B discounts. Covenant was otherwise entitled to obtain those discounts but will not be able to recover those lost savings retroactively.

## B.    Prior Litigation

As this Court will recall, fourteen Texas hospitals, including Covenant, challenged the Exclusion Rule in *Baylor All Saints*. *See* Case No. 4:24-cv-000432-P, ECF No. 6 at 26–27, ECF No. 8-1 at 2–7; Compl. ¶¶ 45–53. Prior to filing suit in the Fort Worth Division, the plaintiffs had filed an appeal request with the PRRB. *Id.*, ECF No. 1-2 at 2–3. The PRRB decided that it lacked jurisdiction because the *Baylor All Saints* plaintiffs had not filed cost reports or otherwise satisfied the requirements for Board review under the Medicare statute. *Id*. at 3, 21. The PRRB also relatedly concluded that the Exclusion Rule was not a "final determination" directly appealable to the Board under 42 U.S.C. § 1395oo(a)(1)(A)(i) or (ii). *Id*. In other words, the PRRB deemed

14

the hospitals' challenge to the Exclusion Rule premature and therefore not within the Board's jurisdiction.

Before this Court, the *Baylor All Saints* plaintiffs requested an order finding that their PRRB appeals were jurisdictionally proper and also vacating the Exclusion Rule as contrary to the Medicare statute. *Id.*, ECF No. 1 at 25–29. The plaintiffs moved for a stay of the effective date of the Exclusion Rule under 5 U.S.C. § 705, or, alternatively, a preliminary injunction against implementation of the Rule. *Id.*, ECF No. 7. The plaintiffs explained that in the absence of such relief, they faced a substantial threat of irreparable harm in the form of unrecoverable economic losses if they were wrongfully deemed ineligible for the 340B program. *Id.*, ECF No. 8 at 27–28. This Court determined that there were no factual disputes to be resolved and gave notice of its intent to convert the motion into a motion for summary judgment and proceed to a resolution on the merits. *Id.*, ECF No. 11. Just under two months after the plaintiffs had filed their amended complaint, this Court granted judgment in their favor. *Id.*, Opinion & Order.

First, this Court agreed with plaintiffs that the PRRB violated procedural requirements in its dismissal decision. *Id.* at 8–9. Second, this Court held that the PRRB's jurisdictional decision was erroneous; the hospitals did not need to submit cost reports prior to challenging the Exclusion Rule because the Exclusion Rule itself was a final determination of the Secretary as to the DSH adjustment, which is an amount of payment under subsection (d) of 42 U.S.C. § 1395ww. *Id.* at 9 (citing 42 U.S.C. § 1395oo(a)(1)(A)(ii)). Third, this Court concluded that there was no reason to remand the claims to the PRRB, which lacked the authority to decide the validity of the regulation, because "sending the Hospitals back to PRRB would be lengthy, costly, and futile." *Id.* at 10. Finally, reaching the merits, this Court held that the Fifth Circuit's decision in *Forrest General* "directly controls the [c]ourt's inquiry—and clarifies that the Exclusion Rule contradicts the

15

[Medicare] statute's plain text," rendering the rule "unlawful." *Id*. at 10-12. Accordingly, the district court vacated the Exclusion Rule, consistent with "the Fifth Circuit's 'ordinary practice [of] vacat[ing] unlawful agency action.'" *Id*. at 15–16 (quoting *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022)).

On appeal, the Fifth Circuit reversed. Rejecting the argument that the Exclusion Rule itself was a final determination supporting jurisdiction, the Fifth Circuit held that the plaintiffs had filed their challenge before the Board prematurely. "[T]he presentment requirement cannot be fulfilled before a hospital submits its cost report to a Medicare Administrative Contractor [MAC]," the court explained, and "[b]ecause the hospitals failed to present a claim to the agency, the district court had no jurisdiction to hear the case." *Baylor All Saints*, 161 F.4th at 303–04. The court recognized that the hospitals "may suffer irreparable delay-related costs," but held that "such costs are not sufficient to exempt them from the channeling requirement." *Id*. at 305. As the Fifth Circuit concluded that it lacked jurisdiction to hear the case, it did not address the merits of the hospitals' challenge to the Exclusion Rule.

## C.    Factual and Procedural Background

On November 27, 2024, Covenant filed—and the Medicare contractor received— Covenant's annual cost report for the reporting period spanning July 1, 2023, through June 30, 2024. In preparing the DSH calculation for that cost report, Covenant complied with the Secretary's Exclusion Rule by excluding from the numerator of the Medicaid fraction patient days of patients who, on or after October 1, 2023, received inpatient hospital benefits from the UCC Pool under the Texas Section 1115 Waiver. If not for that regulation, Covenant would have included those patient days in its most recent report, increasing its DSH percentage and thereby rendering it eligible for participation in the 340B program. *See* Compl. ¶¶ 55, 62.

16

On December 12, 2025, more than a year after filing its annual cost report and having not received an NPR from the Medicare contractor, Covenant filed an appeal with the Board contending that its DSH payment for the reporting period ending June 30, 2024, was understated due to the unlawful requirements of the Exclusion Rule. The Board had jurisdiction over that appeal because more than a year had passed since Covenant filed its cost report without the MAC issuing an NPR; the appeal was filed within 180 days of the one-year anniversary of the filing of the cost report; and the amount in controversy exceeded $10,000. *See* 42 U.S.C. § 1395oo(a)(1).

On December 19, 2025, Covenant submitted a request for the Board to grant expedited judicial review of its appeal. By letter dated January 13, 2026, the Board granted Covenant's request for expedited judicial review, finding that it had jurisdiction over Covenant's appeal but lacked authority to grant the requested relief. ECF No. 1-2 (PRRB's EJR Determination) at 21 ("[T]he Board finds that the question of the validity of the § 1115 Waiver Days issue, as set forth in the August 28, 2023 Federal Register, properly falls within the provisions of 42 U.S.C. § 1395oo(f)(1) and hereby grants the Provider's request for EJR for the issue and the subject year."). In other words, unlike in *Baylor All Saints*, the PRRB expressly recognized that it had jurisdiction over Covenant's appeal and, in turn, granted the request for judicial review.

Covenant has timely initiated this action pursuant to § 1395oo(f)(1). *See* Compl. ¶¶ 54–58.

### III.    LEGAL STANDARDS

#### A.    Administrative Procedure Act

This Court must "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction [or] authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D). An agency's statutory interpretations

17

receive no deference; courts "shall decide all relevant questions of law" and "interpret … statutory provisions" by "applying [the Court's] own judgment." *Rest. L. Ctr. v. United States Dep't of Lab.*, 120 F.4th 163, 170 (5th Cir. 2024) (quoting 5 U.S.C. § 706 and *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2261 (2024)).

Agency action is considered arbitrary and capricious if, as relevant here, the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also* Sw. *Elec. Power Co. v. EPA,* 920 F.3d 999, 1013–14 (5th Cir. 2019) (similar).

### B.    Summary Judgment

"Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Rest. L. Ctr.*, 120 F.4th at 170 (quoting Fed. R. Civ. P. 56(a)). "In a case challenging an agency action under the Administrative Procedure Act ('APA'), summary judgment 'serves as the mechanism for deciding' whether the action 'is supported by the administrative record and otherwise consistent with the APA standard of review.'" *Outsourcing Facilities Ass'n v. United States Food & Drug Admin.*, No. 4:25-CV-0174-P, 2025 WL 1697270, at *1 (N.D. Tex. June 13, 2025) (Pittman, J.) (quoting *MRC Energy Co. v. U.S. Citizenship & Immigr. Servs.*, No. 3:19-cv-2003-K, 2021 WL 1209188, at *3 (N.D. Tex. Mar. 31, 2021) (citation omitted)).

### IV.    ARGUMENT

As this Court recognized in *Baylor All Saints*, the Exclusion Rule is contrary to the text of the Medicare statute and squarely foreclosed by the Fifth Circuit's decision in *Forrest General*. That binding precedent controls this case. Moreover, the Exclusion Rule is independently

18

unlawful because it was promulgated in an arbitrary and capricious manner.  Even assuming that the Medicare statute had given the Secretary the discretion he claims, the Secretary did not exercise that discretion reasonably or consistently with Congress's intent.  The Secretary arbitrarily discriminated against UCC pools based on factors not provided for in the relevant statute, undermined the purpose of the DSH adjustment, and did not adequately explain why he exercised his purported discretion to reverse course on the inclusion of section 1115 inpatient days, especially in light of the reliance concerns raised by this retroactive take-back.

### A.    The Exclusion Rule Is Contrary to Law.

The Exclusion Rule is unlawful because it conflicts with the text of the Medicare statute. As the Fifth Circuit held in *Forrest General*, "the governing statutory text is clear": "if patients underlying a given day were Medicaid-eligible or 'receive[d] benefits under a demonstration project,' then that day goes into the numerator [of the Medicaid fraction]. Period." *Forrest Gen.*, 926 F.3d at 228-29 (quoting 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II)); *see also* Opinion & Order at 10 ("[T]he Exclusion Rule contradicts the statute's plain text").  The Secretary cannot deny by regulation the full DSH adjustment to which Covenant and similarly situated hospitals are entitled by statute.

*Forrest General*, which addressed facts closely analogous to the facts of this case, "directly controls the Court's inquiry." *Id.*  *Forrest General* concerned Mississippi's demonstration project, approved by the Secretary in 2005, which included a UCC pool that provided medical assistance to individuals affected by Hurricane Katrina.  *Forrest Gen.*, 926 F.3d at 226.  That medical assistance took the form of payments made directly to providers to cover the cost of those individuals' inpatient care.  *Id.*  When the agency calculated participating hospitals' DSH percentages, it excluded from the Medicaid fraction inpatient days attributable to individuals eligible to have their costs covered by the UCC pool.  *Id.* at 226–27.  The Fifth Circuit rejected

19

that exclusion as unlawful, holding that the statute unambiguously required those inpatient days to be counted. *Id.* at 229. Here, likewise, the statute unambiguously requires inpatient days attributable to UCC-eligible patients to be counted.

*Forrest General* authoritatively construed every statutory provision applicable here. *See id.* at 223–24 (addressing 42 U.S.C. §§ 1395ww(d)(5)(F)(vi)(II) & hanging paragraph, 1315(a)(2)). The Fifth Circuit explained that the "statute's mechanics are straightforward":

> Section 1395ww(d)(5)(F)(vi)(II) says to include days that a hospital treated patients eligible under a Medicaid-approved state plan in the Medicaid fraction's numerator. And if the Secretary approves a demonstration project, then we regard patient days involving patients who 'receive benefits under a demonstration project' as if they were patient days attributable to Medicaid-eligible patients (which means those days also go into the numerator).

*Id.* at 228–29. The court also held that because the ordinary meaning of "eligible" is simply "capable of receiving," a patient is "regarded as" Medicaid-eligible if he is capable of receiving some "benefits" under a demonstration project, meaning anything "helpful or useful." *Id.* at 229 (emphasis omitted). Putting these pieces together, "the statute means that patients who aren't *actually* Medicaid-eligible still count towards the Medicaid fraction's numerator if they're considered or accounted to be capable of receiving a demonstration project's helpful or useful effects by reason of a demonstration project's authority." *Id.* (emphasis in original). There's "only one plausible way to read this" language; the statute "unambiguous[ly]" includes those Section 1115 patient days. *Id.*

Applying the statute to UCC pools like the one in the Texas Demonstration falls within the heartland of *Forrest General*. The Texas UCC pool is part of an approved Medicaid demonstration project. 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (hanging paragraph). "[M]edical assistance" is defined to include "payment of part or all of the cost of the following care and services or the care and services themselves," including inpatient hospital services. *Id.* § 1396d(a), (a)(1). Under the

20

Texas Demonstration, as approved by the Secretary, expenditures from the UCC pool to offset providers' uncompensated costs of treating uninsured individuals as charity care "shall, for the period of" the demonstration project, "be regarded as expenditures under the State's … plan." ECF No. 1-1 at 5, 7.  So payments from the UCC pool are "medical assistance."  Patients capable of receiving that medical assistance are therefore "regarded as" eligible for Medicaid "because they receive benefits under a demonstration project."  42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (hanging paragraph); *see also Forrest Gen.*, 926 F.3d at 234 ("Medical assistance is a benefit.  And medical assistance is precisely what UCCP patients got.").  That means that inpatient days attributable to individuals whose costs were covered by the UCC pool must be counted in the numerator of the Medicaid fraction.

The statute gives the Secretary discretion prospectively to approve or disapprove of a demonstration project, but his discretion ends there.  "The Secretary *may* exercise discretion, and the Secretary *did* exercise that discretion" by approving the demonstration project.  *Forrest Gen.*, 926 F.3d at 233 (emphasis in original).  In other words, "[o]nce the Secretary authorizes a demonstration project, no take-backs.  The statutory discretion isn't discretion to exclude populations that the Secretary has already authorized and approved for a given period; it's discretion to authorize the inclusion of those populations in the first place."  *Id.*

In *Baylor All Saints*, applying the statute's plain meaning and *Forrest General*, this Court had no difficulty concluding that the Exclusion Rule is contrary to law:

> This case is simple on the merits. Resolving this dispute doesn't require the judicial skills of Learned Hand or Oliver Wendall Holmes. While HHS may protest, a recent "spotted dog" decision by the Fifth Circuit directly controls the Court's inquiry— and clarifies that the Exclusion Rule contradicts the statute's plain text.

*See* Opinion & Order at 10 (citing *Forrest Gen.*, 926 F.3d at 228–29).  Specifically, this Court noted, "the Fifth Circuit has already rejected the arguments HHS raises here, clarifying that the

21

numerator' of the Medicaid fraction "includes hospital days of Medicaid-eligible patients *and* those treated as such pursuant to a § 1115 waiver." Opinion & Order at 11. As to the Texas Demonstration, because the Secretary had already "approved UCC pool payments under" the program, the Exclusion Rule could not "swe[ep] that approval under the rug." *Id*. The Fifth Circuit had "roundly reject[ed]" the same basic move in *Forrest General*, and "[t]he only other court to address this question—the D.C. Circuit" had "agree[d]." *Id*. Indeed, the "clarity" of *Forrest General* "obviate[d] the need for additional analysis" of the Secretary's "already-rejected arguments." *Id*.

On appeal in *Baylor All Saints*, the Secretary advanced three main arguments on the merits: (1) that he has broad discretion to determine whether to include a demonstration-project patient in the numerator, (2) that *Forrest General* must be reversed, and (3) that this Court overread the import of *Forrest General*.

The first argument is the very same one that this Court, applying the Fifth Circuit's clear precedent in *Forrest General*, considered and soundly rejected. *Id*. at 11–12 ("As in *Forrest General*, HHS again argues the Secretary has discretion to decide which days go in the calculation. *See* ECF No. 14 at 20–25. But the Fifth Circuit addressed this point in *Forrest General*…."). Although the Secretary may yet again attempt to resurrect that theory of retroactive discretion, this Court correctly recognized that it is foreclosed by binding precedent.

The Secretary's second argument lays bare the Secretary's real wish: not to comply with *Forrest General*, but to be free of it altogether, because the Exclusion Rule simply cannot be squared with that precedent. As the Secretary himself acknowledged, however, only the Fifth Circuit sitting *en banc* can overrule circuit precedent. Notably, the Fifth Circuit already rejected

22

the Secretary's request for *en banc* consideration of the panel's unanimous decision in Forrest

*General*. *See* No. 18-60227 (5th Cir. Sept. 10, 2019), ECF 90-2.

The Secretary's final argument—a half-hearted attempt to cabin *Forrest General*—falls

flat on even a cursory reading of *Forrest General* itself.  In *Baylor All Saints*, the Secretary argued

that this Court overread *Forrest General* because, according to the Secretary, that decision was

based on the Fifth Circuit's interpretation of the Secretary's prior regulation—not an interpretation

of the Medicare statute.  That argument ignores *Forrest General*'s own clear explanation of its

holding, which was unmistakably based on the statute:

> *[T]he statute* means that patients … count towards the Medicaid fraction's numerator if they're considered or accounted to be capable of receiving a demonstration project's helpful or useful effects by reason of a demonstration project's authority. There's only one plausible way to read this. Thus, *the statute* is unambiguous ….

*Forrest Gen.*, 926 F.3d at 229 (emphasis added); *see also Bethesda Health, Inc.*, 389 F. Supp. 3d

at 47 (noting the statute "is already clear when unadorned").  By authoritatively construing the

statute, the Fifth Circuit necessarily foreclosed the Secretary's ability to get around its decision

simply by promulgating a new regulation.

> **B.    The Exclusion Rule Is Arbitrary and Capricious.**

Furthermore, even if the Secretary's statutory interpretation were not foreclosed by both

the unambiguous language of the Medicare statute and binding precedent, Covenant would still

prevail because the regulation is arbitrary and capricious for multiple independent reasons.  The

Secretary's insistence on regarding as Medicaid-eligible only those patients who "receive *health*

*insurance* through a section 1115 demonstration" 88 Fed. Reg. at 59,016 (emphasis added)—as

opposed to other types of medical assistance—makes no sense and has no basis in the statute.

Nothing in law or logic warrants equating health *benefits* with health *insurance*.  The Secretary

observed that Medicaid-eligible individuals "are eligible for, among other things, specific benefits

23

related to the provision of inpatient hospital services in the form of inpatient hospital insurance."

88 Fed. Reg. at 59,017. The Secretary then drew the following conclusion:

> [b]ecause funding pool payments to hospitals authorized by a section 1115 demonstration do not provide health insurance to any patient, nor do the payments inure to any specific individual, uninsured patients whose costs are subsidized by uncompensated/undercompensated care pool payments to hospitals do not receive benefits to the extent that or in a manner similar to the full equivalent of "medical assistance" available to those eligible under a Medicaid State plan.

*Id.* But that is a non-sequitur. The Secretary's view that patients eligible fore inpatient benefits through an approved section 1115 UCC pool receive only a "limited benefit,", *id.* at 59,016, not only is incorrect, it is also   immaterial because Congress did not authorize the Secretary to take that factor into consideration when making DSH adjustments. The new regulation is therefore arbitrary and capricious. *See State Farm Mut. Auto. Ins.*, 463 U.S. at 43 (explaining that it is arbitrary for an agency to "rel[y] on factors which Congress has not intended it to consider"). In any event, the Secretary *already* approved the UCC benefits as "medical assistance" when he approved the section 1115 waiver.

The Secretary asserts that "at root," "'medical assistance under a State plan approved under [Medicaid]' provides Medicaid beneficiaries with health insurance, not simply medical care." 88 Fed. Reg. at 59,016. The Secretary also characterizes UCC benefits as lesser in value or worth than health insurance. *See id.* at 59,020. But the statute "does not require uninsured and underinsured patients to enroll in a health insurance plan." *Bethesda Health, Inc. v. Azar*, 389 F. Supp. 3d 32, 46 (D.D.C. 2019). Indeed, it defines "medical assistance" as "*payment of part or all of the cost* of" specified care and services, "or the care and services themselves, or both." 42 U.S.C. § 1396d(a) (emphasis added). Inpatient hospital services are specifically enumerated as a form of "medical assistance." *Id.* § 1396d(a)(1). (Enrollment in an insurance product is not. *Id.*) Payments from the UCC pool to defray the cost of medical services provided to uninsured

24

individuals as charity care, Compl. ¶¶ 19–20, are medical assistance. *See Forrest Gen.*, 926 F.3d at 234. The Secretary's preference for formal health insurance plans is unjustified and unmoored from the statutory scheme. The Secretary's admitted goal is to "incentivize[] states to expand Medicaid eligibility by including in the … Medicaid fraction numerator only the days of patients made eligible for health insurance under a State plan or section 1115 demonstration." 88 Fed. Reg. at 59,022. But the Secretary cannot pursue that goal by essentially penalizing the states that seek to offer medical assistance in a manner other than Medicaid expansion under the Affordable Care Act, *see NFIB*, 567 U.S. at 575–78 (controlling op.)—particularly after the Secretary and those states have already reached a mutual agreement in the form of a section 1115 demonstration, *see Forrest Gen.*, 926 F.3d at 233.

The Secretary also failed to adequately account for the purpose of the DSH adjustment. As the Secretary acknowledged, Congress implemented the DSH adjustment "to recognize the higher costs to hospitals of treating low-income individuals covered under Medicaid." 88 Fed. Reg. at 59,013. UCC pools promote the objectives of Medicaid (as the Secretary found when he approved the pools) because they "help hospitals that treat the uninsured and underinsured stay financially viable so they can treat Medicaid patients." *Id.* at 59,015. The Secretary does not assert that the higher costs of treating low-income individuals who benefit from UCC pools are any different from the higher costs of treating low-income individuals who benefit from section 1115 demonstrations in other ways. Thus, he has not justified his regulation in light of the undisputed statutory purpose.

The Secretary speculated that counting UCC patients might "distort the Medicaid proxy" because "[a]n uninsured patient who does not pay their hospital bill (thereby creating uncompensated care for the hospital) is not necessarily a low-income patient." 88 Fed. Reg. at

59,017.  But the Secretary did not cite any evidence or data to support his conjecture that there are UCC patients who are uninsured but not low-income, much less that this population is so large as to meaningfully "distort" the proxy.  In addition, even though commenters pointed out that Texas's UCC pool only provides funds to hospitals for costs incurred in providing medical services to uninsured individuals who had demonstrated financial need according to the hospitals' charity care policies, the Secretary merely "disagree[d]" that this undermined his rationale, without explaining his disagreement.  *Id.* at 59,022.

Finally, the regulation is arbitrary and capricious because the Secretary did not adequately explain his about-face in exercising his purported discretion to exclude inpatient days attributable to section 1115 UCC pools that he already approved.  Commenters emphasized providers' reliance interests and the inherent unfairness of the Secretary's decision, for purposes of the DSH percentage calculation, to take back his previous (and still effective) approval of those UCC pools.  *See* 88 Fed. Reg. at 59,016; *Forrest Gen.*, 926 F.3d at 233 ("Once the Secretary authorizes a demonstration project, no take-backs.").  The Secretary's response to those concerns rings hollow.  He stated that the new DSH regulation "will not change the terms of any current demonstration or the calculations of *Medicaid* payments made thereunder."  88 Fed. Reg. at 59,025.  That is not the point.  As *Forrest General* explained, the point is that the Secretary has already exercised his discretion to regard UCC pool patients as though they are Medicaid-eligible, and so he must continue to regard them as such for all purposes, including for DSH adjustments.

The Secretary asserted in conclusory fashion that the new regulation does not "unsettle any legitimate reliance interest the hospitals may otherwise have in future Medicare DSH payments adjustments."  *Id.*  But flatly denying that the hospitals' reliance interests are legitimate is not a legally adequate response to commenters' concerns.  When there are "serious reliance interests"

26

at stake, those interests "must be taken into account. It would be arbitrary or capricious to ignore such matters." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (citation omitted); *see also DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 30–31 (2020) (similar); *R.J. Reynolds Vapor Co. v. Food & Drug Admin.*, 65 F.4th 182, 189 (5th Cir. 2023) ("[W]hen an agency changes course, it must take into account serious reliance interests") (quotations and citations omitted). The Secretary asserted that because a demonstration project can have multiple aspects, it might establish one group that "the Secretary regards as Medicaid eligible because they receive health insurance through the demonstration, while also creating a separate category of payments that do not provide health insurance to individuals," such as UCC pools. 88 Fed. Reg. at 59,015. But the Secretary drew no such distinction when he approved existing section 1115 waivers, and his belated attempt to create such a distinction retroactively for purposes of the DSH adjustment is unjustified. The Exclusion Rule is thus unlawful not only because it is contrary to statute, but also because it is a textbook example of arbitrary-and-capricious agency action.

### C.    Vacatur Is the Appropriate Remedy.

Should the Court grant summary judgment in Plaintiff's favor, the most appropriate remedy would be vacatur of the challenged regulation. *See* Compl. ¶ 71(a). The Court is required to "hold unlawful and set aside" agency action that is "arbitrary, capricious, … or otherwise not in accordance with law." 5 U.S.C. § 706. "In such circumstances, [the Fifth Circuit's] 'default rule is that vacatur is the appropriate remedy.'" *Ams. for Beneficiary Choice v. United States Dep't of Health & Human Services*, 795 F. Supp. 3d 895, 910 (N.D. Tex. 2025) (O'Connor, J.) (quoting *Rest. L. Ctr.*, 120 F.4th at 177 (further quotation omitted)).

Here, the agency action is the Exclusion Rule, and it is clearly unlawful, not only as applied to Plaintiff. Thus, it is entirely reasonable to set aside—*i.e.*, vacate—the Rule universally. As the Fifth Circuit has held, "the scope of ultimate relief under [5 U.S.C.] Section 706 … is not party-

27

restricted." *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024), *cert. granted on other grounds sub nom. Dep't of Educ. v. Career Colls. & Schs. of Tex.*, 145 S. Ct. 1039, 2025 WL 65914 (Jan. 10, 2025) (Mem.); *see also In re Clarke*, 94 F.4th 502, 512 (5th Cir. 2024) ("Should plaintiffs prevail … this court must 'set aside' [the challenged agency] action, with nationwide effect."). That is particularly warranted here given the significant number of interested and affected parties that opposed the Exclusion Rule during the rulemaking process, brought lawsuits challenging the rule, including before this Court in *Baylor All Saints*, and presumably would do so again after satisfying jurisdictional requirements. However, there is no good reason to require impacted hospitals to jump through those hoops and flood the Courts with these individualized legal challenges when the Exclusion Rule is invalid on its face.

Just as this Court concluded that vacatur was the appropriate remedy in *Baylor All Saints*, it is appropriate for the same reasons here. *See* Opinion & Order at 16 ("The Hospitals say vacatur is warranted and the Court agrees, especially considering 'vacatur does nothing but re-establish the status quo absent unlawful agency action.'" (quoting *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022)).

## V.   CONCLUSION

For the foregoing reasons, the Court should grant Plaintiff's motion for summary judgment.

Dated:  February 9, 2026              Respectfully submitted,

*/s/ Bobby Hill*                      */s/ Nikesh Jindal*
Robert M. Hill                        Nikesh Jindal (admitted *pro hac vice*)
Texas Bar No. 24125624                Mark D. Polston (admitted *pro hac vice*)
KING & SPALDING LLP                   Christopher P. Kenny (admitted *pro hac vice*)
2501 Olive Street, Suite 2300         Alexander Kazam (admitted *pro hac vice*)
Dallas, Texas 75201                   Alek Pivec (admitted *pro hac vice*)
Tel: 214-764-4414                     Ahsin Azim (admitted *pro hac vice*)
Fax: 214-764-4601                     KING & SPALDING LLP
rhill@kslaw.com                       1700 Pennsylvania Avenue NW
                                      Suite 900
                                      Washington, D.C. 20006
                                      (202) 737-0500 (phone)
                                      (202) 626-3737 (fax)
                                      NJindal@kslaw.com
                                      MPolston@kslaw.com
                                      CKenny@kslaw.com
                                      AKazam@kslaw.com
                                      APivec@kslaw.com
                                      AAzim@kslaw.com


                                      *Attorneys for Plaintiff*


## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the CM/ECF system on this day, will be sent via electronic mail to the registered participants as identified on the Notice of Electronic Filing.


Dated: February 9, 2026                         */s/ Bobby Hill*
                                                Robert M. Hill