IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

_____

COVENANT MEDICAL CENTER,

     Plaintiff,

v.

ROBERT F. KENNEDY, JR.,

     Defendant.

Civil Action No. 4:26-cv-00077-P

**BRIEF IN SUPPORT OF DEFENDANT'S RESPONSE
<u>TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>**

RYAN RAYBOULD
UNITED STATES ATTORNEY

Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:    214-659-8626
Facsimile:    214-659-8807
brian.stoltz@usdoj.gov

Attorneys for Defendant

**Table of Contents**

I.      Introduction.................................................................................................... 1

II.     Statutory and Regulatory Background................................................................. 4

        A.      Medicare pays for inpatient hospital care using a "Prospective
                Payment System" that essentially pays a flat, pre-determined rate
                based on the patient's diagnosis.................................................................. 4

        B.      Hospitals can also receive additional payments through the DSH
                adjustment. ...................................................................................... 5

        C.      A hospital's overall payments are determined on a yearly basis with
                administrative and judicial review then available................................... 6

        D.      Calculating a hospital's DSH payment requires computing a Medicaid
                fraction that may—or may not—include patients who were not actually
                Medicaid beneficiaries but whose treatment costs were reimbursed
                under a demonstration project.................................................................. 7

        E.      Whether to include patients treated under demonstration projects in the
                Medicaid DHS fraction has been the subject of prior litigation and
                statutory amendment. ............................................................................ 9

        F.      The agency amends its regulations in 2023 to clarify that only
                demonstration-project patients who receive the equivalent of health
                insurance should be included in the DSH fraction—and that a hospital's
                receipt of uncompensated care costs for patients who do not receive
                insurance-like benefits does not qualify for inclusion of those patients
                in the fraction. ...................................................................................... 10

III.    Factual and Procedural Background .................................................................. 11

        A.      Texas seeks and receives approval for a demonstration project that
                reimburses hospitals for certain uncompensated care costs but that
                does not provide insurance-like benefits to specific patients.............................. 11

        B.      Plaintiff challenges the exclusion from the DSH fraction of patients for
                whom it received uncompensated care cost payments in the *Baylor All
                Saints* litigation, but the Fifth Circuit reverses for lack of jurisdiction. ............... 12

        C.      Plaintiff files the current suit after exhausting administrative remedies.............. 13

IV.     Legal Standard ....................................................................................... 13

V.      Argument and Authorities................................................................................ 13

A.  The Medicare statute grants the Secretary broad discretion to determine when demonstration-project patients should be included in the DSH fraction. ................................................................. 14

B.  The 2023 Final Rule is consistent with the plain language of the statute—and thus is not "contrary to law" under the APA. ................................. 19

C.  The Fifth Circuit's *Forrest General* decision does not support Plaintiff............. 22

D.  The 2023 Final Rule is not arbitrary or capricious. ............................................. 29

E.  Alternately, should the Court agree with Plaintiff's arguments, it should nonetheless limit its relief to Plaintiff and not order an across-the-board vacatur of the 2023 Final Rule. ................................................. 34

VI.  Conclusion ..................................................................................................................... 39

**Table of Authorities**

Cases

*Advoc. Christ Med. Ctr. v. Kennedy*,
    605 U.S. 1 (2025)......................................................................................19, 20, 21

*Am. Sch. of Magnetic Healing v. McAnnulty*,
    187 U.S. 94 (1902)...................................................................................................36

*Am. Stewards of Liberty v. Dep't. of Interior*,
    370 F. Supp. 3d 711 (W.D. Tex. 2019)..............................................................13

*Arizona v. Biden*,
    40 F.4th 375 (6th Cir. 2022) .........................................................................37, 38

*Baylor All Saints Med. Ctr. v. Kennedy*,
    161 F.4th 298 (5th Cir. 2025) .........................................................................1, 13

*Baylor All Saints Med. Ctr. v. Becerra*,
    745 F. Supp. 3d 464 (N.D. Tex. 2024) .......................................1, 12, 22, 35, 37

*Becerra v. Empire Health Found.*,
    597 U.S. 424 (2022)...................................................................................................6

*Bethesda Health, Inc. v. Azar*,
    980 F.3d 121 (D.C. Cir. 2020)..............................................................10, 16, 17

*California v. Texas*,
    593 U.S. 659 (2021)...............................................................................................38

*Califano v. Yamasaki*,
    442 U.S. 682 (1979)........................................................................................34, 39

*Chestnut Hill Benevolent Ass'n v. Burwell*,
    142 F. Supp. 3d 91 (D.D.C. 2015).......................................................................5

*Cookeville Reg'l Med. Ctr. v. Leavitt*,
    531 F.3d 844 (D.C. Cir. 2008)...........................................15, 22, 24, 25, 29

*Cookeville Reg'l Med. Ctr. v. Thompson*,
    No. 05-1053, 2005 WL 3276219 (D.D.C. Oct. 28, 2005). ................................8

*Cty. of Los Angeles v. Shalala*,
    192 F.3d 1005 (D.C. Cir. 1999).......................................................................4–5

*Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*,
    45 F.4th 846 (5th Cir. 2022) ........................................................................35

*Doran v. Salem Inn, Inc.*,
    422 U.S. 922 (1975)......................................................................................37

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021)......................................................................................30

*Forrest Gen. Hosp. v. Azar*,
    926 F.3d 221 (5th Cir. 2019) ...................................1, 2, 10, 15, 16, 17, 19, 24, 26, 27, 29

*Gill v. Whitford*,
    585 U.S. 48 (2018)........................................................................................35

*Good Samaritan Hosp. v. Shalala*,
    508 U.S. 402 (1993)........................................................................................5

*Hecht Co. v. Bowles*,
    321 U.S. 321 (1944)......................................................................................35

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024)......................................................................................30

*Massachusetts v. Mellon*,
    262 U.S. 447 (1923)......................................................................................37

*Methodist Hosp. of Sacramento v. Shalala*,
    38 F.3d 1225 (D.C. Cir. 1994) .......................................................................4

*Ne. Hosp. Corp. v. Sebelius*,
    657 F.3d 1 (D.C. Cir. 2011)............................................................................5

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004)........................................................................................36

*Portland Adventist Med. Ctr. v. Thompson*,
    399 F.3d 1091 (9th Cir. 2005) ........................................................................8

*Rest. Law Ctr. v. U.S. Dep't of Lab.*,
    120 F.4th 163 (5th Cir. 2024) .......................................................................35

*Spry v. Thompson*,
    487 F.3d 1272 (9th Cir. 2007) ........................................................................7

*Starbucks Corp. v. McKinney*,
    602 U.S. 339 (2024)......................................................................................35

*Stephenson v. Shalala*,
    87 F.3d 350 (9th Cir. 1996) ......................................................................................5

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025)......................................................................................34, 37, 39

*Tucson Med. Ctr. v. Sullivan*,
    947 F.2d 971 (D.C. Cir. 1991) ..................................................................................4

*United States v. Texas*,
    599 U.S. 670 (2023)................................................................................35, 36, 37, 38

*Wash. Hosp. Ctr. v. Bowen*,
    795 F.2d 139 (D.C. Cir. 1986) ..................................................................................4

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982)................................................................................................35

*Worldcall Interconnect, Inc. v. FCC*,
    907 F.3d 810 (5th Cir. 2018) ..............................................................................30, 32

Statutes, Rules, and Other Authorities

1 Tex. Admin. Code § 354.1005(a) ..........................................................................31

5 U.S.C. § 702(1) ....................................................................................................38

5 U.S.C. § 703.....................................................................................................36, 38

5 U.S.C. § 706(2) ....................................................................................................37

5 U.S.C. § 551(13) ..................................................................................................39

42 C.F.R. § 405.1803(a)............................................................................................7

42 C.F.R. § 405.1842 ................................................................................................7

42 C.F.R. § 412.106 ............................................................................................10, 11

42 C.F.R. § 412.106(b)(4)(i)....................................................................................17

42 C.F.R. § 412.106(b)(4)(ii)...............................................................................17, 32

42 C.F.R. § 412.106(b)(4)(iii).............................................................................17, 32

42 C.F.R. § 412.116(b)(2)..........................................................................................6

42 C.F.R. § 431.412(a)(2).........................................................................................23

42 C.F.R. § 431.412(c)(2)(ii) ................................................................................................23

42 C.F.R. § 431.412(c)(3) ......................................................................................................23

42 C.F.R. § 447.15 ..................................................................................................................31

42 U.S.C. § 256b(a)(4)(L) ......................................................................................................22

42 U.S.C. § 1315(a)(1) .......................................................................................................7, 23

42 U.S.C. § 1395dd .................................................................................................................21

42 U.S.C. § 1395*oo*(a) ..............................................................................................................7

42 U.S.C. § 1395*oo*(a)(3) .........................................................................................................7

42 U.S.C. § 1395*oo*(f) .............................................................................................................12

42 U.S.C. § 1395*oo*(f)(1) ........................................................................................................13

42 U.S.C. § 1395ww(d)(5)(F)(i) ...............................................................................................5

42 U.S.C. § 1395ww(d)(5)(F)(i)(I) ...........................................................................................5

42 U.S.C. § 1395ww(d)(5)(F)(v) ...............................................................................................5

42 U.S.C. § 1395ww(d)(5)(F)(vi) ....................................................................................6, 9, 16

42 U.S.C. § 1395ww(d)(5)(F)(vi)(II)............................................................6, 14, 15, 19, 21, 24

65 Fed. Reg. 3136 (2000) .................................................................................................7, 8, 9

68 Fed. Reg. 45346 (2003) ..........................................................................................8, 9, 15, 33

88 Fed. Reg. 58640 (2023) ...................................4, 8, 9, 10, 16, 17, 18, 22, 25, 28, 30, 31, 32, 33

Deficit Reduction Act of 2005, Pub. L. No. 109-171, 120 Stat. 4................................8, 15, 25, 33

Social Security Amendments of 1983, Pub. L. 98-21, 97 Stat. 65 .................................................5

Tex. Health & Safety Code Ann. § 311.043 .............................................................................21

Tex. Tax Code Ann. § 11.1801................................................................................................21

U.S. Dep't of Justice,
       *Attorney General's Manual on the Administrative Procedure Act* (1947).......................36

U.S. Dep't of Justice,
*Final Report of the Attorney General's Committee
on Administrative Procedure* (1941) ...............................................................................36

Webster's Third New International Dictionary (1986)...................................................................21

## I.    Introduction

The government recognizes that this Court previously addressed, in the *Baylor All Saints* litigation, the same challenge Plaintiff raises in this case to how the Secretary of Health and Human Services (HHS) calculates the Medicaid numerator portion of the "disproportionate share hospital" (DSH) fraction.  In particular, the issue is whether uninsured patients for whose care a hospital receives reimbursement through an "uncompensated care pool" under a State of Texas demonstration project are regarded as Medicaid beneficiaries for purposes of calculating the hospital's DSH fraction.  In *Baylor All Saints*, in the context of a preliminary injunction motion, the Court rejected the government's argument that no jurisdiction existed, advanced the case to the merits, and concluded that the Fifth Circuit's *Forrest General*[1] decision controlled—while also explaining that the Court was "not unsympathetic" to the agency's reading of the relevant statutory text, which expressly provides that the Secretary "may" (not "must") include such demonstration-project patients in the Medicaid fraction "to the extent . . . the Secretary determines appropriate."  *See Baylor All Saints Med. Ctr. v. Becerra*, 745 F. Supp. 3d 464, 475, 476  (N.D. Tex. 2024).

The Fifth Circuit subsequently reversed the Court's jurisdictional holding in *Baylor All Saints*, such that the case was dismissed and the Court's merits holding was effectively nullified. *See Baylor All Saints Med. Ctr. v. Kennedy*, 161 F.4th 298 (5th Cir. 2025).  With respect, the government urges the Court to take this opportunity to analyze Plaintiff's re-filed claims on a blank slate, now that the prior jurisdictional defect has been cured.  And in that regard, the government respectfully submits that the *Baylor All Saints* merits decision—which was necessarily rendered in the rushed context of a preliminary injunction request, lacked the benefit

---

[1] *Forrest Gen. Hosp. v. Azar*, 926 F.3d 221 (5th Cir. 2019).

1

of an administrative record, and in which the lead argument in the government's brief focused on the jurisdictional issue that the Fifth Circuit ultimately agreed with—misapplied *Forrest General* and did not correctly take into account the significant differences between that case and Plaintiff's claims.

These differences are discussed in more detail below (*see* pp. 22–29, *infra*), but the perhaps key point is that *Forrest General* does not actually stand for the proposition, as Plaintiff contends, that "once the Secretary approves a demonstration project that extends inpatient benefits to individuals, he has regarded them as Medicaid eligible and therefore must include their hospital days for DSH [fraction] purposes." (Doc. 32 at 3.) *Forrest General* did not purport to make such a broad holding applicable to all possible demonstration projects, which may vary widely in how they are constructed and what their particular terms and conditions are, nor did it purport to bar the Secretary from revising the DSH regulation to clarify which patients in demonstration projects count toward the DSH fraction. Instead, *Forrest General* addressed a specific demonstration project created by Mississippi in the wake of Hurricane Katrina, in the context of a regulatory text (since amended) that mandated that any patients who were eligible for inpatient hospital services under a demonstration project would be deemed eligible for Medicaid for purposes of inclusion in the DSH fraction, with the Fifth Circuit ultimately concluding that the Secretary had already determined at the time of authorizing the Mississippi project that the relevant patients would be regarded as Medicaid eligible, such that the Secretary could not later exclude the patients from the hospital's DSH fraction ("no take-backs," per the Fifth Circuit). *See Forrest Gen.*, 926 F.3d at 233. Indeed, the arguments in *Forrest General* centered not on whether some demonstration-project patients might theoretically be excluded from the DSH fraction, but on whether the uncompensated care pool patients in Mississippi were

2

part of that State's project in the first place (which is not at issue here). *See id.* at 232 ("HHS spends almost 100% of its briefing explaining why the [Mississippi uncompensated care pool] just wasn't part of a [] demonstration project"—an argument that the Fifth Circuit rejected).

Here, in contrast, there is no dispute about whether the patients in question were part of the demonstration project, and the government is not arguing that they were not. The relevant question is the second-order question of whether, under the specific terms of the Texas project and the current regulation, such patients are regarded as Medicaid eligible. And even granting that the answer to that question in *Forrest General*, with respect to the Mississippi project under the then-existing regulation, was "yes," that does not mean that the same answer holds for the Texas project at issue here under the current regulation (or all other projects).

And it does not. Instead, when the agency approved a 10-year extension of the Texas demonstration project, the express terms of that approval included the provisos that "this expenditure authority does not make uninsured patients eligible for any benefits under the demonstration" and that "funding of the pools is not medical assistance and does not create Medicaid beneficiaries or provide benefits to individuals." (2d.Supp.AR.3, 15.[2]) From the minute of the Texas project's approval, then, patients with respect to whom hospitals received uncompensated care pool payments were not regarded as Medicaid beneficiaries. And Plaintiff also does not claim that the current version of the regulation requires uncompensated care pool patients to be included within the DSH fraction, as the Fifth Circuit interpreted the prior regulation to require in *Forrest General*. (Indeed, the fact that Plaintiff is seeking to overturn the regulatory amendment confirms that Plaintiff does not understand the regulation to aid its case.)

---

[2] "AR.__" cites are to the Administrative Record (Docs. 24–30); "Supp.AR.__" cites are to the Supplemental Administrative Record (Doc. 33); and "2d.Supp.AR.__" cites are to the Second Supplemental Administrative Record (Doc. 34).

All this means that the uncompensated care pool patients here are not properly included in the DSH fraction, and Plaintiff fails to show otherwise and relatedly also fails—including because *Forrest General* does not sweep as broadly as Plaintiff claims—to shown any invalidity in the 2023 Final Rule amending the DSH regulation to its current form.[3]  Accordingly, the Court should deny Plaintiff's summary-judgment motion and instead enter judgment for Defendant.

## II.    Statutory and Regulatory Background

### A.    Medicare pays for inpatient hospital care using a "Prospective Payment System" that essentially pays a flat, pre-determined rate based on the patient's diagnosis.

Medicare provides federally funded health insurance primarily to the elderly and specific disabled individuals, including for inpatient hospital services. The Secretary administers Medicare through the HHS sub-agency CMS (the Centers for Medicare & Medicaid Services), which in turn uses private "Medicare Administrative Contractors" to conduct day-to-day claims processing, administrative functions, and first-level determinations of a hospital's annual Medicare reimbursement (subject to further administrative review).

From its inception in 1965 until 1983, Medicare paid hospitals the "reasonable costs" incurred in furnishing services to Medicare patients. *Wash. Hosp. Ctr. v. Bowen*, 795 F.2d 139, 141 (D.C. Cir. 1986).  "Under this regime, providers were reimbursed for the actual costs that they incurred, provided they fell within certain cost limits." *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1227 (D.C. Cir. 1994).  As a result, the "more [hospitals] spent, the more they were reimbursed," providing "little incentive for hospitals to keep costs down." *Tucson Med. Ctr. v. Sullivan*, 947 F.2d 971, 974 (D.C. Cir. 1991).

Eager to "stem the program's escalating costs and perceived inefficiency," Congress

---

[3] The 2003 Final Rule at issue appears beginning at AR.4884 and was published at 88 Fed. Reg. 58640 (2023).  For ease of reference, this brief will simply cite to the Federal Register.

changed most hospital reimbursement to a "Prospective Payment System" in 1983. *Cty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1008 (D.C. Cir. 1999) (citing Social Security Amendments of 1983, Pub. L. 98-21, § 601, 97 Stat. 65)). "'Prospective payment' is Medicare jargon for a schedule of set reimbursement amounts corresponding to specific services and procedures." *Stephenson v. Shalala*, 87 F.3d 350, 353 n.6 (9th Cir. 1996). Prospective payment rates are generally determined by patient diagnosis at the time of admission, not the hospital's costs.

Congress enacted the prospective payment system over 40 years ago, and through the years has substantially amended and revised the statute. The result is that hospital payments are governed by a "complex statutory and regulatory regime," *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 404 (1993), and "[a] little history, then, goes a long way in making intelligible certain statutory and regulatory language that, at first blush, seems mired in impenetrable bureaucratese." *Chestnut Hill Benevolent Ass'n v. Burwell*, 142 F. Supp. 3d 91, 93 (D.D.C. 2015). With that in mind, this brief has attempted to lay out the relevant history when pertinent.

**B.      Hospitals can also receive additional payments through the DSH adjustment.**

Even though hospitals receive prospective payments based on a patient's diagnosis at admission, rather than the hospital's actual costs, Congress found that some hospitals, regardless of efficiency, require "an additional payment amount" beyond these rates. 42 U.S.C. § 1395ww(d)(5)(F)(i). The DSH adjustment is one of these payments and applies to hospitals that serve a "disproportionate number of low-income patients." *Id.* § 1395ww(d)(5)(F)(i)(I).

Whether a hospital qualifies for the DSH adjustment, and the amount of such adjustment, depends on the hospital's "disproportionate patient percentage." *Id.* § 1395ww(d)(5)(F)(v), (vii). This is a congressionally established formula calculated and applied at the close of a hospital's fiscal year to identify the percentage of low-income patients served. *See Ne. Hosp. Corp. v.*

*Sebelius*, 657 F.3d 1, 3 (D.C. Cir. 2011).  The formula consists of two fractions: (i) the Medicare/SSI fraction and (ii) the Medicaid fraction (at issue here).  *See* 42 U.S.C. § 1395ww(d)(5)(F)(vi).  "Those fractions are designed to capture two different low-income populations a hospital serves."  *Becerra v. Empire Health Found.*, 597 U.S. 424, 429 (2022).  The Medicare fraction counts low-income Medicare patients as identified by their receipt of SSI payments.  *Id.* at 429–30.  The Medicaid fraction represents the proportion of a hospital's patients "who are not entitled to Medicare and have low incomes, as identified by their eligibility for Medicaid."  *Id.* at 430.

This case centers on which patients should be counted in the numerator of the Medicaid DSH fraction.  The numerator "is the number of the hospital's patient days" in a cost period for two groups of individuals: (1) Medicaid beneficiaries (*i.e.*, individuals "who (for such days) were eligible for medical assistance under a State plan approved under subchapter[4] XIX, but who were not entitled to benefits under [Medicare] part A"); and—in the provision particularly relevant here and discussed in more detail below—(2) individuals who are not Medicaid beneficiaries but whom the Secretary "determines appropriate" to be "regarded as such because they receive benefits under a demonstration project approved under subchapter XI"; the Secretary "may" include such patients in the numerator.  42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).  The denominator is "the total number of the hospital's patient days for such period."  *Id.*

**C.    A hospital's overall payments are determined on a yearly basis with administrative and judicial review then available.**

Medicare calculates DSH payments on a fiscal year basis.  Throughout the year, most hospitals receive biweekly estimated DSH payments "equal to 1/26 of the total estimated amount

---

[4] The statutory text as enacted by Congress in the Deficit Reduction Act of 2005 refers to "title" XIX and "title" XI, but the version in the U.S. Code uses "subchapter" in place of "title" to track the organization of the code.

of payment for the year," subject to periodic readjustment. 42 C.F.R. § 412.116(b)(2). When the fiscal year ends, hospitals must submit a "cost report" to their Medicare contractor. *See* 42 U.S.C. § 1395*oo*(a). The contractor reviews the report and makes a final determination of the hospital's annual DSH payment. 42 C.F.R. § 405.1803(a). Hospitals that do not timely receive, or that are dissatisfied with, that determination may file an administrative appeal with the agency's Provider Reimbursement Review Board. 42 U.S.C. § 1395*oo*(a)(3). If the Board has the authority to review the matter, it will decide it, but if the challenge pertains to an issue that the Board lacks legal authority to decide (such as a statutory or regulatory provision or ruling of the CMS Administrator, all of which are binding on the Board), the Board can certify the issue for "Expedited Judicial Review" (as it did here). 42 C.F.R. § 405.1842.

**D.     Calculating a hospital's DSH payment requires computing a Medicaid fraction that may—or may not—include patients who were not actually Medicaid beneficiaries but whose treatment costs were reimbursed under a demonstration project.**

In a perfect world, calculating the Medicaid fraction would be simple—identify the Medicaid patients a hospital treats and tally up the number of patient days. But, when it comes to the Medicare statute, things are rarely simple. In § 1115 of Title XI of the Social Security Act, Congress granted the Secretary authority to waive certain requirements in the Medicaid program "[i]n the case of any experimental, pilot, or demonstration project which, in the judgment of the Secretary, is likely to assist in promoting the objectives of" Medicaid. 42 U.S.C. § 1315(a)(1). Among other things, states have used the flexibility of this waiver process to expand or offer Medicaid-like benefits to individuals who are not eligible for the State's actual Medicaid plan. *See Spry v. Thompson*, 487 F.3d 1272, 1275 (9th Cir. 2007). Prior to 2000, Medicare generally precluded hospitals from counting individuals covered by a program created under such a waiver (which this brief will generally refer to as demonstration projects) in the Medicaid DSH fraction.

*See* 65 Fed. Reg. 3136, 3136–37 (2000) (explaining the Secretary's prior policy).  But this policy changed in 2000.  *Id.*

Three significant events then occurred between 2000 and 2006.  First, it became apparent to the Secretary that some demonstration projects provided benefits that were extremely limited in scope and, consequently, were not appropriate for the Medicaid DSH fraction.  *See* 68 Fed. Reg. 45346, 45420–21 (2003).

Second, in 2005, the Ninth Circuit and a district court in the District of Columbia found that the Secretary's pre-2000 policy that excluded most demonstration-project patients from the DSH fraction was contrary to the then-existing statutory language.  *See* 88 Fed. Reg. at 59014; *Portland Adventist Med. Ctr. v. Thompson*, 399 F.3d 1091 (9th Cir. 2005); *Cookeville Reg'l Med. Ctr. v. Thompson*, No. 05-1053, 2005 WL 3276219 (D.D.C. Oct. 28, 2005).

Third, in § 5002(a) of the Deficit Reduction Act of 2005, 120 Stat. 4, Congress "effectively overruled" the Ninth Circuit and District of Columbia decisions.  88 Fed. Reg. at 59014.  Congress accomplished this by adding a provision to 42 U.S.C. § 1395ww(d)(5)(F)(vi) to codify HHS's discretion to include—or not include—demonstration-project patients in the DSH fraction.  That amendment provides the following:

> In determining under [42 U.S.C. § 1395ww(d)(5)(F)(vi)(II)] the number of the hospital's patient days for such period which consists of patients who (for such days) were eligible for medical assistance under a State plan approved under title XIX, the Secretary may, to the extent and for the period the Secretary determines appropriate, include patient days of patients not so eligible but who are regarded as such because they receive benefits under a demonstration project approved under title XI.

Deficit Reduction Act § 5002(a), 120 Stat. 31.

The Deficit Reduction Act also expressly "ratified" regulations promulgated in 2000 and 2003 that permitted the inclusion in the Medicaid DSH fraction of some, but not all, patients who

8

received medical assistance under a demonstration project.  *Id.* § 5002(b), 120 Stat. 31 (ratifying the regulations found at 65 Fed. Reg. 3136 and 68 Fed. Reg. 45345); *see also* 65 Fed. Reg. 3136 (providing that patients in "expanded eligibility groups" who were discharged prior to January 20, 2000 "were not to be included in the Medicare DSH calculation"); 68 Fed. Reg. at 45420–21 (providing that hospitals could not include patients unless they received "benefits under the demonstration project that are similar to those available to traditional Medicaid beneficiaries").

**E.**     **Whether to include patients treated under demonstration projects in the Medicaid DHS fraction has been the subject of prior litigation and statutory amendment.**

Using the § 1115 waiver process, a number of states—Texas included—have created demonstration projects using variations of an "uncompensated care pool" that offsets hospitals' costs to treat the uninsured or underinsured.  *See* 88 Fed. Reg. at 59014–15.  Eligibility for such pool payments is typically not means-tested like Medicaid (in other words, pool funds may pay for treatment for patients with incomes too high to qualify for Medicaid but who for whatever reason are uninsured).  Nor do the pools provide benefits similar to those mandated by the Medicaid statute directly to a specific beneficiary population.  Pool programs, including those similar to the Texas program, also "do not provide individuals with a right to seek medical care or any guarantee that the cost of any care will be made on their behalf," but instead simply provide funds directly to hospitals.  *See id.* at 59022.  Pools also differ from Medicaid in scope of coverage.  They reimburse only a portion of an uninsured patient's bills, and hospitals can bill patients for remaining charges and refer unpaid balances to collection agencies.

Following the Deficit Reduction Act of 2005's enactment, several disputes arose regarding how to count patients who indirectly benefited from these kinds of demonstration projects that did not offer a suite of insurance-like benefits directly to patients, but rather authorized supplemental funding to hospitals with uncompensated costs associated with

providing charity care to uninsured and underinsured patients.  HHS has long taken the position that the availability of this supplemental funding does not provide patients with insurance-type benefits and thus should have no bearing on the calculation of a hospital's Medicaid DSH fraction.  *See* 88 Fed. Reg. at 59016.  Nevertheless, in 2019 and 2020, the Fifth and D.C. Circuits interpreted the prior version of 42 C.F.R. § 412.106 to require inclusion in the DSH fraction of certain patients in two state demonstration projects whose unpaid bills were claimed by hospitals as a basis for receiving supplemental funding from an uncompensated care pool.  *See Bethesda Health, Inc. v. Azar*, 980 F.3d 121, 122 (D.C. Cir. 2020); *Forrest Gen. Hosp.*, 926 F.3d at 231–22, 234; *see also* 88 Fed. Reg. at 59015 & n.210 (discussing cases).

**F.   The agency amends its regulations in 2023 to clarify that only demonstration-project patients who receive the equivalent of health insurance should be included in the DSH fraction—and that a hospital's receipt of uncompensated care costs for patients who do not receive insurance-like benefits does not qualify for inclusion of those patients in the fraction.**

In response to *Forrest General*, *Bethesda*, and other similar cases, the Secretary amended the DSH regulation in 2023 to clarify that the Medicaid DSH fraction should only include patient-days related to "those patients who receive from the demonstration [project] . . . health insurance that covers inpatient hospital services."[5]  88 Fed. Reg. at 59016.  The amended regulation also "explicitly exclude[s] from the [DSH] Medicaid fraction numerator the days of patients with uncompensated care costs for which a hospital is paid from a funding pool authorized by a section 1115 demonstration project." *Id.*

---

[5] This insurance-like benefit can either be provided directly or in the form of premium assistance that covers 100% of the patient's premium costs, which the patient uses to buy such insurance.  *See* 88 Fed. Reg. at 59106.  For simplicity this brief refers to both options collectively as providing insurance or insurance-like benefits.

### III.    Factual and Procedural Background

**A.    Texas seeks and receives approval for a demonstration project that reimburses hospitals for certain uncompensated care costs but that does not provide insurance-like benefits to specific patients.**

In 2021, CMS notified Texas[6] that it had approved extending the State's demonstration project (the "Texas Healthcare Transformation and Quality Improvement Program") "subject to the limitations specified in the attached waivers, expenditure authorities, STCs, and any supplemental attachments defining the nature, character, and extent of federal involvement in this project." (*See* 2d.Supp.AR.1.) Texas accepted CMS's approval, including "the Standard Terms and Conditions (STCs) for this demonstration extension which define the nature, character and extent of anticipated federal involvement in this extension." (2d.Supp.AR.562.)

As part of the approval, CMS expressly addressed whether patients whose care might be compensated under the project would be considered Medicaid beneficiaries—and made clear that they would not be. "Funding of the existing UC pool and new PHP-CCP pool," CMS explained, "is not medical assistance, does not provide benefits to individuals, and does not create Medicaid beneficiaries." (2d.Supp.AR.8.)

The terms and conditions that were made part of the approval also said the same thing:

> 5. EXPENDITURES RELATED TO THE UNCOMPENSATED CARE POOL
>
> Subject to an overall cap on the Uncompensated Care (UC) Pool, the following expenditure authorities are granted for the period of the Demonstration:
>
> Effective October 1, 2019, expenditures for furnishing medical services described in section 1905(a)(1) et seq. of the Act that are incurred by hospitals and other providers for uncompensated costs of medical services provided to uninsured individuals as charity

---

[6] The relevant state agency is the Texas Health and Human Services Commission, but for simplicity this brief will just refer to "Texas."

> care, and to the extent that those costs exceed the amounts paid to the hospitals pursuant to section 1923 of the Act. *Such funds may be used by providers to offset the uncompensated costs of treating the uninsured, but this expenditure authority does not make uninsured patients eligible for any benefits under the demonstration.*

(2d.Supp.AR.15 (emphasis added).)

> V. FUNDING POOLS UNDER THE DEMONSTRATION

> The terms and conditions in Section V apply to the state's exercise of the following Expenditure Authorities: Expenditures Related to the Uncompensated Care Pool . . . .

> 38) Uncompensated Care (UC) Pool. Payments from this pool may be used to defray the actual uncompensated cost of medical services that meet the definition of "medical assistance" contained in section 1905(a) of the Act, that are provided to uninsured individuals as charity care by hospitals, clinics, or by other provider types, as specified at subparagraph (c) below, including uninsured full or partial discounts, that provide all or a portion of services free of charge to patients who meet the provider's charity care policy and that adhere to the charity care principles of the Healthcare Financial Management Association. . . . *UC payments are not associated with particular individuals and are not a form of health coverage or any other benefit inuring to individuals.*

(2d.Supp.AR.50–51 (emphasis added).)

**B.**     **Plaintiff challenges the exclusion from the DSH fraction of patients for whom it received uncompensated care cost payments in the *Baylor All Saints* litigation, but the Fifth Circuit reverses for lack of jurisdiction.**

Plaintiff is a Lubbock hospital enrolled as a Medicare provider. Plaintiff is one of the fourteen Texas hospitals that previously sued in this Court in the *Baylor All Saints* litigation to contest the Secretary's policy of excluding Texas demonstration-project patients from the DSH fraction. The Court granted summary judgment in the plaintiffs' favor, declared 42 C.F.R. § 412.106(b)(4)(iii) to be unlawful, and vacated the rule. *Baylor All Saints*, 745 F. Supp. 3d at 478–79. But on appeal, the Fifth Circuit reversed on jurisdictional grounds because the plaintiffs had not fulfilled a jurisdictional requirement to first present their claims to the agency through

the cost-report process. *Baylor All Saints*, 161 F.4th at 302–04.

**C.      Plaintiff files the current suit after exhausting administrative remedies.**

In December 2025, having now followed the relevant cost-report procedures, Plaintiff filed an administrative appeal request with the Provider Reimbursement Review Board. (AR.4.) Plaintiff's sole issue concerned the application of the newly revised 42 C.F.R. § 412.106(b)(4)(iii) to its DSH payment calculation, and specifically the exclusion of uncompensated care pool demonstration-project patients from the Medicaid DSH fraction for Plaintiff. (Supp.AR.3–4.) The Board granted Expedited Judicial Review at Plaintiff's request. (Supp.AR.12.) This lawsuit has followed.

## IV.      Legal Standard

Under the Medicare statute, judicial review is governed by the applicable provisions in the Administrative Procedure Act ("APA"). 42 U.S.C. § 1395*oo*(f)(1). In challenges to agency action under the APA, "[s]ummary judgment is the proper mechanism for deciding, as a matter of law, whether an agency's action is supported by the administrative record and consistent with the APA standard of review." *Am. Stewards of Liberty v. Dep't. of Interior*, 370 F. Supp. 3d 711, 723 (W.D. Tex. 2019) (citation omitted).

## V.      Argument and Authorities

This case concerns the Medicare DSH payment, which permits hospitals that treat a disproportionate share of low-income patients to receive an additional Medicare payment to account for the health complications that such low-income populations often have. Whether a hospital is eligible to receive a DSH payment (and if so, in what amount) depends, in relevant part, on the "Medicaid fraction," which represents the proportion of patients a hospital treats who are eligible for Medicaid. Here, the terms of the Texas demonstration project and the Final Rule

challenged by Plaintiff both make clear that patients for whom hospitals received uncompensated care pool payments under the Texas project are not regarded as Medicaid beneficiaries for purposes of inclusion in the DSH fraction. And contrary to Plaintiff's argument, *Forrest General* does not compel a decision otherwise or render the 2023 Final Rule unlawful, as that case dealt with a different question than the one at issue here. *Forrest General* concerned whether patients associated with uncompensated care costs paid under a Mississippi demonstration project were "regarded" as Medicaid-eligible under that project and HHS's then-existing regulation. *Forrest General* did not analyze the separate question of whether the Secretary may permissibly revise that regulation and redefine the type of benefit a patient must receive from a demonstration project to be "regarded as" Medicaid-eligible, nor did it address the terms of the Texas demonstration project that Plaintiff participates in. Plaintiff's motion for summary judgment should be denied because the Secretary acted lawfully under the broad discretion granted by 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) in determining that uncompensated care pools do not make patients eligible for medical assistance in the sense of regarding them as Medicaid beneficiaries for DSH calculation purposes.

A.     **The Medicare statute grants the Secretary broad discretion to determine when demonstration-project patients should be included in the DSH fraction.**

The Medicare statute defines the two categories of people that may be included in the numerator of the Medicaid DSH fraction. First, the statute provides that the days a hospital treated any non-Medicare patient who is an actual Medicaid beneficiary must be included in the numerator. 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). That component of the fraction is not at issue.

The second category of individuals who may (at least in certain circumstances) be included in the numerator of the Medicaid fraction are those who are *not* eligible Medicaid beneficiaries under the State's Medicaid plan, but as to whom the Secretary exercises discretion

to "regard[] as such because they receive benefits under a demonstration project." *Id.* This language was added by the Deficit Reduction Act of 2005, 120 Stat. 31, in order to address a disagreement about the extent of the agency's authority to include in the Medicaid fraction the days of patients who are not technically Medicaid beneficiaries but fall within an approved demonstration project. By its terms, the statute's permissive language grants the Secretary broad discretion to determine whether to "regard" a demonstration-project patient as Medicaid-eligible and to then include their days of treatment in the Medicaid DSH fraction. *See* 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (providing that the Secretary "may, to the extent and for the period the Secretary determines appropriate" include the days of patients "regarded as" Medicaid-eligible).

Prior to 2000, HHS did not include any days of patients who received benefits from a demonstration project (because such patients did not receive healthcare coverage "under a State plan," as the statute required). *See generally Cookeville Reg'l Med. Ctr. v. Leavitt*, 531 F.3d 844, 846 (D.C. Cir. 2008). But HHS later reversed course, determining that it could permissibly regard demonstration-project patients as eligible for inclusion in the DSH calculation. *See* 68 Fed. Reg. at 47199. Next, in a regulation promulgated in 2003, the agency clarified that it would regard patients as eligible in this manner if the patient received from the demonstration project benefits similar to the full panoply of benefits traditionally available to Medicaid beneficiaries. 68 Fed. Reg. 45420–21; *see also Forrest Gen.*, 926 F.3d at 231 (noting that the 2003 regulation "equates patient days involving Medicaid-eligible patients . . . with patient days involving patients who, while not strictly eligible for Medicaid, receive healthcare coverage under similarly comprehensive state-authorized plans (plans that include inpatient hospital service benefits)").

Critically, however, demonstration projects come in many varieties, and not all of them extend "the full equivalent of 'medical assistance' available to those eligible under a Medicaid

15

State plan." 88 Fed. Reg. at 59017. As relevant here, some demonstration projects—like the Texas project—authorize supplemental funding for hospitals that provide a significant amount of charity care and other uncompensated care to uninsured or underinsured individuals.

To be clear, the result is that hospitals like Plaintiff receive payment for services provided to such patients, through the demonstration project. And nobody is trying to take away these payments (contrary to Plaintiff's suggestion that HHS is trying to "deny reimbursement for a large swath of patients served by hospitals that disproportionately care for low-income patients" (Doc. 32 at 1)). Instead, at issue here is whether the hospital's receipt of such supplemental funding should also enable the hospital to receive a *further additional payment* for these patients by including them in the DSH fraction that leads to the separate DSH payment that a hospital may receive at year-end. HHS's position has long been that such patients should not be included in the Medicaid fraction for purposes of calculating the DSH payment, because, *inter alia*, of the lack of means testing and because none of the demonstration-project money goes to provide insurance-like coverage, such that hospitals that receive such funds may continue to charge uninsured and underinsured patients the full amount of the services provided and refer any unpaid balance to a collection agency. However, both the Fifth Circuit and the D.C. Circuit interpreted the agency's 2003 regulation as requiring inclusion in the Medicaid DSH fraction of all such patients whose unpaid bills a hospital subsequently claimed as a basis for supplemental funding from a demonstration project. *Forrest Gen.*, 926 F.3d at 232–34; *Bethesda Health, Inc.*, 980 F.3d at 122. As the Fifth Circuit explained in *Forrest General*, the then-existing regulation stated that a patient would be regarded as eligible for Medicaid for purposes of the DSH calculation and included in the Medicaid DSH fraction so long as the patient was "'eligible for inpatient hospital services'" under a demonstration project. 926 F.3d at 231 (quoting the then-

16

existing regulatory text of 42 C.F.R. § 412.106(b)(4)(i)). The court interpreted this to mean that when hospitals were able to claim uncompensated care costs associated with treating an uninsured patient, the regulation mandated that the patient be regarded as Medicaid-eligible for purposes of the DSH calculation. *Id.* at 231–32; *see also Bethesda*, 980 F.3d at 122.

The rule at issue here amended the regulation interpreted in *Forrest General* and *Bethesda* to conform the text with HHS's original intent. *See* 88 Fed. Reg. at 59015 (explaining that "it was never our intent . . . to include in the . . . Medicaid fraction numerator days of patients that benefited so indirectly from a demonstration"). The regulatory text was clarified to state that patients who receive benefits from a demonstration project will be "regarded as eligible for Medicaid on a given day" only if: (1) the patient "receives health insurance authorized by a demonstration [project] . . . for that day," (2) the demonstration directs that the "cost of such health insurance may be counted as [Medicaid] expenditures" under the State plan, and (3) the health insurance "covers inpatient hospital services." 42 C.F.R. § 412.106(b)(4)(ii).

This focus on "health insurance" coverage is designed to make clear that the availability of supplemental demonstration-project funding for hospitals with high uncompensated costs should have no bearing on the calculation of the Medicaid DSH fraction. To avoid any ambiguity on this score, the rule expressly states that "[p]atients whose health care costs, including inpatient hospital services costs, for a given day are claimed for payment by a provider from . . . [a] funding pool authorized under [42 U.S.C. § 1315] to fund providers' uncompensated care costs are *not* regarded as eligible for Medicaid" and "may *not* be included" in the Medicaid DSH fraction. 42 C.F.R. § 412.106(b)(4)(iii) (emphasis added).

That is because uncompensated care pools like the one operated by Texas "do not extend health insurance to [any] individuals nor are they similar to the package of health insurance

benefits provided to participants in a State's Medicaid program under the State plan." 88 Fed. Reg. at 59015. The significance of health insurance-like benefits is that "[h]ealth insurance provides a reasonable expectation on the part of the insurance holder that they can seek treatment without the risk of financial ruin." *Id.* at 59020. But demonstration projects that authorize supplemental funding to hospitals based on the total amount of uncompensated care they provide do not give uninsured patients this same guarantee; "hospitals may bill uninsured patients for the full cost of their care and refer their medical debts to collection agencies when they are unable to pay," even if the hospital later claims these uncompensated costs as a basis for receiving supplemental funding from an uncompensated care pool. *Id.* Indeed, many demonstration projects that authorize such supplemental funding—including the Texas project that forms the predicate for Plaintiff's complaint—expressly state that the Secretary's approval of spending authority to pay hospitals based on uncompensated costs "does not make uninsured patients eligible for any benefits under the demonstration." (AR.36.) Because such demonstration projects do not authorize uninsured patients to directly receive benefits, the agency expressed some doubt as to whether they could be treated as Medicaid-eligible within the meaning of the statute. *See* 88 Fed. Reg. at 59022.

But even assuming the statute permits HHS to "regard" such patients as Medicaid-eligible, the agency has declined to exercise that discretion, because, *inter alia*, payments from uncompensated care pools to hospitals are not means tested and a hospital can receive such payments for costs associated with high-income individuals "who could afford but elect[] not to buy insurance and let[] bills go unpaid." *Id.* Thus, including patients simply because a hospital received an uncompensated care pool payment would be a "distortion from how Congress intended the DSH calculation to work." *Id.*

**B.**      **The 2023 Final Rule is consistent with the plain language of the statute—and thus is not "contrary to law" under the APA.**

The Medicare statute does not require the Secretary to include in the Medicaid DSH fraction numerator every day for which a hospital receives payments authorized by a demonstration project. Rather, the statute makes clear that, in calculating the number of days that a hospital treats patients who are "eligible for medical assistance under a State plan," the Secretary "*may*, to the extent and for the period the Secretary determines appropriate," include the days of patients who are not "eligible for medical assistance under a State plan," "but who are regarded as such because they receive benefits under a demonstration project." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (emphasis added). This provision reflects two important components of the Secretary's broad discretion to determine whether to include a demonstration-project patient in the DSH fraction.

First, as the Fifth Circuit recognized in *Forrest General*, a patient cannot be included under this provision unless the Secretary has authorized a demonstration project that provides benefits to that patient. 926 F.3d at 229. Second, the Secretary must actually "regard" the patient as being eligible for medical assistance under the State plan because the patient receives benefits under a demonstration project. *See id.* Thus, under 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II), the only non-Medicaid beneficiaries who may potentially be included in the Medicaid DSH fraction are those who "receive benefits under a demonstration project approved" by the Secretary. And even then, the statute uses permissive language—patients who are "regarded as" eligible for medical assistance "*may*" be included in the numerator "to the extent and for the period the Secretary determines appropriate." *Id.* (emphasis added).

The Supreme Court's decision in *Advocate Christ Medical Center v. Kennedy*, 605 U.S. 1 (2025), which related to another aspect of the DSH fraction, is instructive on the question of

19

which patients may—or may not—be included in the fraction due to their eligibility for other benefits.  There, for purposes of the Medicare component of the DSH fraction (which seeks to identify low-income seniors who receive hospital treatment), the Supreme Court construed the "key phrase" in the statute—which called for the inclusion in the Medicare DSH fraction of those patients "entitled to supplementary security income [SSI] benefits"—to determine what constitutes SSI benefits and which individuals are entitled to such benefits.  *Id.* at 8.  As a first step, the Court noted that "[t]o determine when a person is 'entitled to supplementary security income benefits,' § 1395ww(d)(5)(F)(vi)(I), we must know what the benefits are."  *Id.* at 10. And to "define[] the entitlement to benefits," a court must "carefully examin[e] the prerequisites and characteristics of that particular benefit," including "the specific features" of the benefit.  *Id.* at 17, 18.

Accordingly, as directed by § 1395ww(d)(5)(F)(vi)(I), the Court looked exclusively to the SSI subchapter to conclude that the phrase "SSI benefits" means cash benefits, with eligibility determined on a monthly basis.  *Id.* at 10–12 (citing 42 U.S.C. ch. 7, subch. XVI, 42 U.S.C. §§ 1381a, 1382).  Notably, the Court refused to consider or include indirect benefits "housed elsewhere," *id.* at 14, where "none of these benefits is housed '*under subchapter XVI*,'" *id.* at 13 (emphasis added by the Court), even if those indirect benefits might be affected by or related to a person's eligibility for SSI.  The Court certainly would have refused to define the phrase "SSI benefit" so broadly to include any "helpful or useful effects" that an individual might receive as a result of his or her association with the SSI program.  (*Cf.* Doc. 32 at 20.)

Following the reasoning of *Advocate Christ*, to determine for purposes of the Medicare DSH fraction's twin—the Medicaid DSH fraction—whether an individual "receive[s] benefits under a demonstration project approved under subchapter XI," it must be ascertained what those

benefits are. 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II); *see Advoc. Christ*, 605 U.S. at 10. And it is the terms of the approved demonstration project that identify the benefits received (or not received) under the project. Here, those terms are set out in CMS's approval letter for the Texas project and "the attached waivers, expenditure authorities, [special terms and conditions], and any supplemental attachments defining the nature, character, and extent of federal involvement in this project, including the benefits provided." (2d.Supp.AR.1.)

Those terms authorize the State to pay uncompensated care pool funds to hospitals to defray or offset the actual uncompensated costs of treating uninsured patients, and this is the only approved expenditure and benefit provided. (2d.Supp.AR.3–4, 8, 15, 51.) The terms further emphasize that "UC payments are not associated with particular individuals and are not a form of health coverage or any other benefit inuring to individuals." (2d.Supp.AR.51.) The uninsured patients who receive charity care, whose costs might be covered by uncompensated care pool funds, receive no direct benefits from the demonstration project and are in no way deemed "fitted or qualified" or "entitled" to receive those payments. *See Advoc. Christ*, 605 U.S. at 3 (citing Webster's Third New International Dictionary 736, 758 (1986) (defining "eligible" as "fitted or qualified to be chosen or used" or "entitled to something" and defining "entitle" as "to give a right or legal title to" or to "qualify (one) for something")). At most, the uninsured patients receive the same helpful or useful effect from the uncompensated care pool that all patients, including those with private or government insurance, receive—*i.e.*, that the hospitals remain operational to provide care, including charity care when available.[7] Under *Advocate Christ*, this

---

[7] To the extent all hospitals are obligated to provide emergency care to uninsured patients, and Texas non-profit hospitals are obligated to provide charity care beyond emergency services, these requirements derive from federal and state law, not the Texas demonstration project. *See, e.g.*, 42 U.S.C. § 1395dd; Tex. Health & Safety Code Ann. § 311.043; Tex. Tax Code Ann. § 11.1801.

helpful or useful effect is not sufficient to be deemed a benefit received from the demonstration project, and thus the patient days associated with costs covered by uncompensated care pool funds cannot be included in the Medicaid fraction.  Likewise, Plaintiff's 340B eligibility is irrelevant to this Court's analysis of the 2023 Final Rule, (*see* Doc. 32 at 13–14), given that the 340B program benefits are "housed elsewhere," in 42 U.S.C. § 256b and not in § 1395ww(d)(5)(F)(vi)(II) or in the Texas demonstration project.

Moreover, even if these indirect effects *could* be considered a benefit received from the demonstration project, it remains the case—as the Secretary explained in the preamble to the challenged rule—that the statute still grants the Secretary broad discretion to determine both (i) what type of benefits a patient must receive from a demonstration project to be "regarded as" eligible for medical assistance under the State plan, and separately, (ii) whether (or not) to include those patients in the Medicaid fraction.  *See* 88 Fed. Reg. at 59020; *see also Cookeville*, 531 F.3d at 847 (holding that the statute "explicitly giv[es] the Secretary discretion to determine whether to include a demonstration project's expansion waiver population in the [DSH] calculation").  The regulation at issue here permissibly exercises this statutory authority; it defines which patients should be "regarded as" eligible for medical assistance and included in the Medicaid DSH fraction.  The regulation is thus entirely consistent with the text of the statute.

C.    **The Fifth Circuit's *Forrest General* decision does not support Plaintiff.**

In the now-dismissed *Baylor All Saints* case, this Court held that *Forrest General* precluded the Secretary from amending the DSH regulation to clarify that demonstration-project patients whose care is merely paid for by uncompensated care pool funds, but who receive no insurance-like benefits, are excluded from the DSH fraction.  745 F. Supp. 3d at 474–76.  But

respectfully, the Court's conclusion in *Baylor All Saints* was incorrect, and *Forrest General* is not case determinative here.

Plaintiff takes the position that, under *Forrest General*, the Secretary's approval of a demonstration project in and of itself also mandates that patients treated under that project be included in the DSH fraction. (*See* Doc. 32 at 3.) But nothing in 42 U.S.C. § 1315 (the demonstration-project statute) limits the Secretary to an all-or-nothing approval decision of that nature. The statute instead authorizes the Secretary to approve demonstration projects "to the extent . . . he finds necessary." 42 U.S.C. § 1315(a)(1). That text confers authority not merely to approve or deny an application wholesale, but to define—and limit—the scope of the approval itself. The implementing regulations likewise contemplate that the Secretary may request "modifications" to the application governing how the demonstration project operates, 42 C.F.R. § 431.412(a)(2), including in the context of extensions, *id.* § 431.412(c)(2)(ii), (3). The statutory and regulatory scheme thus contemplates conditional and bounded approvals.

Section 1315 long predates Congress's 2005 amendment to the Medicare DSH statute. It has, for decades, vested the Secretary with discretion to structure and delimit approved demonstration projects. Nothing in the later DSH statutory amendment of 2005 purports to curtail that preexisting waiver authority. Nor did *Forrest General* hold that § 1315's grant of authority is displaced when demonstration project-related patients are later referenced in the Medicare DSH statute.

Here, unlike in *Forrest General*, the Secretary exercised his delegated authority and unequivocally limited "the extent" of the demonstration project's uncompensated care pool, expressly providing that pool days would not be regarded as Medicaid days and that the Texas demonstration-project patients would not be receiving benefits under the project.

23

(2d.Supp.AR.3, 15, 51.)    In *Forrest General*, though, the Fifth Circuit explained that non-Medicaid eligible patients must "receive benefits *under* a demonstration project" to count toward the Medicaid DSH fraction.  *Forrest Gen.*, 926 F.3d at 229.  The Texas patients do not.

Second, the DSH statute also independently confers discretion over whether to include demonstration-project patients in the DSH fraction.  The statute provides that the Secretary "*may*, to the extent and for the period the Secretary determines appropriate," include such patients who receive benefits under a demonstration project.    42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (emphasis added).  That text does not mandate categorical inclusion; it authorizes a discretionary determination bounded by scope and time.  Moreover, if the Secretary's approval of a demonstration project (under § 1315) automatically had the effect that all relevant patients were thereafter included in the DSH fraction (as Plaintiff suggests), then § 1395ww's proviso that the Secretary "may" include such patients in the fraction (and to do so "to the extent and for the period the Secretary determines appropriate") would be meaningless. Plaintiff's construction of the statute, which would render § 1395ww's relevant language a dead letter and of no meaning, cannot be the correct one.

The statutory context confirms as much.  Congress added the relevant language in § 1395ww as part of the Deficit Reduction Act of 2005, to "clarif[y] an ambiguity in the existing legislation."  *Cookeville*, 531 F.3d at 849.  That ambiguity was "whether the Secretary had discretion to exclude the [demonstration-project] population from the [DSH] adjustment," and the statutory amendment "emphasize[d] that the Secretary always had this discretionary authority."  *Id.*  The amendment thus resolved ambiguity; it did not withdraw the Secretary's longstanding authority to define the contours of approved demonstration projects, nor did it eliminate the separate discretion conferred in the DSH provision itself.  Moreover, Congress

24

included an express "ratification and prospective application of previous regulations" provision in the Deficit Reduction Act that affirmatively "ratified" the agency's prior and then-existing policies governing when demonstration-project patients should be excluded from the DSH calculation. Deficit Reduction Act § 5002(b), 120 Stat. 31 (capitalization altered). If, as Plaintiff contends, the effect of the Deficit Reduction Act's amendment of § 1395ww was somehow that Congress was dictating that all demonstration-project patients must be included in the DSH fraction, it would be inconsistent for Congress to simultaneously ratify the agency's existing policies which had the opposite effect.

To sum up, *Forrest General* would control here only if it stood for the proposition that the Secretary lacks authority—under both § 1315 and the amended DSH statute at § 1395ww— to define the scope of demonstration-project approvals and to determine whether demonstration-project patients should be included in the Medicaid fraction. But *Forrest General* does not so hold.

And again, Congress has confirmed that the opposite is true. Through the Deficit Reduction Act of 2005, Congress "emphasize[d] that the Secretary *always* had th[e] discretionary authority" to determine which demonstration-project patients to regard as eligible for Medicaid and whether to include any of their treatment days in the DSH fraction. *Cookeville*, 531 F.3d at 849 (emphasis added). And Congress expressly endorsed the agency's exercise of this authority on a prospective basis. *See id.*; *see also* 88 Fed. Reg. at 5014. It therefore follows that the Secretary may revise his regulations governing which patients may be "regarded as" Medicaid-eligible and included in the DSH calculation, as he did here.

Critically, in *Forrest General*, the Fifth Circuit was not called upon to address—nor did it directly analyze—this separate question that is now at issue in this Court: whether the Secretary

may permissibly revise the regulation interpreted in *Forrest General* and redefine (or clarify) what type of benefit a patient must receive from a demonstration project to be "regarded as" Medicaid eligible in the first place.

Instead, the Fifth Circuit recognized in *Forrest General* that (a) the statute gives the Secretary discretion to include or not include patients in the DSH fraction (by noting that the "Secretary *may* exercise discretion" to include such patients), but then the court highlighted with respect to the Mississippi demonstration project at issue in that case that (b) "the Secretary *did* exercise that discretion when he authorized the [uncompensated care pool] in the 2005 and 2006 letters" that approved the Mississippi project, 926 F.3d at 233, and that (c) the then-existing regulation only required the patients to receive inpatient health services (which they did receive) to be regarded as Medicaid eligible, *id.* at 234 (noting that "the only question . . . to answer when counting patient days associated with an approved demonstration project *under the relevant DSH adjustment regulation* is whether [uncompensated care pool] patients were capable of receiving inpatient health services" (emphasis added)).

This discussion in *Forrest General* of what the Mississippi project approval letters and the then-existing regulation said shows that the rule established by that precedent is not simply "if a demonstration project is approved, the patients are included in the DSH fraction." Rather, whether or not patients will be included in the fraction will turn on things like the specifics of the demonstration project at issue and what the current regulation provides (*i.e.*, items (b) and (c) in the paragraph above). Here, then, the proper analysis will require looking to whether the terms and conditions of the Texas demonstration project regard as Medicaid eligible those patients for whom uncompensated care pool payments are made and whether the regulation somehow dictates that such patients must be considered Medicaid eligible. If so, then under the reasoning

26

of *Forrest General* the Secretary could not later exclude these patients from the DSH fraction on the back end. But, if the Texas project's patients have not been regarded as Medicaid eligible per the project-authorizing documents and the regulation does not dictate some contrary result, it in no way runs afoul of *Forrest General* for the Secretary to determine that they are not to be included in the fraction. To the contrary, excluding such patients from the fraction is entirely consistent with *Forrest General*'s recognition of the Secretary's discretion under the statute and with that decision's explication of how the Mississippi demonstration project and the then-existing regulation regarded the relevant patients. These considerations would have been unnecessary to consider if the statute alone dictated the result in *Forrest General*.

The Fifth Circuit's explanation of what arguments were presented to it in *Forest General* also highlights why that case differs from this one. The Fifth Circuit noted that "HHS spends almost 100% of its briefing explaining why the [Mississippi uncompensated care pool] just wasn't part of a [] demonstration project." *Forrest Gen.*, 926 F.3d at 232. In other words, HHS was not in the Fifth Circuit's view contesting that patients in the Mississippi demonstration project were to be included in the DSH fraction; there was simply a dispute over whether the uncompensated care pool patients were part of that group. The Fifth Circuit held that HHS was wrong in this regard—the patients were part of the Mississippi project, the court explained, because the approval letters made clear that there was but a single project which included the uncompensated care cost pools—and therefore it naturally followed that these patients were required to be included in the DSH fraction, given the Fifth Circuit's explanation that the Secretary had already exercised discretion to regard the Mississippi project's patients as Medicaid-eligible when initially approving the project and that the regulation likewise required this result. *See. id.* at 233, 234 (explaining that "the Secretary *did* exercise that discretion when

27

he authorized the UCCP in the 2005 and 2006 letters," and that "the relevant DSH adjustment regulation" looked only to whether the patients received inpatient health services (which they did)).

Here, in contrast, there is no dispute about whether the patients in question were part of the demonstration project, and the government is not arguing that they were not. The relevant question is the second-order question of whether, under the specifics of the Texas project and the current regulation, such patients are regarded as Medicaid eligible. And even granting that the answer to that question with respect to the Mississippi project under the then-existing regulation in *Forrest General* was "yes," that does not mean that the same answer holds for the Texas project at issue here under the current regulation.

And it does not. Instead, the record reflects that when the Texas demonstration project was extended, the express terms of the approval included the provisos that "this expenditure authority does not make uninsured patients eligible for any benefits under the demonstration" (2d.Supp.AR.15), and that "funding of the pools is not medical assistance and does not create Medicaid beneficiaries or provide benefits to individuals." (2d.Supp.AR.3.) From the time of the Texas project's renewal, then, patients with respect to whom hospitals received uncompensated care pool payments were not regarded as Medicaid beneficiaries—in contrast to how the Fifth Circuit construed the Mississippi demonstration project in *Forrest General*.

*Forrest General* is best understood as holding that the agency *may* "regard" patients who are authorized to receive benefits in a demonstration project as being eligible for Medicaid within the meaning of the statute, and if the agency *does in fact* regard them in this manner, the statute requires those patients to be included in the Medicaid DSH fraction and they cannot be removed on the back end. *See* 88 Fed. Reg. at 59020. Understood in that manner, the

28

challenged rule is entirely consistent with *Forrest General*—it merely clarifies what benefits a patient must be authorized to receive from a demonstration project to be "regarded as" Medicaid-eligible for purposes of the DSH calculation.

As Plaintiff concedes, "[t]he statute gives the Secretary discretion prospectively to approve or disapprove of a demonstration project." (Doc. 32 at 21.) Plaintiff also concedes that the Secretary has "'discretion to authorize the inclusion of [certain] populations in the first place.'" (Doc. 32 at 21 (quoting *also Forrest Gen.*, 926 F.3d at 233).) The corollary must be that the Secretary has the authority to *not* include, *i.e.*, to exclude, certain populations as Medicaid beneficiaries, when approving a demonstration project. *See also Cookeville*, 531 F.3d at 849 (explaining that the Deficit Reduction Act of 2005 made clear that "the Secretary always had this discretionary authority"). Thus, the Secretary was perfectly within his statutory authority when "the Secretary *did* exercise that discretion" by approving the Texas demonstration project, but on the condition that uncompensated care pool patient populations are not regarded as Medicaid beneficiaries. *See Forrest Gen.*, 926 F.3d at 233 (emphasis in original). Unlike in *Forrest General*, the demonstration-project patients in the Texas project were excluded from being considered Medicare beneficiaries "in the first place," when the Secretary expressly determined that they are not regarded as receiving benefits under the project or being Medicaid beneficiaries. (2d.Supp.AR.3, 15.) Thus, there are "no take-backs" of the type that the Fifth Circuit found objectionable in *Forrest General* with respect to the Mississippi project. *See* 926 F.3d at 234.

**D.      The 2023 Final Rule is not arbitrary or capricious.**

Plaintiff also challenges the 2023 Final Rule as arbitrary and capricious. (Doc. 32 at 23–27.) When reviewing an agency's policy, a "court simply ensures that the agency has acted

within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  "When the best reading of a statute is that it delegates discretionary authority to an agency," the reviewing court fulfills its role under the APA by "recognizing constitutional delegations, fixing the boundaries of the delegated authority, and ensuring the agency has engaged in reasoned decisionmaking within those boundaries."  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024) (cleaned up).  At bottom, "arbitrary and capricious review asks whether [the] agency articulated a rational connection between the facts found and the decision made."  *Worldcall Interconnect, Inc. v. FCC*, 907 F.3d 810, 817 (5th Cir. 2018) (cleaned up).

The rulemaking record here shows that HHS acted well within the bounds of Congress's express delegation of discretion by promulgating the 2023 Final Rule and amending 42 C.F.R. § 412.106(b)(4).  The preamble to the rule explains that an amendment was necessary to clarify that HHS "regards" a demonstration-project patient as eligible for Medicaid for purposes of the DSH fraction only if that patient receives from the demonstration project "health insurance that covers inpatient hospital services."  88 Fed. Reg. at 59017.

As the agency explained, the term "'eligible for Medical assistance under a state plan approved under title XIX' is a term of art that Congress uses to identify patients that are eligible for Medicaid."  *Id.* at 59021.  And this is precisely why the agency's policy of "regarding" certain demonstration-project patients as Medicaid-eligible for purpose of the DSH fraction has long "rested on the presumption that the demonstration provided a package of health insurance benefits that were essentially the same as what a State provided to its Medicaid population."  *Id.* at 59015.    But demonstration projects that authorize "funding for uncompensated/

30

undercompensated care pools" to ensure the financial viability of hospitals that treat uninsured or underinsured patients do not extend this kind of comprehensive benefit to patients. *Id.* Although the agency recognized that this supplemental funding may, in some sense, indirectly benefit uninsured patients, it explained that this indirect benefit is entirely unlike the health insurance benefits traditionally available to Medicaid beneficiaries. *Id.* That is because health insurance "provides a reasonable expectation on the part of the insurance holder that they can seek treatment without the risk of financial ruin," *id.* at 59020; if a patient is eligible for Medicaid health insurance, the hospital must accept a payment from Medicaid as "payment in full" for a patient's treatment, 42 C.F.R. § 447.15; *see also* 1 Tex. Admin. Code § 354.1005(a) ("An eligible provider must certify that no charges beyond reimbursement paid under the Texas Medicaid Program for a covered service or any function incidental to the provision of a covered service, have been, or will be, billed to an eligible recipient.").

By contrast, demonstration projects that authorize uncompensated care pools do not guarantee that Medicaid will pay the bill of any particular patient. To the contrary, "hospitals may bill uninsured patients for the full cost of their care and refer their medical debts to collection agencies when they are unable to pay," even if some of their medical treatment costs may later be paid to the provider by an uncompensated care pool. 88 Fed. Reg. at 59020.

Further, Congress designed the DSH adjustment to "compensate hospitals for serving a disproportionate share of low-income patients." *Id.* at 59020. When confronted with uncompensated care pools that are not means-tested—such as the Texas pool—the Secretary cannot determine whether the patients associated with those payments are in fact low-income patients of the type Congress intended to include in the DSH calculation. *Id.* Including such patients is therefore likely to "distort[] . . . how Congress intended the DSH calculation to

31

work." *Id.* It would also risk materially increasing DSH payments to hospitals in States with such pools as compared to States without them. *Id.* And that disparity could arise even where hospitals in States without such pools bear greater uncompensated-care burdens—precisely because they lack supplemental funding pools. *Id.*

HHS accordingly revised the DSH regulation to provide that it will only regard a patient as eligible for Medicaid if: (1) the patient "receives health insurance authorized by a demonstration [project] approved by the Secretary under [42 U.S.C. § 1315] for that day," (2) the demonstration project directs that the "cost of such health insurance may be counted as [Medicaid] expenditures" under the State plan, and (3) that health insurance "covers inpatient hospital services." 42 C.F.R. § 412.106(b)(4)(ii). The regulation further provides that patients are not regarded as eligible for Medicaid on a given day simply because their "health care costs, including inpatient hospital services costs, . . . are claimed for payment by a provider from an uncompensated, undercompensated, or other type of funding pool." *Id.* § 412.106(b)(4)(iii).

In short, the 2023 Final Rule shows that HHS considered the relevant issues and reasonably explained its decision to modify § 412.106(b)(4) to limit the types of demonstration projects for which patient days can be counted in the DSH Medicaid fraction to include only those of individuals who receive from the project health insurance-type benefits that cover inpatient hospital services. HHS "articulated a rational connection" between the facts regarding how uncompensated care pools work and the decision that it made, and that is all that was required. *Worldcall*, 907 F.3d at 817.

Plaintiff nonetheless contends, without citation to any specific provision within 42 U.S.C. § 1395ww(d)(5)(F)(vi), that Congress did not authorize HHS to limit the inclusion of demonstration-project patients in the DSH fraction to those who receive the equivalent of

insurance, and that Congress never intended HHS to consider this factor.  (Doc. 32 at 23–24.)

Plaintiff then reasserts that the Secretary is bound to include, once he approves a demonstration

project, all patient days where an individual receives care that is all or partially paid for by

Medicaid funds.  (Doc. 32 at 23–24.)  Plaintiff also argues that the new regulation amounts to an

"about-face" change in policy, inadequately explained in the rule.  (Doc. 32 at 26.)

But Plaintiff's arguments are meritless.  First, the only factor imposed by Congress in

§ 1395ww(d)(5)(F)(vi)(II) weighs against Plaintiff because the statute provides that a non-

Medicaid beneficiary must "receive benefits under a demonstration project" before the Secretary

can exercise discretion to regard the person as eligible for medical assistance under a State plan.

Beyond that limitation, the Deficit Reduction Act gives the Secretary broad discretion to

determine what type of benefit a patient must receive from a demonstration project to be

"regarded as" eligible for medical assistance under the State plan.  *See* 88 Fed. Reg. at 59020.  In

arguing arbitrary and capricious inconsistency, Plaintiff also ignores the text, history, and context

of the Deficit Reduction Act of 2005, including Congress's explicit ratification of HHS's prior

policies defining who should be "regarded as" Medicaid-eligible for purposes of the DSH

calculation.  (*See* pp. 8–9, 24–25, *supra*.)  For example, one of the prior regulations expressly

ratified by Congress in the Deficit Reduction Act was a 2003 rule in which HHS expressly

explained its "intention . . . to include patient days of [demonstration-project] populations who

receive benefits under the demonstration project that are similar to those available to traditional

Medicaid beneficiaries," while contrasting that scenario with "limited benefit demonstrations"

that did not provide similarly comprehensive coverage.  *See* 68 Fed. Reg. at 45420–21 (ratified

by Deficit Reduction Act § 5002(b), 120 Stat. 31).  Given that the current regulatory amendment

calls for this same sort of parsing of whether demonstration-project patients will be included in

33

the DSH fraction based on whether insurance-type benefits are being provided, it cannot be said that HHS has acted contrary to the intent of Congress or considered some unallowed factor. Congress has already approved this kind of methodology.

The Secretary acted well within the bounds of Congress's express delegation by promulgating the 2023 Final Rule and did not act arbitrarily or capriciously. Thus, there is no basis to set aside that agency action as arbitrary, capricious, or otherwise invalid under the APA.

**E.      Alternately, should the Court agree with Plaintiff's arguments, it should nonetheless limit its relief to Plaintiff and not order an across-the-board vacatur of the 2023 Final Rule.**

If the Court rejects the government's arguments and agrees that uninsured patients whose treatment by Plaintiff is paid under the Texas demonstration project should be counted within Plaintiff's DSH fraction, the Court should enter only party-specific relief as to the challenged rule, rather than across-the-board vacatur. That is because, properly understood, the APA does not authorize such vacatur or a departure from traditional principles of equity, which limit courts to party-specific relief tailored to the legal violation.

As the Supreme Court recently recognized, "[t]raditionally, courts issued injunctions prohibiting executive officials from enforcing a challenged law or policy only against the plaintiffs in the lawsuit." *Trump v. CASA, Inc.*, 606 U.S. 831, 837 (2025). Thus, in *CASA*, the Supreme Court held that the "more recent development" of "universal injunctions"—through which district courts "assert[] the power to prohibit enforcement of a law or policy against *anyone*"—"lacks a historical pedigree" and "falls outside the bounds of a federal court's equitable authority under the Judiciary Act" of 1789. *Id.* at 837, 847. A court sitting in equity must tailor relief to "'be no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs*.'" *Id.* at 852 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702

34

(1979) (emphasis added by *CASA*)). That principle also "ensures that federal courts respect the limits of their Article III authority," *United States v. Texas*, 599 U.S. 670, 693–94 (2023) (Gorsuch, J., joined by Thomas and Barrett, JJ., concurring in the judgment), which likewise requires that "a plaintiff's remedy" "be limited to the inadequacy that produced his injury." *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (alterations and quotation marks omitted).

To be sure, as Plaintiff references (Doc. 32 at 27), the Fifth Circuit has characterized vacatur as a "'default rule'" and thus the "'appropriate remedy'" when a court determines that an action should be held unlawful and set aside under the APA. *See Rest. Law Ctr. v. U.S. Dep't of Lab.*, 120 F.4th 163, 177 (5th Cir. 2024) (quoting *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022)). And while this Court likewise noted that vacatur is the "ordinary practice" for unlawful agency action in the Fifth Circuit, it also "doubt[ed] the APA intended to authorize vacatur." *Baylor All Saints*, 745 F. Supp. 3d at 478.

That doubt is correct. Courts should "not lightly assume that Congress has intended to depart from established principles" of equity, *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982), and ordinarily courts expect that Congress will make "an unequivocal statement of its purpose" if it intends to make "a drastic departure from the traditions of equity practice." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944); *accord Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) ("When Congress empowers courts to grant equitable relief, there is a strong presumption that courts will exercise that authority in a manner consistent with traditional principles of equity."). Nothing in the APA authorizes courts to depart from traditional equitable principles and grant universal relief as a matter of course.

In APA challenges, as in any other case involving non-monetary relief, federal courts are authorized to award traditional party-centered remedies such as declaratory judgments and,

where necessary, appropriately tailored injunctions.  But the APA does not authorize courts to radically depart from those traditional remedies, let alone to do so by default.  *See Texas*, 599 U.S. at 693–703 (Gorsuch, J., joined by Thomas and Barrett, JJ., concurring in the judgment). Under the APA, at 5 U.S.C. § 702, judicial review is available only to "person[s]" who have "suffer[ed] legal wrong because of agency action, or [been] adversely affected or aggrieved by agency action."  Aggrieved persons may seek remedies as set forth in the succeeding section, 5 U.S.C. § 703.  And that section specifies that where, as here, there is no "special statutory review proceeding" applicable to the matter, the plaintiff may bring "any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus."  *Id.*

"Conspicuously missing from the list [of remedies] is vacatur."  *Texas*, 599 U.S. at 698 (Gorsuch, J., concurring).  Instead, § 703's formulation of remedies makes clear that, rather than itself creating new remedies, the APA looks to pre-existing remedies available in the "form[s] of legal action" known at the time of the APA's enactment.  As described in the Attorney General's Manual on the APA—"a document whose reasoning [the Supreme Court has] often found persuasive," *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004)—the APA "constitute[s] a general restatement of the principles of judicial review embodied in many statutes and judicial decisions."  U.S. Dep't of Justice, *Attorney General's Manual on the Administrative Procedure Act* 93 (1947).  And in the absence of a special review statute, the ordinary method of review before the APA was a suit in equity against a federal official, typically seeking a prohibitory injunction.  *See, e.g.*, *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902); *see also* U.S. Dep't of Justice, *Final Report of the Attorney General's Committee on Administrative Procedure* 81 (1941) (noting that "the injunction is the remedy normally used" in nonstatutory

36

suits "for the protection of the individual against illegal official action" but that courts also employed remedies such as "habeas corpus, certiorari, mandamus, [and] prohibition" and could issue "declaratory judgments").

In granting vacatur in *Baylor All Saints*, this Court cited § 706 of the APA.  745 F. Supp. 3d at 476, 479.  Many other courts, particularly in the D.C. Circuit, have also done the same, but those precedents do not meaningfully grapple with § 706's text, which states that, in certain circumstances, a reviewing court "shall . . . hold unlawful and set aside agency action."  5 U.S.C. § 706(2).  As discussed, remedies under the APA are governed by § 703.  Section 706, by contrast, is "titled 'Scope of review,'" and addresses "the court's decisional process" leading up to its judgment, not "the remedies the court may authorize after reaching its judgment on the merits."  *Texas*, 599 U.S. at 696 (Gorsuch, J., concurring).

In this context, the APA's direction to a reviewing court to "set aside" unlawful agency action means to disregard that unlawful action—to set it to the side—in resolving the case before the court, in the same way a court would set aside and disregard an unconstitutional statute.  It is well settled that courts "have no power per se to review and annul acts of Congress on the ground that they are unconstitutional."  *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923); *see also CASA*, 606 U.S. at 844 (explaining that a court considering declaratory or injunctive relief against the operation of a statute lacks the authority to "'directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs'" (quoting *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975))).  Instead, judicial review "amounts to little more than the negative power to disregard an unconstitutional enactment."  *Mellon*, 262 U.S. at 488.  Judicial review of agency rules under § 706 should function the same way.  *See Texas*, 599 U.S. at 695–99 (Gorsuch, J., concurring); *Arizona v. Biden*, 40 F.4th 375, 397 (6th Cir. 2022)

(Sutton, C.J., concurring).

This usage also makes sense of the phrase "set aside" in all settings where § 706(2) applies. The APA expressly permits, for example, challenges to agency action to be raised in "actions for declaratory judgment[]" or "habeas corpus" actions, 5 U.S.C. § 703, but "no one thinks a court adjudicating a declaratory action or a habeas petition 'vacates' agency action along the way." *Texas*, 599 U.S. at 699 (Gorsuch, J., concurring). And the same is true for the APA's instruction that a court should disregard unfounded agency "findings" or "conclusions"; it makes little sense to say that a court "vacates" those findings or conclusions as opposed to simply disregarding them for purposes of resolving the case before it. *Id.* at 697–98 (Gorsuch, J., concurring).

Separately, even if vacatur were a permissible remedy under the APA, it is an equitable remedy subject to ordinary equitable principles. Nothing about the term "set aside" suggests that Congress intended to "overthrow the 'bedrock practice of case-by-case judgments with respect to the parties in each case'" and authorize sweeping relief as a matter of course. *See Texas*, 599 U.S. at 702 (2023) (Gorsuch, J., concurring) (quoting *Arizona*, 40 F.4th at 396 (Sutton, C.J., concurring)). To the contrary, the APA expressly states that "[n]othing" in the statute "affects . . . the power or duty of the court to . . . deny relief on any . . . equitable ground." 5 U.S.C. § 702(1). Courts should accordingly consider whether declaratory or injunctive relief in lieu of vacatur is appropriate and, if not, whether any vacatur remedy should be tailored rather than universal.

One equitable principle is particularly relevant here. Remedies "ordinarily operate with respect to specific parties," rather than "on legal rules in the abstract." *California v. Texas*, 593 U.S. 659, 672 (2021) (quotation marks omitted). Equitable remedies are no exception. As *CASA*

confirms, equitable relief should "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *CASA*, 606 U.S. at 852 (quoting *Yamasaki*, 442 U.S. at 702). And even if "set[ting] aside agency action" under § 706(2) of the APA meant vacating it, "agency action" is in turn defined to include "the whole *or a part* of an agency rule," 5 U.S.C. § 551(13) (emphasis added), which readily encompasses relief directed to only certain applications of the rule at issue, including those applications that affect a plaintiff to the lawsuit.

Thus, under traditional equitable principles, a party-specific declaration that the challenged rule is unlawful would fully remedy Plaintiff's injuries and would be the more appropriate remedy here, assuming Plaintiff establishes its entitlement to such relief.

## VI.    Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment should be denied and the Court should instead enter judgment in Defendant's favor dismissing this action with prejudice.

Respectfully submitted,

RYAN RAYBOULD
UNITED STATES ATTORNEY

/s/ Brian W. Stoltz
Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:    214-659-8626
Facsimile:    214-659-8807
brian.stoltz@usdoj.gov

Attorneys for Defendant

Certificate of Service

On March 9, 2026, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ Brian W. Stoltz
Brian W. Stoltz
Assistant United States Attorney

40