IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| COVENANT MEDICAL CENTER, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| ROBERT F. KENNEDY, JR, in his official capacity as Secretary of Health and Human Services, | § | Civil Action No. 4:26-cv-00077-P |
| | § | |
| | § | |
| *Defendant.* | § | |
| | § | |
| | § | |
| | § | |
| | § | |

---

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT**

---

**TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................................1

II.   ARGUMENT...........................................................................................................4

      A.    The Exclusion Rule is Contrary to Law................................................................ 4
      B.    The Exclusion Rule Is Arbitrary and Capricious.................................................. 14
      C.    Vacatur Remains the Appropriate Remedy. .......................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advocate Christ Medical Center v. Kennedy*,
605 U.S. 1 (2025)......................................................................................................5, 8, 9

*Ams. for Beneficiary Choice v. United States Dep't of Health & Human Services*,
795 F. Supp. 3d 895 (N.D. Tex. 2025) ...................................................................17

*Baylor All Saints Med. Ctr. v. Kennedy*,
161 F.4th 298 Case No. 24-10934, ECF No. 58 (5th Cir. Aug. 28, 2025) ................................8

*Bethesda Health, Inc. v. Azar*,
389 F. Supp. 3d 32 (D.D.C. 2019), *aff'd*, 980 F.3d 121 (D.C. Cir. 2020)....................... *passim*

*Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*,
98 F.4th 220 (5th Cir. 2024) .................................................................................17

*In re Clarke*,
94 F.4th 502 (5th Cir. 2024) .................................................................................17

*Crane v. Napolitano*,
No. 3:12-CV-03247-O, 2013 WL 1744422 (N.D. Tex. Apr. 23, 2013) ..................................17

*Decker v. Nw. Envtl. Def. Ctr.*,
568 U.S. 597 (2013)..............................................................................................2, 10

*Dep't of Educ. v. Career Colls. & Schs. of Tex.*,
145 S. Ct. 1039, 2025 WL 65914 (Jan. 10, 2025) .................................................17

*Djie v. Garland*,
39 F.4th 280 (5th Cir. 2022) ................................................................................2, 10

*Forrest Gen. Hosp. v. Azar*,
926 F.3d 221 (5th Cir. 2019) ............................................................................. *passim*

*Joyce v. Young Cnty. Sheriff's Office*,
No. 4:23-CV-620-O, 2024 WL 3625681 (N.D. Tex. Aug. 1, 2024) .......................................16

*Miller v. Davis*,
No. 4:19-CV-535-P, 2020 WL 758722 (N.D. Tex. Feb. 14, 2020)........................................16

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut.
Auto. Ins. Co.*,
463 U.S. 29 (1983).............................................................................................14, 16

*Rest. L. Ctr. v. United States Dep't of Lab.*,
  120 F.4th 163 (5th Cir. 2024) ...............................................................................17

*Trump v. CASA*
  606 U.S. 831, 847 n.10 (2025)............................................................................4, 17

*United States v. Larionoff,*
  431 U.S. 864 (1977)..............................................................................................2, 10

**Statutes**

5 U.S.C. § 706(2) ........................................................................................................1, 17

42 U.S.C. § 1315(a) ...................................................................................................8, 11

42 U.S.C. § 1395ww(d)(5)(F).............................................................................. *passim*

42 U.S.C. § 1396d.........................................................................................4, 7, 11, 15

**Other Authorities**

42 C.F.R. § 412.106(b)(4)(iii)............................................................................. *passim*

42 C.F.R. § 430.25(b) .....................................................................................................9

68 Fed. Reg. 45,346, 45,420–21 (Aug. 1, 2003).......................................................12, 16

BLACK'S LAW DICTIONARY (10th ed. 2014) ...............................................................6, 9

BLACK'S LAW DICTIONARY (11th ed. 2019) ...............................................................6, 9

## I.    INTRODUCTION

As the Secretary's response makes clear, both parties agree that "this Court previously addressed, in the *Baylor All Saints* litigation, the same challenge Covenant raises in this case to how the Secretary . . . calculates the Medicaid numerator portion of the 'disproportionate share hospital' (DSH) fraction." ECF No. 36 ("Resp.") at 1. And as this Court recognized in *Baylor All Saints*, that challenge must succeed under binding Fifth Circuit precedent, which unequivocally forecloses the regulatory approach the Secretary has taken here. Although the Secretary endeavors to repackage some of his arguments, this Court, the Fifth Circuit, and the D.C. Circuit have already rejected them. The Secretary has not identified any basis for altering this Court's prior reasoning and conclusion on the merits. The Exclusion Rule should again be vacated.[1]

The Secretary futilely urges the Court to take a "blank slate," *id*. at 1, but the statute's plain text and the holding of the Fifth Circuit in *Forrest Gen. Hosp. v. Azar*, 926 F.3d 221 (5th Cir. 2019), are, for all intents and purposes, etched in stone. Once again, "HHS's decision to exclude UCCP [uncompensated care pool] patient days from the Medicaid fraction's numerator is 'not in accordance with law.'" *Forrest Gen.*, 926 F.3d at 234 (quoting 5 U.S.C. § 706(2)(A)). Indeed, all of the Secretary's arguments in opposition, including his efforts to recast the underlying statutory provisions, have been authoritatively dispensed with by the Fifth Circuit in a decision that "directly controls [this] Court's inquiry." Case No. 4:24-cv-000432-P, ECF No. 33 at 10 ("Opinion & Order") (citing *Forrest Gen.*, 926 F.3d at 228–29). As the Fifth Circuit explained, "if the Secretary approves a demonstration project, then we regard patient days involving patients who 'receive benefits under a demonstration project' as if they were patient days attributable to Medicaid-

---

[1] The parties also agree that this Court has jurisdiction. *See* Resp. at 13 (acknowledging that Plaintiff "ha[s] now followed the relevant cost-report procedures . . . .").

eligible patients (which means those days also go into the numerator)." *Forrest Gen.*, 926 F.3d at 228. And it is equally clear that patients who receive medical assistance under an uncompensated care pool program—whether operated by Mississippi or by Texas—receive "benefits" because "[m]edical assistance is a benefit." *Id.* at 234.

It's that simple. "Just as the statute's mechanics are straightforward, so too are its words." *Id.* at 229. Or as a D.C. federal court echoed, the "statute" is "already clear when unadorned." *Bethesda Health, Inc. v. Azar*, 389 F. Supp. 3d 32, 47 (D.D.C. 2019), *aff'd*, 980 F.3d 121 (D.C. Cir. 2020) ("embrac[ing] the district court's opinion as the law of this circuit"). Therefore, as this Court recognized in *Baylor All Saints* in previously finding the Exclusion Rule to be unlawful, "[t]his case is simple on the merits." Opinion & Order at 10.

The Secretary clearly disfavors the legislative framework established by Congress that requires the counting of these patient days, as evidenced by his intransigence in adopting the Exclusion Rule, 42 C.F.R. § 412.106(b)(4)(iii), notwithstanding its clear and direct conflict with the holdings in *Forrest General* and *Bethesda Health* and over the vocal opposition of adversely affected hospitals like Covenant that serve low-income populations. But no matter the Secretary's distaste for the framework mandated by Congress, "[w]hen a regulation attempts to override statutory text, the regulation loses every time—regulations can't punch holes in the rules Congress has laid down." *Djie v. Garland*, 39 F.4th 280, 285 (5th Cir. 2022); *see also Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 609 (2013) ("It is a basic tenet that 'regulations, in order to be valid, must be consistent with the statute under which they are promulgated.'" (quoting *United States v. Larionoff*, 431 U.S. 864, 873 (1977)). Faced with that reality, the Secretary now tries to distort the holdings in *Forrest General* and *Bethesda Health*, arguing that those cases merely "interpreted the prior version of 42 C.F.R. § 412.106," Resp. at 10—an obvious misreading of those decisions

that ignores their thorough discussion and application of the statute to require the counting of patient days covered by uncompensated care pools and reject the contrary approach preferred by the Secretary.

Looking even farther afield, the Secretary also attempts to invoke the terms of the Texas Healthcare Transformation and Quality Improvement Program ("Texas Demonstration"), as agreed to by HHS and Texas, to negate the clear import of the statute, as definitively construed and applied by both the Fifth Circuit and D.C. Circuit. He argues that certain statements he made to Texas in approving the Texas Demonstration somehow absolve him of the statutory obligation to count patient days associated with that demonstration in the Medicaid fraction. Specifically, he points to the following statements from the demonstration letters and documents: (1) "this expenditure authority does not make uninsured patients eligible for any benefits under the demonstration" and (2) "funding of the pools is not medical assistance and does not create Medicaid beneficiaries or provide benefits to individuals." Resp. at 3. But this merely rehashes the same arguments advanced by the Secretary and soundly rejected by the courts in *Forrest General* and *Bethesda Hospital* that beneficiaries do not receive any "benefit" from uncompensated care pools. As those decisions make clear, what matters under the statute is what the demonstration "*in fact*" does, not what the Secretary says or "presume[s]" it does. *Forrest Gen.*, 926 F.3d at 229 (emphasis in original); *see also id.* at 229 ("The statute explains that we are to 'regard' such patients this way because they '*receive benefits* under a demonstration project'"). Here, as in *Forrest General*, "[m]edical assistance is a benefit. And medical assistance is precisely what UCCP patients got." *Id.* at 234.

The Exclusion Rule is also arbitrary and capricious for the reasons laid out in the opening brief, including that the Rule runs contrary to the purposes of the DSH adjustment, and that the

3

Secretary did not adequately account for hospitals' reliance interests.  Nothing in the Secretary's response justifies the Secretary's attempt to favor certain types of medical assistance—such as medical assistance reimbursed by health insurance—over others, such as medical assistance funded by uncompensated care pools.  Nor does the Secretary offer any real-world evidence whatsoever justifying this punitive treatment of uncompensated care pools, which is notable for its omission given that these patient days were counted under Texas's demonstration program (and other states as well) for years prior to the Secretary's unlawful adoption of the Exclusion Rule.

Finally, vacatur remains the appropriate remedy.  *Trump v. CASA* explicitly left intact the status quo with respect to vacatur under the Administrative Procedure Act.  606 U.S. 831, 847 n.10 (2025).  Therefore, Fifth Circuit precedent establishing vacatur as the default remedy remains controlling and dictates that same remedy here.

## II.    ARGUMENT

### A.  The Exclusion Rule is Contrary to Law.

Under *Forrest General*, the "governing statutory text is clear," and the Exclusion Rule is contrary to that controlling law.  *Forrest Gen.*, 926 F.3d at 228.  The DSH statute's plain text requires that "if the Secretary approves a demonstration project, then we regard patient days involving patients who 'receive benefits under a demonstration project' as if they were patient days attributable to Medicaid-eligible patients (which means those days also go into the numerator)." *Id*. (quoting 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II)).  "Medical assistance is a benefit." *Id.* at 234.  The Texas Demonstration UCCP patients received "medical assistance," which is "payment of part or all of the cost of the following care and services or the care and services themselves," including inpatient hospital services.  42 U.S.C. § 1396d(a), (a)(1); *see generally* ECF No. 32 ("Mot.") at 19–23.  Therefore, their patient days "go[] into the numerator." *Forrest Gen*., 926 F.3d at 229.  As noted by this Court, the binding case law definitively construing and

4

applying the statutory text makes this analysis "simple on the merits"; it "doesn't require the judicial skills of Learned Hand or Oliver Wendell Holmes."  Opinion & Order at 10.

The Secretary argues in vain that this Court "misapplied *Forrest General*" when it decided in *Baylor All Saints* that the Exclusion Rule is unlawful.  Resp. at 2.  The Secretary's arguments make clear that he is really asking this Court to overturn *Forrest General* by distorting the clear meaning of the Fifth Circuit's opinion.

First, the Secretary argues, much like he did in *Forrest General* and *Bethesda Health*, that beneficiaries do not receive any benefit under uncompensated care pool programs, and therefore these patient days should not be counted.  The only added gloss is that the Secretary cites the Supreme Court's recent decision in *Advocate Christ Medical Center v. Kennedy*, 605 U.S. 1 (2025), arguing that there is a distinction between "direct" and "indirect" benefits, wherein only direct benefits may be counted in the Medicaid fraction, and health insurance is the sole direct benefit.  Resp. at 14–22.  But *Advocate Christ* is entirely inapposite, as it dealt with qualifying Social Security related benefits under the separate Medicare fraction and has no bearing on the eligible *Medicaid* related benefits that are the subject of 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).  Indeed, neither that statute nor *Forrest General* reference any distinction between direct and indirect benefits, let alone insurance and non-insurance.  Rather, in applying the operative statutory text, *Forrest General* noted that "[m]edical assistance is a benefit," 926 F.3d at 234, without any consideration of whether that benefit is "direct" or "indirect."

Next, the Secretary argues that the Exclusion Rule is lawful because (a) *Forrest General* was based on the Fifth Circuit's interpretation of the prior regulation, not the Medicare statute, and so the Secretary's discretion to issue the Exclusion Rule was unaffected by the decision, and (b) he properly exercised this "delegated authority" through the letters he sent in relation to the Texas

5

Demonstration. Resp. at 23–29. Again, the Secretary's efforts to rewrite the opinion in *Forrest General* to his liking fail. *Forrest General* definitively construed and applied *the statute* in holding that patient days from UCC pools must be included in the numerator, explaining that "*the statute's* mechanics are straightforward, [and] so too are its words." *Forrest Gen.*, 926 F.3d at 229 (emphasis added); *see id.* ("[T]he statute means that patients . . . count towards the Medicaid fraction's numerator if they're considered or accounted to be capable of receiving a demonstration project's helpful or useful effects by reason of a demonstration project's authority."). And the Fifth Circuit also held that the Secretary's "2005 and 2006 letters" "simply [weren't] germane to the governing statute or regulation" which "only care about whether patients underlying particular days were *in fact* eligible or *regarded as* eligible for Medicaid." *Id.* at 233 (emphasis in original). That squarely forecloses the Secretary's argument here that the language in the Texas waiver can somehow nullify the benefit afforded to beneficiaries through the provision of medical assistance, as funded by federal Medicaid dollars.

1.      It is undisputed that the beneficiaries accounting for the patient days at issue here received inpatient health services pursuant to a demonstration program approved by the Secretary. Under the plain meaning of the statute, as definitively construed in *Forrest General*, that should be the end of the inquiry, as these patient days must be included in the Medicaid fraction. To try to avoid this obvious conclusion, the Secretary acrobatically belabors how the term "benefits" should be applied here. But "benefit" should simply be given its plain meaning: "'advantage or privilege something gives; the helpful or useful effect something has.'" *Forrest Gen.*, 926 F.3d at 229 (quoting *Benefit*, BLACK'S LAW DICTIONARY (10th ed. 2014)); *see also Bethesda Health*, 389 F. Supp. 3d at 47 (quoting *Benefit*, BLACK'S LAW DICTIONARY (11th ed. 2019)). Inpatient health services—medical care for the sick and needy—are benefits.

6

Given that Medicaid revolves around "[a] state plan for medical assistance," 42 U.S.C. § 1396a(a), the meaning of "medical assistance" is also germane. It is also straightforward; "medical assistance" includes "inpatient hospital services." 42 U.S.C. § 1396d(a)(1).

Though the Secretary tries to "mystify[]" this analysis as he did in *Forrest General*, 926 F.3d at 234, his contrived distinction between "direct" and "indirect" benefits has no basis in the law. Neither does his insistence that benefits must be "insurance-like." Resp. at 16; *see also Bethesda Health*, 389 F. Supp. 3d at 46 ("The statutory text does not require uninsured and underinsured patients to enroll in a health insurance plan."). Though "medical assistance" extends to 32 categories of care (the first listed being "inpatient hospital services"), none of those categories delineate between direct and indirect service and none involve insurance. 42 U.S.C. § 1396d(a)(1)–(32).

In *Forrest General*, the Secretary argued (as he does here) that the individual beneficiaries did not "receive[] benefits under the UCCP," but rather "payments were made *to hospitals* for uncompensated costs the hospitals incurred in treating patients who were not beneficiaries of Medicaid or any other assistance program." *Forrest Gen. Hosp. v. Azar*, Case No. 18-60227, ECF No. 39, Brief for Appellee at 26 (5th Cir. Aug. 21, 2018) (emphasis in original); *compare id. with* Resp. at 16 ("To be clear, the result is that hospitals like Plaintiff receive payment for services provided to such patients, through the demonstration project."). And he argued that while the UCCP "provided funds to hospitals that incurred uncompensated costs in treating patients," those patients "received no healthcare benefits, whether through Medicaid, private insurance, or otherwise." *Id*. at 26–27; *compare id. with* Resp. at 21 ("The uninsured patients who receive charity care, whose costs might be covered by uncompensated care pool funds, receive no direct

benefits from the demonstration project and are in no way deemed 'fitted or qualified' or 'entitled' to receive those payments." (citation omitted)).

The Fifth Circuit unequivocally rejected these now-recycled arguments. It first observed that "HHS thinks UCCP patients didn't receive benefits under a demonstration project." *Forrest Gen.*, 926 F.3d at 227; *see id*. at 234 ("HHS argues that 'no patient received benefits under the UCCP.'"). Judge Willett, writing for a unanimous panel, then observed:

> This statement is mystifying. If UCCP patients didn't receive benefits under the UCCP, what *did* they receive? And under what or whose authority did they receive, well, whatever non-benefits they received? Medical assistance is a benefit. And medical assistance is precisely what UCCP patients got.

*Id*. (emphasis in original). The Fifth's Circuit's reasoning is textually sound, as the Secretary cannot provide federal matching Medicaid funds for expenditures under demonstration projects for anything other than "medical assistance." The statute makes clear that the Secretary's invocation of his authority to "regard" uncompensated care pool expenditures as "matchable" means as a matter of law that he "regards" those expenditures to be "medical assistance," which is a benefit to those patients who receive it. 42 U.S.C. § 1315(a), (a)(2)(A); s*ee Bethesda Health*, 389 F. Supp. 3d at 50 ("There is no doubt that uninsured and underinsured patients . . . received benefits under a demonstration project and . . . were 'regarded as such.'" (quoting 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II))).

Grasping at straws, the Secretary suggests that this Court's analysis should change because of *Advocate Christ Medical Center v. Kennedy*, 605 U.S. 1 (2025). Resp. at 19–21.[2] *Advocate Christ* has no bearing on this case. In *Advocate Christ*, "the key phrase in the Medicare fraction

---

[2] Although *Advocate Christ* was issued during the pendency of the *Baylor All Saints* appeal, the Secretary did not file a 28(j) letter alerting the panel of its supposed import—even though he did submit a 28(j) letter regarding other developments in the case law. *Baylor All Saints Med. Ctr. v. Kennedy*, Case No. 24-10934, ECF No. 58 (5th Cir. Aug. 28, 2025).

[was] 'entitled to *supplementary security income* benefits . . . under subchapter XVI.'" *Advocate Christ*, 605 U.S. at 8 (quoting 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I)).   The hospitals argued primarily that the term "SSI benefits" included certain non-cash benefits, such as vocational rehabilitation services and continued Medicaid coverage.   But the Court rejected that broader reading, emphasizing that the statute refers specifically to a "supplemental security *income*" benefit. *Id*. at 13 (emphasis added by the Court).   The Court therefore concluded that an individual is "entitled to [SSI] benefits . . . under subchapter XVI" when that individual is "eligible to receive an SSI cash payment." *Id.* at 18, 20.

Here, in contrast, the Medicaid fraction's use of the word "benefit" has no qualifier.   42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (hanging paragraph) ("because they receive benefits under a demonstration project").   As held by the Fifth Circuit and D.C. Circuit and as discussed *supra*, the term "benefit" therefore takes on its natural meaning.   *Forrest Gen.*, 926 F.3d at 229 (noting that "Black's Law Dictionary defines a 'benefit' as the 'advantage or privilege something gives; the helpful or useful effect something has"); *see also Bethesda Health*, 389 F. Supp. 3d at 47 (quoting *Benefit*, BLACK'S LAW DICTIONARY (11th ed. 2019)).   Moreover, in construing the term "SSI benefit" in *Advocate Christ*, the Court looked in part to the "purpose" of the program, which was to provide "*income.*" *Advocate Christ*, 605 U.S. at 10–11 (emphasis in original).   By contrast, the undisputed purpose of a demonstration project, as reflected in the Secretary's own regulations, is "to provide the flexibility needed to enable States to try new or different approaches to the efficient and cost-effective delivery of health care services, or to adapt their programs to the special needs of particular areas or groups of beneficiaries." 42 C.F.R. § 430.25(b).   Against that backdrop of "experimentation and innovation," Opinion & Order at 4 n.4, Congress in using the word "benefit," consistent with its plain textual meaning, did not arbitrarily limit qualifying benefits to either

"direct" or "indirect" assistance. Rather, Congress made clear through the statutory text that "medical assistance," which specifically includes inpatient services, is precisely the type of benefit that renders demonstration projects eligible for federal matching dollars, thereby requiring the inclusion of those patient days in the Medicaid fraction.

2.     Next, the Secretary erroneously argues that *Forrest General* was based entirely on the regulation in effect at the time and thus "is best understood as holding that the agency *may* 'regard' patients who are authorized to receive benefits in a demonstration project as being eligible for Medicaid within the meaning of the statute." Resp. at 28 (emphasis in original). He argues that "[u]nderstood in that manner, the challenged rule is entirely consistent with *Forrest General*— it merely clarifies what benefits a patient must be authorized to receive from a demonstration project to be 'regarded as' Medicaid-eligible for purposes of the DSH calculation." *Id*. at 28–29.

The Secretary has floated this same argument before, and this Court should reject it now as it did in *Baylor All Saints*. In *Forrest General*, the Fifth Circuit interpreted the statutory term "eligible" and held that in ordinary usage it simply means "capable of receiving," and therefore a patient is "regarded as" Medicaid-eligible if he is *capable of receiving* some "benefits under a demonstration project," meaning anything "helpful or useful." *Forrest Gen.*, 926 F.3d at 229. The court's holding was squarely based on its interpretation of this statutory language. None of the court's discussion or rationale was predicated on the meaning of the regulation in effect at that time. The court's ruling in *Forrest General* precludes the Secretary from adopting a new regulation that simply takes another run at escaping the clear statutory language. *Djie*, 39 F.4th at 285; *see also Decker*, 568 U.S. at 609 ("It is a basic tenet that 'regulations, in order to be valid, must be consistent with the statute under which they are promulgated.'" (quoting *Larionoff*, 431 U.S. at 873).

10

The Secretary also argues that "nothing in 42 U.S.C. § 1315 (the demonstration-project statute) limits the Secretary to an all-or-nothing approval decision," leaving him free to issue regulations that contemplate "conditional and bounded approvals." Resp. at 23. However, § 1315 and 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II), as properly understood in their full statutory context, make plain the fallacy of the Secretary's claims of unfettered discretion to issue "conditional" waivers approving Medicaid expenditures for inpatient hospital days with the authority to turn around and deny those very same patient days as Medicaid eligible for DSH reimbursement purposes.[3] Under § 1315, approval of a demonstration project reflects "the judgment of the Secretary [that it] is likely to assist in promoting the objectives of" Medicaid. 42 U.S.C. § 1315(a). By virtue of the approval, the "costs of such project which would not otherwise be included as [Medicaid] expenditures . . . shall, to the extent and for the period prescribed by the Secretary" in the approval, "be regarded as expenditures under the State plan." *Id.* § 1315(a)(2)(A). Congress's directive in the DSH provision uses nearly identical language: "to the extent and for the period the Secretary determines appropriate," demonstration-project patients are "regarded as" Medicaid-eligible "because they receive benefits under a demonstration project." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (hanging paragraph).

---

[3] To the extent that the Secretary relies upon language from the Texas Demonstration to claim that Texas Demonstration beneficiaries do not receive a "benefit," *see, e.g.*, Resp. at 11, that argument fails because just as an agency cannot rewrite a statutory standard through regulation, it cannot undo a statute by contract. Moreover, even looking to the terms of the Texas Demonstration, it does not support the Secretary's claim. Specifically, the Texas Demonstration provides: "**Uncompensated Care (UC) Pool**. Payments from this pool may be used to defray the actual uncompensated cost of medical services that meet the definition of 'medical assistance' contained in section 1905(a) of the Act." ECF No. 34 at 51 (emphasis in original). "Medical assistance" as defined by "section 1905(a) of the Act," codified at 42 U.S.C. § 1396d, includes "inpatient hospital services." 42 U.S.C. § 1396d(a)(1). Again, echoing *Forrest General*, "[m]edical assistance is a benefit. And medical assistance is precisely what [these] patients got." 926 F.3d at 234.

11

In other words, the expenditures that were "regarded as" medical assistance for purposes of Medicaid funding, by virtue of the Secretary's approval of the demonstration program, are the same "benefits" received under the demonstration program. So, when the Secretary determined that the Texas Demonstration promoted the objectives of Medicaid and elected to use his expenditure authority to match the "medical assistance" provided to the hospitals' inpatients,[4] that decision had binding legal consequences for purposes of DSH as well. Indeed, when the Secretary caused expenditures under the Texas Demonstration—including the UCC pool—to be regarded "as expenditures under the State's Medicaid" plan for a specified period, the Secretary also necessarily decided that the patients who benefit from that program would be "regarded" as though they were Medicaid-eligible for that same period. *See Forrest Gen.*, 926 F.3d at 233.

*Forrest General* makes this unambiguously clear: "The Secretary may exercise discretion, and the Secretary did exercise discretion" by approving the demonstration project. *Id.* "Once the Secretary authorizes a demonstration project, no take-backs. The statutory discretion isn't discretion to exclude populations that the Secretary has already authorized and approved for a given period; it's discretion to authorize the inclusion of those populations in the first place." *Id.* The Secretary is free to decide whether certain individuals may qualify and benefit from a demonstration program, including based on income or age limits, or other considerations, but once

---

[4] The Secretary belabors the history of the Deficit Reduction Act in support of his argument that he may exclude inpatient benefits from "benefits" as that term is used in 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). *See, e.g.*, Resp. at 7–9, 15–16, 33. However, reviewing this same history, the court in *Bethesda Health* held that the Secretary's actions leading up to the Act cemented that "benefits" included "inpatient benefits." *Bethesda Health*, 389 F. Supp. 3d at 47 ("In August 2003, the Secretary thus clarified that his 'intention in allowing hospitals to include patient days related to section 1115 expansion waiver populations was to include patient days of demonstration populations who receive benefits under the demonstration project that are similar to traditional Medicaid beneficiaries, *including inpatient benefits*.'") (quoting 68 Fed. Reg. 45,346, 45,420–21 (Aug. 1, 2003) (emphasis added in *Bethesda*)).

he approves a program, and thereby elects to use his matching expenditure authority to "regard" the costs of the program as "expenditures under a State plan" (*i.e.*, medical assistance), he is bound by that choice. He cannot turn around for purposes of DSH reimbursement, whether by regulation or letter, and declare that the individuals who received this "medical assistance" did not receive a "benefit[] under a demonstration project" when he paid the check for those benefits.

3.      The Secretary also argues that the "discussion in *Forrest General* of what the Mississippi project approval letters" stated proves that "the proper analysis will require looking to . . . the terms and conditions of the Texas demonstration project," *i.e.*, the letters between HHS and Texas. Resp. at 26. This is exactly backwards. When in *Forrest General* the Fifth Circuit discussed the Mississippi letters, it wrote that they "simply [were]n't germane to the governing statute or regulation. The statutory and regulatory texts only care about whether patients underlying particular days were in fact eligible or regarded as eligible for Medicaid—there's no textually grounded reason to consider what patients were presumed to be otherwise eligible for." *Forrest Gen.*, 92 F.3d at 233. As just discussed, patients are "regarded as Medicaid eligible," such that their patient days go into the Medicaid fraction, when they "receive[d] benefits under a demonstration project," *id*. at 228–29, and "medical assistance" is a type of "benefit," *id*. at 234. This is an objective test, based on what the demonstration project in fact does—it waives the Medicaid statute's limits on who may receive the benefit of "medical assistance" and pays for these expenditures as if they were expenditures under a State Plan. It is not a subjective test, based either on the Secretary's written (and self-serving) characterization of what he thinks the project does or on what he may wish the project did if he were unconstrained by limits placed on him by Congress.

13

The Secretary also argues that by putting in his letters to Texas the statement that "expenditure authority" and the "funding of the pools" are not benefits, "[f]rom the time of the Texas project's renewal, then, patients with respect to whom hospitals received uncompensated care pool payments were not regarded as Medicaid beneficiaries." Resp. at 28. But as explained above, the Secretary's characterizations in these letters are not controlling. It holds no weight when the Secretary states that he does not intend to regard those who receive these benefits as "Medicaid beneficiaries." What matters is that he has agreed to pay matching Medicaid funds to cover their inpatient services. To do that, section 1115 requires that he regard those "expenditures" as "expenditures under a State Plan." And the Medicare DSH statute makes clear that when he does that, he "regards" the beneficiaries as "Medicaid eligible." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (hanging paragraph) ("the Secretary may . . . include patient days of patients not so eligible but who are regarded as such because they receive benefits under a demonstration project.").

### B. The Exclusion Rule Is Arbitrary and Capricious

As Plaintiff explained, the Exclusion Rule must be vacated not only because it is contrary to statute, but also because it is arbitrary and capricious in several independent ways. First, in discriminating in favor of "insurance" benefits and against non-insurance benefits, the rule impermissibly "relied on factors which Congress had not intended [the agency] to consider." *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Second, the Secretary did not adequately account for the purpose of the DSH adjustment, which is designed to account for the higher costs to hospitals of treating low-income patients. And third, the Secretary ignored hospitals' important reliance interests in the inclusion of patient days from the previously approved section 1115 UCC pools. In response, the

14

Secretary fails to show that he acted reasonably and in line with Congress's intent, and he neglects to address Covenant's reliance argument, thereby forfeiting on that issue.

The Secretary makes no meaningful attempt to show that Congress intended for him to discriminate in favor of "insurance" benefits and against other benefits received under a demonstration project. Indeed, the statutory definition of "medical assistance," which refers to "payment of part or all of the cost of" specified care and services, "or the care and services themselves, or both," shows just the opposite. 42 U.S.C. § 1396d(a); *see* Mot. at 24. If that were not enough, inpatient hospital services are specifically identified as a form of "medical assistance." *Id.* § 1396d(a)(1). Insurance, in contrast, is *not* identified as a form of "medical assistance." The Secretary has no response to these points.

Instead, the Secretary focuses on arguing that his categorical preference for insurance, to the complete exclusion of UCC pools that support medical assistance for low-income patients, is somehow reasonable and consistent with the purpose of DSH adjustments. Resp. at 29–31.

The Secretary speculates, without support in evidence or even common sense, that demonstration projects are susceptible to exploitation by "high-income individuals." *See, e.g.*, *id.* at 18. That the Secretary has no support for this claim is no surprise, because there is no reason to think that any appreciable number of high-income individuals would both (a) be uninsured and (b) seek treatment funded by a UCC pool at a hospital that disproportionately serves low-income populations. Moreover, the Secretary ignores the fact that the Texas Demonstration, which he approved, has guardrails to screen applicants and prevent abuse:

> **Uncompensated Care (UC) Pool.** Payments from this pool may be used to defray the actual uncompensated cost of medical services that meet the definition of "medical assistance" contained in section 1905(a) of the Act, that are provided to uninsured individuals as charity care by hospitals, clinics, or by other provider types, as specified at subparagraph (c) below, including uninsured full or partial discounts, that provide all or a portion of services free of charge to patients *who*

15

> *meet the provider's charity care policy and that adhere to the charity care principles of the Healthcare Financial Management Association.*

ECF No. 34 at 51 (emphasis added); *see also id*. at 133. The Secretary's far-fetched, unsubstantiated hypotheticals about high-income UCC patients are hardly a reasonable basis for denying states and hospitals the flexibility to provide medical assistance through UCC pools.

As for the Exclusion Rule's disruption of hospitals' reliance interests, the Secretary gives them the same short shrift in his brief that he did in the Rule itself. *See* Mot. at 26–27. This underscores the Secretary's failure to consider an "important aspect of the problem," which is yet another independent reason to vacate the Exclusion Rule. *State Farm Mut. Auto. Ins.*, 463 U.S. at 43. The closest the Secretary comes to addressing this issue is his reference to a 2003 rule in which HHS indicated its intent to include patient days of patients who "receive benefits under the demonstration project that are similar to those available to traditional Medicaid beneficiaries" while excluding patient days associated with "limited benefit demonstrations." Resp. at 33. What the Secretary neglects to mention, however, is that those "limited benefits" (such as family planning services) did not include inpatient benefits, which the 2003 rule described as "similar" to the benefits available to Medicaid beneficiaries. 68 Fed. Reg. 45,346, 45,420–21 (Aug. 1, 2003). In other words, the Secretary's 2003 rule adopted a policy to *include* all those patients who received "inpatient benefits" through a demonstration project. But in 2023, he abandoned that policy without providing any reasoned basis for doing so. The Exclusion Rule is thus a departure from, not a descendant of, the 2003 rule. Given the Secretary's at best perfunctory response to Plaintiff's reliance argument, he has forfeited the issue. *Joyce v. Young Cnty. Sheriff's Office*, No. 4:23-CV-620-O, 2024 WL 3625681, at *3 n.4 (N.D. Tex. Aug. 1, 2024) (O'Connor, J.) ("[F]ailure to address the issue in his summary judgment response constitutes a waiver of it."); *see also Miller v. Davis*, No. 4:19-CV-535-P, 2020 WL 758722, at *3 (N.D. Tex. Feb. 14, 2020) (Pittman, J.) (

16

"[T]he claim is inadequately briefed and thus is waived"); *Crane v. Napolitano*, No. 3:12-CV-03247-O, 2013 WL 1744422, at *19 (N.D. Tex. Apr. 23, 2013) (O'Connor, J.) ("In the Fifth Circuit, a party waives any issues that are inadequately briefed.").

### C. Vacatur Remains the Appropriate Remedy.

Vacatur is the standard, default remedy within the Fifth Circuit when the government has acted in excess of its delegated authority. *See In re Clarke*, 94 F.4th 502, 512 (5th Cir. 2024) ("Should plaintiffs prevail . . . this court must 'set aside' [the challenged agency] action, with nationwide effect."); *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024), *cert. granted on other grounds sub nom. Dep't of Educ. v. Career Colls. & Schs.* of Tex., 145 S. Ct. 1039, 2025 WL 65914 (Jan. 10, 2025) (Mem.) ("the scope of ultimate relief under [5 U.S.C.] Section 706 . . . is not party-restricted."). The Secretary mistakenly argues that the Court's holding in *Trump v. CASA* should lead this Court to enter a different remedy than complete vacatur of the Exclusion Rule. In *CASA*, the Supreme Court clearly stated that it did not "resolve[] the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action." 606 U.S. at 847 n.10 (2025) (citing 5 U.S.C. § 706(2)). Therefore, after *CASA*, courts in this district have continued to apply vacatur as the appropriate remedy in cases like this one. *Ams. for Beneficiary Choice v. United States Dep't of Health & Human Services*, 795 F. Supp. 3d 895, 910 (N.D. Tex. 2025) (O'Connor, J.) (quoting *Rest. L. Ctr. v. United States Dep't of Lab.*, 120 F.4th 163, 177 (5th Cir. 2024) (further quotation omitted)). Like in *Baylor All Saints*, universal vacatur of the Exclusion Rule remains the correct remedy here. *See* Mot. at 27–28. The Secretary identifies no rationale for why relief should be party-specific and other impacted hospitals in Texas (and other states with similar demonstration programs) should continue to have to comply with the plainly unlawful Exclusion Rule, forcing hospitals to lose valuable 340B related

drug discounts that can never be recouped and to incur substantial delays in receiving DSH payments to which they are clearly entitled.

Dated:  March 19, 2026                    Respectfully submitted,

                                          /s/ Nikesh Jindal
Robert M. Hill                            Nikesh Jindal (admitted *pro hac vice*)
Texas Bar No. 24125624                    Mark D. Polston (admitted *pro hac vice*)
KING & SPALDING LLP                       Christopher P. Kenny (admitted *pro hac vice*)
2501 Olive Street, Suite 2300             Alexander Kazam (admitted *pro hac vice*)
Dallas, Texas 75201                       Alek Pivec (admitted *pro hac vice*)
Tel: 214-764-4414                         Ahsin Azim (admitted *pro hac vice*)
Fax: 214-764-4601                         KING & SPALDING LLP
rhill@kslaw.com                           1700 Pennsylvania Avenue NW, Suite 900
                                          Washington, D.C. 20006
                                          Tel: 202-737-0500
                                          Fax: 202-626-3737
                                          NJindal@kslaw.com
                                          MPolston@kslaw.com
                                          CKenny@kslaw.com
                                          AKazam@kslaw.com
                                          APivec@kslaw.com
                                          AAzim@kslaw.com


                                          *Attorneys for Plaintiff*


**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the CM/ECF system on this day, will be sent via electronic mail to the registered participants as identified on the Notice of Electronic Filing.


Dated: March 19, 2026                     /s/ *Nikesh Jindal*
                                          Nikesh Jindal