UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**COVENANT MEDICAL CENTER,**

Plaintiff,

v.

**No. 4:26-cv-00077-P**

**ROBERT F KENNEDY, JR,**

Defendant.

## OPINION & ORDER

Before the Court is Plaintiff's Motion for Summary Judgment. ECF No. 31. Having considered the relevant facts, applicable law, and relevant docket entries, the Court hereby **ORDERS** that the Motion is **GRANTED** for the reasons below.

## BACKGROUND

This case returns to the Court once again following the cure of jurisdictional defects as ordered by the Fifth Circuit. Previously, this Court ruled that the Exclusion Rule was unlawful. *Baylor All Saints Med. Ctr. v. Becerra*, 745 F. Supp. 3d 464 (N.D. Tex. 2024). But the Fifth Circuit, without ruling on the merits of the case, determined that this Court actually lacked jurisdiction until the claim was funneled through the Medicare channeling scheme and remanded the case to the district court. *Baylor All Saints Med Ctr. v. Kennedy*, 161 F.4th 298 (5th Cir. 2025). As the Parties agree, the administrative process has now run its course, and the merits of this case are now ripe for review.

This case concerns the Medicare and Medicaid payments made by the federal government to Texas hospitals. Since Medicare and Medicaid were established in 1965, federal, state, and local governments have cooperated to provide low- or no-cost healthcare for persons otherwise unable to afford it.[1] One way of doing so is a reimbursement system for hospitals that serve

---

[1] In his memoirs, President Lyndon Johnson provides an excellent account of his administration's work with Congress to enact Medicare and Medicaid,

Medicare beneficiaries. Medicare reimburses hospitals for covered services via the inpatient prospective payment system ("IPPS"), which is distributed by diagnostic related group ("DRG"). Acronyms aside, the regime is simple: DRGs are unique classifications assigned for related diagnoses with a set payment rate. For instance, a certain rate will be more or less appropriate for respiratory infections/inflammations, another for heart failure and shock, and another for kidney and urinary tract infections. The resulting DRG is a guidepost that signals how much Medicare, Medicaid, or insurance should pay for a patient's treatment.

By aggregating anticipated costs by DRG, the IPPS efficiently reimburses hospitals at scale, with payments subjects to myriad adjustments. This case involves an adjustment Congress provided when it amended the Medicare statute in 1986. Designed to help hospitals in underprivileged communities, the 1986 amendment gives an adjustment to Disproportionate Share Hospitals ("DSH")—hospitals that serve a "significantly disproportionate number of low-income patients." 42 U.S.C. § 1395ww(d)(5)(F)(i)(I). To provide indigent healthcare for disadvantaged populations, DSHs confront higher costs and generate lower revenues. Enter the adjustment—an offset DSHs receive to lessen this financial burden. Whether a hospital qualifies as a DSH (and the corresponding adjustment it receives) is determined by calculating the hospital's DSH percentage, which functions as a "proxy for the number of low-income patients the hospital services." This figure determines eligibility for an array of programs, two of which are relevant here. That is, first, the DSH adjustment, and second, the 340B Drug Discount programs for DSHs. Under the 340B Programs, qualifying DSHs receive a substantial rebate on many drugs, enabling them to use such drugs at or below a statutory price ceiling. *See generally* 42 U.S.C. § 256b.

---

endeavoring to provide basic healthcare to those most in need. *See* LYNDON BAINES JOHNSON, THE VANTAGE POINT: PERSPECTIVES OF THE PRESIDENCY, 1963–1969, 212–21 (1971). Unfortunately, such instances of effective cooperation are largely a thing of the past. Over the last two decades, the executive and legislative branches seem to cooperate less and less, even on simple things that almost everyone agrees are in the best interests of the American people. As here, in today's America, most "laws" are created through administrative fiat, rather than the actual legislative process envisioned by the Founders.

The DSH percentage is the sum of two fractions. At issue here is the "Medicaid fractions," a moniker eponymous for the fraction's statutory genesis. As enunciated in the Medicaid statute, the Medicaid Fraction is:

> The fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consists of patients who (for such days) were eligible for medical assistance under a State plan approved under subchapter XIX [Medicaid], but who were not entitled to benefits under part A of this subchapter, and the denominator of which is the total number of the hospital's patient days for such period.

42 U.S.C. §1395ww(d)(5)(F)(vi)(II). In other words, the Medicaid Fraction is the ratio of patient days attributable to Medicaid-eligible patients, expressed as a function of treatment days attributable to all inpatients at the hospital.

Congress gave the Medicaid Fraction a facelift in the 2005 Deficit Reduction Act, which adds the following proviso to the calculus:

> In determining [the Medicaid fraction,] the number of the hospital's patient days for such period which consists of patients who (for such days) were eligible for medical assistance under a State plan approved under [Medicaid], the Secretary may, to the extent and for the period the Secretary determines appropriate, include patient days of patients not so eligible who are regarded as such because they receive benefits under a demonstration project approved under title XI.

42 U.S.C. §1395ww(d)(5)(F)(vi)(II). Under this revamped provision, "the Medicaid fraction's numerator includes both (1) days a hospital treated patients who were Medicaid-eligible, and (2) days a hospital treated patients who are regarded as Medicaid-eligible because they received *demonstration project* benefits." *Forrest Gen. Hosp. v. Azar*, 926 F.3d 221, 224 (5th Cir. 2019) (emphasis added).

Demonstration projects function through State Plans made in conjunction with the federal government. To obtain federal funds under

3

Medicaid, states submit a "State Plan" for approval by the Centers for Medicare & Medicaid Services ("CMS"). The State Plan lays out who will receive medical assistance, what kind of assistance they'll receive, and other matters of import. If CMS approves the State Plan, that state gets access to federal Medicaid funding. But, Title XI § 1115 of the Social Security Act authorizes Defendant Kennedy, as Secretary of Health and Human Services ("HHS"), to authorize "demonstration projects"—pilot programs that "assist in promoting the objectives of [Medicaid]." 42 U.S.C. § 1315(a). With Defendant Kennedy's approval, standard Medicaid requirements are waived for demonstration projects. "In other words, these § 1115 waivers are Congress's green light to the Secretary to relax the usual state-plan-approval requirements." *Forrest*, 926 F.3d at 224.

Much hinges on Kennedy's approval for demonstration projects: "If the Secretary approves a demonstration project, then [courts] regard patient days involving patients who 'receive benefits under a demonstration project' as if they were patient days attributable to Medicaid-eligible patients (which means those days also go into the numerator)." *Id.* at 228. And the bigger the numerator, the greater the proportion of patient days factored into the DSH percentage, resulting in more money for qualifying DSHs. Why does this matter? Because in 2012, the Supreme Court made Medicaid expansion optional for states. *See Nat. Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012). Since then, many states (like Texas) have declined to expand the program, opting to chart their own path and rely upon § 1115 waivers to access federal funding.

That's why it was a big deal when the Texas Healthcare Transformation and Quality Improvement Program ("THTQIP") got § 1115 approval. Under THTQIP, the Texas Medicaid program provides direct payments to hospitals from Uncompensated Care Cost ("UCC") pools as renumeration for indigent care services. In simple terms, a UCC pool is a bucket of funds reserved for hospitals to cover unmonetized services rendered. If for some reason the bills don't get paid, hospitals can access funds from a UCC pool to help bridge the gap. The Secretary approved this plan in January 2021. This approval was big news for Texas hospitals. With approval for THTQIP programming, patients could have

their medical costs offset by UCC pool payments and the Hospitals could include those patients in calculating their respective Medicaid Fractions.

Then HHS decided to shake things up. In August 2023, HHS adopted a new regulation that excludes patients receiving UCC pool benefits from the Medicaid Fraction numerator. In relevant part, the new regulation provides that:

> Patients whose health care costs, including inpatient hospital services costs, for a given day are claimed for payment by a provider from an uncompensated, undercompensated, or other type of funding pool authorized under section 1115(A) of the Act to fund providers' uncompensated care costs are not regarded as eligible for Medicaid for purposes of [42 C.F.R. § 412.106(b)(4)(ii)] on that day and the days of such patients may not be included in [the Medicaid Fraction].

88 Fed. Reg. 58, 640, 59,332 (Aug. 29, 2023) promulgated at 42 C.F.R. § 412.106(b)(4)(iii) (hereinafter "the Exclusion Rule").

Plaintiff claims the Exclusion Rule conflicts with the clear wording of 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) and the Fifth Circuit's binding interpretation of the same in *Forrest Gen. Hosp. v. Azar*, 926 F.3d 221 (5th Cir. 2019). Plaintiff and other hospitals originally took their concerns to the appropriate administrative body, the Provider Reimbursement Review Board ("PRRB"). The PRRB reviewed and sua sponte dismissed their challenge on jurisdictional grounds, rendering no decision on the underlying legal dispute. Those Plaintiffs then sought judicial review in this Court on May 10, 2024, seeking declaratory and injunctive relief. The Court then advanced the Motion for Preliminary Injunction to the merits and ruled on said Motion in Plaintiffs' favor. *Baylor All Saints Medical Ctr. v. Becerra*, 745 F. Supp. 3d 464 (N.D. Tex. 2024). There, this Court held that the Fifth Circuit had already rejected HHS' interpretation of the Exclusion Rule, warranting declaratory relief in the Hospitals' favor and accordingly granted equitable relief in the form of vacatur.

Following an appeal, the Fifth Circuit clarified that the Plaintiff Hospitals needed to follow Medicare's channeling scheme to present their

5

claim to the agency by submitting relevant cost reports to the agency before this Court had jurisdiction. *Baylor All Saints Med. Ctr. v. Kennedy*, 161 F.4th 298 (5th Cir. 2025). Those jurisdictional requirements are now fulfilled—Plaintiff here submitted its cost report in 2024 and the agency Board found that it had jurisdiction over Plaintiff's appeal of its failure to receive its desired reimbursement. The Board then granted its request for judicial review.

Accordingly, the Court returns to the merits of Plaintiff's claim once again.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact" and "is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is "genuine" if the evidence presented would allow a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 242–43 (1986). And a fact is "material" when it might affect the outcome of a case. *Hobby Distillers Ass'n v. Alcohol and Tobacco Tax and Trade Bureau*, 740 F. Supp. 3d 509, 517 (N.D. Tex. 2024). When determining whether summary judgment is appropriate, the Court views the evidence in the light most favorable to the nonmovant. *First Am. Title Ins. Co. v. Cont'l Cas. Co.*, 709 F.3d 1170, 1173 (5th Cir. 2013). In conducting its evaluation, the Court may rely on any admissible evidence of record but need only consider materials cited by the parties. FED. R. CIV. P. 56(c)(1)–(3).

## ANALYSIS

Plaintiff argues that the Exclusion Rule is unlawful, seeking declaratory and injunctive relief. It also argues that the Secretary's rationale in excluding the relevant patient days was arbitrary and capricious in violation of the APA.

### A. The Exclusion Rule is unlawful.

As before, this case remains simple on the merits. While HHS continues to say otherwise, a recent spotted dog decision by the Fifth Circuit directly controls the Court's inquiry—and clarifies that the

Exclusion Rule contradicts the statute's plain text. *See Forrest*, 926 F.3d at 228–29. Statutorily, the Medicaid Fraction includes: "patients who . . . were eligible for medical assistance under a State plan approved under [Medicaid]." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). And since 2005, the Secretary has been empowered to authorize demonstration projects, the beneficiaries of which are to be included in the Medicaid Fraction's numerator:

> In determining [the Medicaid fraction,] the number of the hospital's patient days for such period which consists of patients who (for such days) were eligible for medical assistance under a State plan approved under [Medicaid], ***the Secretary may, to the extent and for the period the Secretary determines appropriate, include patient days of patients not so eligible but who are regarded as such because they receive benefits under a demonstration project approved under Title XI.***

Deficit Reduction Act of 2005, Pub. L. No. 109–171, §5002(a), 120 Stat. 4 (2006) (codified at 42 U.S.C. §1395ww(d)(5)(F)(vi)(II)) (emphasis added). And the Fifth Circuit has already rejected the arguments HHS raises here, clarifying that the numerator includes hospital days of Medicaid-eligible patients *and* those treated as such pursuant to a § 1115 waiver. *See Forrest*, 926 F.3d at 228.

As noted, the Secretary approved UCC pool payments under THTQIP. But the Exclusion Rule swept this approval under the rug, stating the beneficiaries of such pool payments "are not regarded as eligible for Medicaid for purposes of [the Medicaid Fraction] . . . and the days of such patients may not be included in this [] computation." 42 C.F.R. § 412.106(b)(4)(iii). Fifth Circuit precedent roundly rejects this position. *Forrest*, 926 F.3d at 228. Indeed, the clarity of *Forrest* obviates the need for additionally analysis vis-à-vis HHS's already-rejected arguments here.

In *Forrest*, the Fifth Circuit addressed a Mississippi plan, which, like Texas's plan, includes patients not eligible for Medicaid. *See Forrest*, 926 F.3d at 226. Like the Texas Plan, Mississippi's was also approved by the Secretary. *Id*. Promulgating a new rule does not change the statutory text

7

or the Fifth Circuit's interpretation, especially when "the governing statutory text is clear." *Id.* at 229. Section 1395ww(d)(5)(F)(vi)(II) requires HHS to "include days that a hospital treated patients eligible under a Medicaid-approved state plan in the Medicaid fraction's numerator." *Id.* The only other court to address this question, the D.C. Circuit, agrees. *Bethesda Health, Inc. v. Azar*, 389 F. Supp. 3d 32, 43–44 (D.D.C. 2019), *aff'd*, 980 F.3d 121 (D.C. Cir. 2020). This Court need not entertain further what the Fifth Circuit has already addressed. *See Forrest*, 926 F.3d at 226.

As in *Forrest,* HHS again argues the Secretary has discretion to decide which days go in the calculation. But the Fifth Circuit addressed this point in *Forrest*, noting "[t]he Secretary *may* exercise discretion, and the Secretary did exercise discretion when he authorized the [state plan]." *Forrest*, 926 F.3d at 233 (emphasis added). Thus, the Secretary exercised his discretion when he approved Texas's plan. "No take-backs." *Id.*

The Secretary tries to exploit the Supreme Court's recent decision in *Advocate Christ Medical Center v. Kennedy*, 605 U.S. 1 (2025) to say that the specific benefits must be directly set forth in the statute to qualify for the DSH percentage. In that case, in reference to the DSH percentage that concerned Medicare (as distinct from Medicaid) the Court ruled that the benefits a patient needed to be eligible had to be social security income (or cash) benefits as cited by the statute—not "indirect" benefits "housed elsewhere." *Id.* at 8–14. Somehow the Secretary takes that holding to mean the benefits applicable here must be spelled out by the agency in the demonstration project. That would be an extra-textual reading, a reading that by the Secretary's own logic would make the benefit "indirect" because it would be listed in the agreement between the State and the federal government—not in the Statute. Regardless, the key difference is that the Medicare statute qualified the word benefit with "income," and here there is no qualifier whatsoever. Thus, any general form of medical assistance still qualifies as an applicable benefit under the statute. The Supreme Court did nothing to alter the Fifth Circuit's analysis of the § 1395 statute.

To be fair, the Court is not unsympathetic to HHS's statutory interpretation. It's far from an implausible interpretation to read the Deficit Act's proviso as warranting discretion in the eligibility

determination itself, as well as in the authorization of a state's plan. *See, e.g.*, 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (stating "the Secretary *may* to the extent and for the period the Secretary *determines appropriate*, include patient days of patients not so eligible but who are regarded as such because they receive benefits under a demonstration project") (emphasis added). But, this Court will not resurrect an argument scotched by the Fifth Circuit. Accordingly, the Court **DECLARES** 42 C.F.R. §41e2.106(b)(4)(iii) to be **unlawful** under the statute. *See* 5 U.S.C. §706(2)(A) (empowering the court to deem unlawful any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). Because the regulation is unlawful under the statute, the Court need not visit argumentation regarding whether the Secretary's process in adopting the regulation was arbitrary and capricious in violation of the APA.

Having granted declaratory relief, the Court now turns to Plaintiff's additional requests for equitable remedies.

## B. Vacatur is appropriate but an injunction is not appropriate.

Plaintiff also asks the Court to vacate the Exclusion Rule and enjoin its enforcement.

As for the injunction, it "is not a remedy which issues as of course." *Harrisonville v. W.S. Dickey Clay Mfg. Co.*, 289 U.S. 334, 337–38 (1933). Indeed, injunctive relief is a "drastic and extraordinary remedy." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). To get an injunction, Plaintiff must show:

> [first], that [they have] suffered an irreparable injury; [second] that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; [third] that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and [fourth] that the public interest would not be disserved by [the injunction].

*eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). And they must "clearly carry[] the burden of persuasion on all [four] elements." *Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.*, 577 F.3d 250, 253 (5th Cir.

9

2009). Plaintiff fails to do so. Specifically, Plaintiff wins on factors two through four, but lose on factor one.

To start with the wins, Plaintiff shows the inadequacy of legal remedies. *See eBay*, 547 U.S. at 391. Because it sues the government, money damages are off the table. *See Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021). That's a win for factor two. And factor three and four "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). As applied to the Parties themselves, the Corut "looks to the relative harm to both parties if the injunction is granted or denied." *Def. Distrib. v. U.S. Dep't of State*, 838 F.3d 451, 460 (5th Cir. 2016). A denied injunction could disqualify Plaintiff from myriad federal benefits by operation of an invalid regulation. A granted injunction meanwhile merely stops HHS from enforcing a single unlawful regulation. That balance clearly favors Plaintiff. *Def. Distrib.*, 838 F.3d at 460.

If the private-interests inquiry favors Plaintiff, the public-interest inquiry does so even more. The Exclusion rule forces Plaintiff to cut costs and limit services for low-income patients in Texas. "Such a consequence would harm the public at large." *Career Colleges & Schs. of Tex. v. United States Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) (holding the public interest favors an injunction because "a failure to stay the Rule would significantly constrain schools' operations and prevent them from devoting resources to educating their students, upgrading the facilities, and constructing new ones."). "But even more fundamentally, the public interest is served when administrative agencies comply with their obligations under the APA." *Carroll Indep. Sch. Dist. v. United States Dep't of Educ.*, No. 4:24-cv-004610-O, 2024 WL 3381901, at *7 (N.D. Tex. July 11, 2024) (O'Connor, J.). There is generally no public interest in the perpetuation of unlawful agency action. *See Wages & White Lion Invs.*, 16 F.4th at 1143.

Indeed, in most cases, the avoidance of improper laws is "the highest public interest at issue." *Def. Distrib.*, 838 F.3d at 460. That interest is implicated here. But it is the penultimate interest for this case given the significant public-health considerations. *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 492 U.S. 14, 19–20 (2020) (noting public health is

10

paramount in injunctive-relief analyses). Yet despite these decisive victories, Plaintiff must "clearly carry[] the burden of persuasion of all elements" to obtain a permanent injunction. *Bluefield Water Ass'n*, 577 F.3d at 253. And Plaintiff fails to do so for the first factor, irreparable harm. *eBay*, 547 U.S. at 391.

Without an irreparable injury, you cannot receive an injunction. *See id.* As noted, Plaintiff can't get damages. That ordinarily indicates a harm is irreparable. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The key word in this consideration is *irreparable*. Mere injuries, however substantial . . . are not enough. The possibility that adequate compensatory or other corrective relief . . . will be available at a later date . . . weighs heavily against a claim of irreparable harm."). But what about "other relief"? *See id.* Plaintiff can return to the administrative process and recover any reimbursements owed to them, negating any claim of irreparable harm. *Baylor All Saints Medical Center v. Becerra*, 745 F. Supp. 3d 464 (N.D. Tex. 2024). Thus, the Court **DENIES** the request for an injunction.

However, the Plaintiff succeeds in its argument for vacatur. In deciding which equitable remedy to use, the Court must always consider the "least severe" equitable remedy to resolve a plaintiff's harm. *See Nuziard*, 2024 WL 965299, at *44–49 (collecting cases); *see generally O'Donnell v. Harris Cnty.*, 892 F.3d 147, 155 (5th Cir. 2018) (noting an equitable remedy must be "narrowly tailored to the injury it is remedying"). While this Court doubts the APA intended to authorize vacatur, *see Nuziard*, 2024 WL 965299, at *41–44, the Fifth Circuit's "ordinary practice is to vacate unlawful agency action." *Data Mkfg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022); *see also Brown v. U.S. Dep't of Educ.*, 640 F. Supp. 3d 644, 667 (N.D. Tex. 2022) (Pittman, J.) (vacated on other grounds). Having considered the briefing and evidence of record, the Court will vacate the agency action here too because the Exclusion Rule is unlawful. *See* 5 U.S.C. § 706 (empowering courts to "set aside" unlawful agency actions). Between alternatives, vacatur is less severe on HHS but still remedies the Plaintiff's harm. *See Texas v. United States*, 40 F.4th 205, 219 (5th Cir. 2022) (citing *Monsanto*, 561 U.S. at 165) ("There are meaningful differences between an

11

injunction, which is a 'drastic and extraordinary remedy,' and vacatur, which is a 'less drastic remedy.'"). And vacatur is considerably less severe here considering the record's inability to support an injunction, warranting endorsement of the Fifth Circuit's standard practice. *See Data Mktg. P'ship*, 45 F.4th at 859.

Plaintiff says vacatur is warranted and the Court agrees, especially considering "vacatur does nothing but re-stablish the status quo absent unlawful agency action." *Texas*, 40 F.4th at 220. As such, "[a]part from the constitutional or statutory basis on which the court invalidated an agency action, vacatur neither compels nor restrains further agency decision-making." *Id*. Accordingly, while this Court's doubts regarding vacatur under the APA are well-known, *see Nuziard*, 2024 WL 965299, at *43–44, the remedy is warranted considering the Exclusion Rule's patent invalidity. *See* 42 C.F.R. § 412.106(b)(4)(iii); *see also Forrest*, 926 F.3d at 221. Because the Fifth Circuit prefers vacatur to remedy unlawful agency actions, *see Data Mktg. P'ship*, 45 F.4th at 859, and because the Exclusion Rule warrants a lesser equitable remedy than an injunction, the Court must **GRANT** Plaintiff's request for vacatur under 5 U.S.C. § 706.

## CONCLUSION

For the foregoing reasons, the Court holds the Exclusion Rule is unlawful. Accordingly, the Court **GRANTS** summary judgment in Plaintiff's favor and **DECLARES** 42 C.F.R. § 412.106(b)(4)(iii) to be unlawful. The agency action being unlawful, the Court hereby **VACATES** 42 C.F.R. § 412.106(b)(4)(iii).

The Court further notes Plaintiff's request for fees and costs. Should Plaintiff intend to pursue an award of fees and/or costs, the Court **ORDERS** them to submit a properly supported motion within **seven days** of the date of this Order.

**SO ORDERED** on this **27th day of July 2026**.

Mark T. Pittman
UNITED STATES DISTRICT JUDGE

12